## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NATIONAL FAIR HOUSING ALLIANCE,
1331 Pennsylvania Ave.
Washington, DC 20004,

RISE ECONOMY,
1300 Clay St., Suite 600
Oakland, CA 94612,

BLDS, LLC,
1201 N. Orange St., Suite 602
Wilmington, DE 19801, and

SOLASAI,
1608 Walnut St., Suite 1108
Philadelphia, PA 19103,

               Plaintiffs,

v.

CONSUMER FINANCIAL PROTECTION
BUREAU,
1700 G St. NW
Washington, DC 20552, and

MARK PAOLETTA,[1] *in his official capacity as Acting Director of the Consumer Financial Protection Bureau*,
1700 G St. NW
Washington, DC 20552,

               Defendants.

Case No. 1:26-cv-01820

AMENDED COMPLAINT FOR
DECLARATORY AND INJUNCTIVE
RELIEF

---

[1] On August 1, 2026, Mark Paoletta succeeded Russell Vought as putative Acting Director of the Consumer Financial Protection Bureau and is automatically substituted for Russell Vought as a defendant. *See* Fed. R. Civ. P. 25(d).

**INTRODUCTION**

1.      This case challenges a Final Rule issued on April 22, 2026, by the Consumer Financial Protection Bureau ("CFPB") to amend Regulation B, 12 C.F.R. Part 1002, the implementing regulation of the Equal Credit Opportunity Act ("ECOA"). *See* Final Rule, Equal Credit Opportunity Act (Regulation B), 91 Fed. Reg. 21620-01 (Apr. 22, 2026) ("Final Rule").

2.      Congress enacted ECOA fifty years ago to eradicate credit discrimination against groups of people, like women and Black Americans, who had systematically been denied access to financial independence and opportunity. The Final Rule upends decades of consistent regulatory implementation of ECOA and dismantles some of the statute's fundamental protections.

3.      The Final Rule contains three categories of changes. First, contrary to fifty years of consistent Congressional, regulatory, and judicial authority, the Final Rule asserts that ECOA does not encompass disparate-impact liability. Disparate impact liability under ECOA—liability for practices that adversely affect people on the basis of their protected class status where those practices are not justified by a legitimate rationale or, if they are justified, less discriminatory alternatives exist—has been critical in addressing unnecessary barriers to credit.

4.      Second, the Final Rule dramatically narrows existing prohibitions against discriminatory actions that would discourage prospective applicants from applying for credit. The Final Rule purports to usurp a court or jury's responsibility to determine whether, when viewed in context, certain facially innocuous statements are in fact code-words or dog-whistles indicating discriminatory intent. In so doing, the Final Rule permits creditors to exclude consumers from applying for credit because of their protected class status, and it effectively immunizes many practices that contribute to the "redlining" of neighborhoods and communities,

i.e., intentionally avoiding lending in communities of color and otherwise discouraging people in those communities from applying for credit.

5.      Third, the Final Rule effectively eliminates for-profit institutions' statutory right to offer Special Purpose Credit Programs ("SPCPs") designed to expand access to credit for groups that face special obstacles accessing credit. It thus eliminates programs that have been proven effective in ensuring equal credit opportunity—ECOA's very purpose.

6.      The Final Rule does not reflect reasoned decision-making or an expert, good-faith effort to implement our nation's foundational credit antidiscrimination statute. Quite the opposite: The Final Rule is a drastic turn, without justification, from the CFPB's (and its Federal Reserve Board predecessor's) longstanding interpretation and enforcement of key ECOA provisions. Indeed, the CFPB acknowledges that the amendments are likely to *increase* credit discrimination, the very thing the statute is designed to prevent.

7.      The Final Rule is arbitrary and capricious by any measure. To start, the CFPB failed to identify any concrete problem with the current regulatory regime. The CFPB relied on conclusory assertions and speculation, not evidence, to justify its dramatic departure from decades of settled ECOA implementation. The CFPB's approach is at odds with the available evidence: As commenters to the proposed rule made clear, public data and research—much of it from the CFPB itself—show that the Final Rule is ill-conceived and likely to harm covered entities and consumers alike.

8.      The CFPB's purported cost-benefit analysis, which is required under the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank Act"), independently renders the Final Rule arbitrary and capricious. The CFPB's asserted benefits rest on unsupported generalizations and assumptions, while the CFPB gives the back of the hand to

the documented costs that the Final Rule will exact on covered entities, consumers, and small businesses. The CFPB's simplistic references to general principles of economic theory, free-floating hypotheses about potential outcomes, and disregard of hard facts are not actual "analysis" and, thus, do not satisfy the requirements of the Dodd-Frank Act.

9.     The CFPB's rulemaking process was also flawed. The CFPB issued the Notice of Proposed Rulemaking ("NPRM") without undertaking an Initial Regulatory Flexibility Analysis and without convening a Small Business Regulatory Enforcement Fairness Act panel, as required by the Small Business Regulatory Enforcement Fairness Act of 1996. The CFPB failed to consult with the appropriate prudential regulators or other federal agencies prior to issuing the NPRM, as required by the Dodd-Frank Act. The NPRM provided just thirty-two days for comments, limiting commenters' ability to compile and provide evidence concerning the rule, and the CFPB refused requests to extend the deadline. While that would have been a needlessly compressed comment period under any circumstance, the thirty-two days here encompassed the Thanksgiving holiday and ran parallel to the comment period that the CFPB set for a simultaneous proposal to overhaul implementation of a separate section of ECOA—a proposal in which Plaintiffs and many other commenters also have a significant interest. The CFPB then failed to conduct a Final Regulatory Flexibility Analysis, and, although the Final Rule *acknowledged* many comments, it failed to *respond* to significant comments or simply asserted it was not persuaded, without giving a reasoned explanation.

10.     The Final Rule suffers from other defects, too. Multiple provisions cannot be squared with the plain text of ECOA, rendering some of the rule changes contrary to law and others outside the scope of the CFPB's rulemaking authority. On top of that, Mr. Vought, who was purporting to serve as Acting Director at the time of the CFPB's rulemaking, did not have

lawful authority to serve as Acting Director of the CFPB and, thus, the CFPB could not issue rules under his purported authority.

11.     The Final Rule is already inflicting concrete harm on Plaintiffs, which include nonprofits and two fair lending consultancies. The consultancy Plaintiffs have lost work as covered entities—financial institutions and other creditors—restructure their operations to respond to the changes to Regulation B, reducing or eliminating their demand for those Plaintiffs' services. For the nonprofit plaintiffs, the Final Rule disrupts and thwarts their core activities, threatening their ability to help people and underserved communities access credit on an equal basis, and inflicting financial harm.

12.     Plaintiffs accordingly seek to vacate the Final Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), as arbitrary, capricious, not in accordance with law, without observance of procedure required by law, and in excess of statutory authority. The Rule should also be vacated because actions directed by Mr. Vought were *ultra vires*.

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because this action arises under the laws of the United States, namely, the APA, 5 U.S.C. §§ 702, 706.

14.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1)(A) because Defendants are officers and agencies of the United States.

**PARTIES**

15.     Plaintiff National Fair Housing Alliance ("NFHA") is a national, nonprofit public service membership organization incorporated under the laws of the Commonwealth of Virginia with its principal place of business in Washington, D.C. NFHA was established in 1988, and its mission is to build inclusive, well-resourced, resilient communities, ensure equal housing opportunities for all people and communities, and end housing discrimination and segregation.

NFHA operates several programs to realize this important mission: housing and community development, education and outreach, responsible AI, member services, public policy and advocacy, compliance and technical assistance, counseling and referral, and enforcement initiatives. NFHA's mission-driven activities include testing, developing, and promoting fairness techniques for less discriminatory algorithmic models; developing non-discriminatory algorithmic systems; providing technical assistance and training to lenders and others regarding compliance with ECOA and its implementing rules; assisting various entities with the development and implementation of SPCPs; increasing sustainable homeownership promotion; improving neighborhood quality; developing policies and governance protocols that advance fair housing and lending opportunities; implementing programs to eliminate discrimination; assisting NHFA's members in expanding fair housing and lending opportunities; and educating the public.

16.     Plaintiff Rise Economy, founded in 1986 as the California Reinvestment Committee, is a nonprofit organization based in San Francisco, California. Rise Economy was founded for the purpose of expanding access to credit, financial services, and investments in low-income communities and communities of color. Its membership comprises more than 300 nonprofit community-based organizations and public agencies, including small business lenders, community development financial institutions, housing counseling agencies, and technical assistance providers that work directly with small businesses and homeowners to ensure equal access to capital.

17.     Plaintiff BLDS, LLC is a private company with offices in the Philadelphia, PA, and Wilmington, DE, areas. BLDS conducts and provides statistical, economic, and quantitative analyses to clients such as financial institutions and other companies, governmental entities, and

others. These analyses are focused on fair lending compliance, including compliance with ECOA and its implementing rules.

18.     Plaintiff SolasAI is a private company based in Philadelphia, PA. SolasAI develops software and provides other services to help financial institutions and other companies detect, explain, and reduce discrimination and bias in credit models and other algorithms, particularly in machine learning models that use artificial intelligence. SolasAI's work is focused on fair lending compliance, including compliance with ECOA and its implementing rules.

19.     On August 1, 2026, Defendant Mark Paoletta succeeded Russell Vought as putative Acting Director of the Consumer Financial Protection Bureau. Mark Paoletta is sued in his official capacity.

20.     Defendant Consumer Financial Protection Bureau is an agency of the United States.

<strong>FACTUAL BACKGROUND</strong>

## I.     STATUTORY BACKGROUND

21.     ECOA is the nation's hallmark civil rights law protecting against credit discrimination. Congress enacted ECOA in 1974 with a stated purpose "to require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all creditworthy customers without regard" to prohibited bases. Equal Credit Opportunity Act of 1974, Pub. L. No. 93-495, § 502, 88 Stat. 1500, 1521 (1974) ("1974 Act").

22.     When it first enacted ECOA in 1974, Congress recognized the need "to make credit available with fairness, impartiality, and without discrimination on the basis of sex or marital status." *Id*.

23.     In 1976, Congress reenacted ECOA and expanded its discrimination prohibitions beyond sex and marital status to bar discrimination:

7

- on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);
- because all or part of the applicant's income derives from any public assistance program; or
- because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

Equal Credit Opportunity Act Amendments of 1976, Pub. L. No. 94-239, § 701, 90 Stat. 251, 251 (1976) (codified as 15 U.S.C. § 1691) ("1976 Act"). In doing so, the Senate emphasized that "it must be established as clear national policy that no credit applicant shall be denied the credit he or she needs and wants on the basis of characteristics that have nothing to do with his or her creditworthiness." S. Rep. No. 94-589, at 3 (1976).

24.     Together with these prohibitions, the 1976 Act specified certain activities that *do not* constitute discrimination under ECOA. In particular:

It is not a violation of this section for a creditor to refuse to extend credit offered pursuant to—

(1) any credit assistance program expressly authorized by law for an economically disadvantaged class of persons;

(2) any credit assistance program administered by a nonprofit organization for its members or an economically disadvantaged class of persons; or

(3) any special purpose credit program offered by a profit-making organization to meet special social needs which meets standards prescribed in regulations by the [Bureau];

if such refusal is required by or made pursuant to such program.

90 Stat. at 251–52.

25.     Congress included these provisions permitting Special Purpose Credit Programs to ensure that ECOA would not restrict creditors' ability to offer certain safe credit programs that meet special needs, such as historic and ongoing challenges in access to credit. Through ECOA's provision for SPCPs, Congress intended to ensure that the statute would enable the continuation

of programs designed to fill protected class-based credit gaps—for example, credit programs for minority-owned businesses.

26.     The 1974 and 1976 Acts required the Federal Reserve Board to "prescribe regulations to carry out the purposes of [ECOA]" that "are necessary or proper to effectuate the purposes of [ECOA], to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." 15 U.S.C. §1691b.

27.     Starting in 1975, the Board promulgated what is known as "Regulation B" to implement ECOA. In doing so, the Board promulgated rules recognizing the availability of disparate impact under ECOA, providing protections against discriminatory actions that would discourage prospective applicants, and articulating reasonable standards for creditors to establish SPCPs. Those rules remained consistent for decades, including after the Dodd-Frank Act transferred ECOA rule-writing responsibilities from the Board to the newly created CFPB.[2]

28.     Although Congress amended ECOA several times since its initial 1974 and 1976 enactments, it has not substantially altered any of the ECOA provisions at issue.

29.     For instance, in 1995 and 1997, Congress rejected bills that would have restricted ECOA liability to intentional discrimination only. Each time, the proposed legislation would have amended the statute to prohibit the use of "statistical data which tends to show that the credit decisions of a creditor have had a disparate impact on various classes of credit applicants . . . without additional evidence that" the creditor had "the purpose or intent to engage in an activity in violation" of ECOA. Credit Opportunity Amendments Act of 1995, H.R. 1699, 104th

---

[2] *See* 12 U.S.C. § 5581. In 2011, the CFPB republished Regulation B with only technical and conforming changes. 76 Fed. Reg. 79442-01 (Dec. 21, 2011).

Cong. (1995); Credit Opportunity Amendments Act of 1997, H.R. 229, 105th Cong. (1997). These proposed restrictions were unsuccessful.

## II.    REGULATION B: DISPARATE IMPACT LIABILITY

### A.    *For Fifty Years, Regulation B Recognized that ECOA Encompasses Disparate Impact Liability.*

30.    In 1977, the Board finalized regulations to implement the 1976 Act, after receiving, considering, and responding to public comments. Regarding disparate impact liability, the regulation emphasized that ECOA's legislative history "indicates that the Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness [under ECOA]." Amendments to Regulation B to Implement the 1976 Amendments to the Equal Credit Opportunity Act, 42 Fed. Reg. 1242, 1255 (Jan. 6, 1977). That language remained in Regulation B from 1977 until the CFPB published the Final Rule.

31.    In 1985, when the Board republished Regulation B and accompanying commentary incorporating existing Board interpretations, the Board restated with "[n]o substantive change" the same indication of congressional intent with regard to disparate impact. And it included in Regulation B's new Official Staff Commentary, codified in the Code of Federal Regulations, the burdens of proof for disparate impact claims first developed under Title VII and applicable under ECOA. *See* Revision of Regulation B; Official Staff Commentary, 50 Fed. Reg. 10890-01, 10912 (Mar. 18, 1985), *codified at* 12 C.F.R. pt. 1002, Supp. I, comment 6(a)-2. These provisions also remained unchanged until the publication of the Final Rule.

32.    In 1994, the Department of Justice ("DOJ"), together with the Department of Housing and Urban Development, the Department of the Treasury, the Board, the Federal

Deposit Insurance Corporation, the Federal Housing Finance Board, the Federal Trade Commission, and the National Credit Union Administration, uniformly acknowledged that disparate impact claims are cognizable under ECOA, *see* Policy Statement on Discrimination in Housing, 59 Fed. Reg. 18266, 18269 (Apr. 15, 1994), an understanding that, until the Final Rule, had remained unchanged in the federal government.

**B.    *The Final Rule Does an About-Face on Disparate Impact Liability.***

33.    The Final Rule states that ECOA does not encompass disparate-impact liability. Specifically, the Final Rule categorically states that ECOA "does not provide that the 'effects test' applies for determining whether there is discrimination in violation of [ECOA]," 91 Fed. Reg. at 21668 (12 C.F.R. § 1002.6(a)), and that "[ECOA] does not provide for the prohibition of practices that are facially neutral as to prohibited bases, except to the extent that facially neutral criteria function as proxies for protected characteristics designed or applied with the intention of advantaging or disadvantaging individuals based on protected characteristics." *Id.* at 21670 (12 C.F.R. pt. 1002, Supp. I, comment 6(a)-2).

34.    The Final Rule's assertion that ECOA does not provide for disparate-impact liability is contradicted by the plain language of the statute, which is not limited to intentional discrimination. ECOA prohibits discrimination "on the basis of" certain protected classes. 15 U.S.C. § 1691(a). "On the basis of" is the same effects-based language the Supreme Court used in *Griggs* when it determined that Title VII requires "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously *to discriminate on the basis of* racial or other impermissible classification." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (emphasis added). Congress expressly modeled ECOA's discrimination prohibition with *Griggs*'s approach to antidiscrimination law in mind. S. Rep. No. 94-589, at 4 (citing *Griggs*).

11

35. The Final Rule is also fundamentally at odds with ECOA's purpose because elimination of disparate impact liability will result in more credit discrimination. Congress had good reason for including language embracing disparate impact in ECOA's operative clause: in practice, ensuring equal access to credit has always required the elimination of unnecessary and discriminatory credit barriers. Disparate impact compliance remains critical today to ensure equality of credit opportunity in a rapidly expanding world of automated models and targeted digital advertising that decide who gets credit offers, which applicants are approved, and the price each pays for credit. Without disparate impact liability, discriminatory outcomes are likely to arise from a data modeler's use of information in predicting outcomes that can "bake in" prior discrimination and disparities.

36. The Final Rule primarily justifies its departure from the previously uniform consensus that ECOA encompasses disparate impact by insisting that "the best reading" of the statutory text is that "ECOA does not authorize disparate-impact liability." 91 Fed. Reg. at 21630, 21634; *see also, e.g.*, 91 Fed. Reg. at 21634 ("The Bureau has determined that the best interpretation of ECOA is that it does not authorize disparate-impact claims."). Based on this superficial and erroneous analysis of the text, the CFPB determined that it need not weigh all the other factors normally considered in statutory construction, such as statutory purpose. *Id.* ("[T]he Bureau has determined that, in light of the statutory language, it is not necessary to consider other factors, including the statutory purpose of ECOA.").

37. Commenters disputed this textual argument, pointing out that there is effects-based language in ECOA. Commenters also pointed out how reading ECOA to encompass disparate impact makes sense in the context of other parts of the statute and when comparing

12

ECOA's text to other antidiscrimination laws. The CFPB dismissed these comments without an adequate explanation or meaningful consideration.

38.     The Final Rule also fails to rebut or even grapple with comments observing that "the statutory purpose, the legislative history, and longstanding judicial and agency interpretations all support the conclusion that ECOA authorizes disparate-impact liability." *Id.* Instead, the Final Rule merely repeats its "determin[ation] that the best reading is that ECOA does not authorize disparate-impact liability." *Id.*

39.     Multiple commenters also noted that Congress "effectively ratified judicial interpretations that ECOA authorizes disparate-impact liability" when it did not eliminate disparate impact as part of other amendments to the statute. *Id.* at 21635. The commenters noted that the Supreme Court endorsed this type of ratification when examining the FHA in *Inclusive Communities*. *Id.* Yet the Final Rule again fails to meaningfully address these arguments or legal authority and circles back to the tautology "that the statutory language should be the primary basis for interpreting the statute." *Id.*

40.     The Final Rule similarly fails to provide an answer to comments that pointed out that, prior to ECOA's enactment, Congress deleted from the draft ECOA legislation language that would have signaled an intentional discrimination limitation, and that, after enactment, Congress twice rejected attempts to narrow ECOA's reach to intentional discrimination. *Id*. at 21627.

41.     The CFPB gave no weight to interpretative agencies' uniform application of ECOA, stretching back to the 1976 Act, because prior agency interpretations cited to legislative history rather than relying strictly on statutory text. But this position, too, ignores that statutory construction generally gives significant weight to fifty years of settled agency interpretation. *Id.* at 21634.

42.     The Final Rule claims that reading disparate-impact liability out of the statute is consistent with ECOA's purpose by speculating that the prospect of disparate-impact liability "may" or "could" deter creditors from adopting policies that "may generally expand access to credit . . . because of concerns about potential disparate-impact liability." *Id.* at 21635. But the CFPB identified no examples of this hypothetical deterrence or those hypothetical policies. And the CFPB ignored comments, which included statements by financial services companies, indicating that, in fact, disparate impact liability promotes a "pro-innovation framework for preventing discrimination" and that "has the potential to increase financial inclusion and lower prices."[3]

43.     The CFPB also attempts to justify the Final Rule by stating that it "remains concerned that disparate-impact liability raises constitutional concerns to the extent it requires creditors to engage in balancing of race and other constitutionally suspect factors in order to minimize the risk of disparate-impact liability." 91 Fed. Reg. at 21636. According to the CFPB, "[d]isparate-impact liability encourages and, in some cases, may require covered entities to engage in the intentional use of balancing to eliminate disparate outcomes by treating individuals based on constitutionally implicated characteristics." *Id.*

44.     The CFPB offers no examples of racial balancing or any other sort of harm caused by disparate impact compliance over the five decades that disparate impact has been part of ECOA and thus has not substantiated these purported concerns. Commenters pointed out how disparate impact analysis, as it actually is used, does not encourage or require any such racial balancing, including longstanding examples of which the CFPB from its historical experience

---

[3] Comment Letter from The Innovation Council on ECOA Proposed Rule at 1 (Dec. 15, 2025). Members of The Innovation Council include Block, Chime, Intuit, Plaid, and Upstart, among others. *Id.* at 1 n.1.

should be aware.[4] Commenters provided specific examples of changes made as a result of disparate-impact concerns, including polices related to how creditors treat taxable income versus non-taxable income and polices related to how creditors treat applicants with criminal histories that raise no constitutional concerns.[5] The CFPB ignored these comments.

45.    The CFPB also ignored comments explaining that its speculation about discriminatory effects flowing from disparate impact liability is baseless and contrary to Supreme Court precedent. *See Inclusive Communities*, 576 U.S. 519, 540 (2015) (explaining that "disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions").

46.    The CFPB's assertions also reveal an elementary misunderstanding of how disparate impact compliance currently operates to remove arbitrary or unnecessary credit barriers for *all* borrowers rather than benefiting some and not others. As commenters explained, particularly with respect to ECOA compliance, credit is not a zero-sum game in which one creditworthy applicant needs to be denied to approve another creditworthy applicant. Disparate impact liability is triggered by policies and practices that disproportionately create unjustified barriers to credit for protected groups. But in removing those barriers (while still satisfying a creditor's business needs), *all* borrowers benefit from greater access to credit, without disadvantaging anyone.

47.    Industry comments also reflect the troubling prospect that the Final Rule will chill lenders from voluntarily identifying and mitigating policies with disparate impacts because

---

[4] Comment Letter from National Fair Housing Alliance on ECOA Proposed Rule at 17–18 (Dec. 15, 2025) (hereinafter "NFHA Comment").

[5] *Id.*

they fear the CFPB would view any such effort as unlawful disparate treatment. The CFPB did not appropriately consider or address the impact of this chilling effect in the Final Rule.[6]

48.     The Final Rule does not dispute the extensive evidence presented by commenters of the many ways in which disparate impact compliance has advanced the purposes of the statute by eliminating unnecessary credit barriers, benefiting consumers and businesses, and expanding markets for creditors.

49.     The Final Rule's only response is to state that "the Bureau concludes that the need to align Regulation B with ECOA's statutory language is paramount and that any reliance interests in the Regulation B interpretation of ECOA-impact claims are insufficient compared with the importance of conforming Regulation B to the statutory language." 91 Fed. Reg. at 21636.

50.     The Final Rule also notes that "consumers will remain protected under ECOA from disparate treatment," *id.*, but this response fails to address substantial and distinct reliance on ECOA's prohibition on practices that have a *disparate impact*. The CFPB posits that "[creditors] will have greater flexibility to adopt facially neutral policies and procedures," *id.*, but it does not explain why creditors' ability to adopt "facially neutral policies and procedures" that in practice discriminate against protected classes would serve the core purpose of ECOA and the interests of the consumers and businesses that the statute is designed to protect.

---

[6] *See* Comment Letter from Consumer Bankers Association on ECOA Proposed Rule at 4 (Dec. 15, 2025); Comment Letter from U.S. Chamber of Commerce on ECOA Proposed Rule at 6 (Dec. 15, 2025).

## III.    REGULATION B: DISCOURAGEMENT OF PROSPECTIVE APPLICANTS

### A.  *For Fifty Years, Regulation B Stated that ECOA Prohibits Discouragement.*

51.    Since the Federal Reserve Board first promulgated Regulation B in 1975, the regulation has implemented ECOA's anti-discrimination mandate by prohibiting both outright discrimination against applicants for credit, and discriminatory discouragement of prospective applicants for credit. 40 Fed. Reg. 49298, 49307 (Oct. 22, 1975). The Board explained that Regulation B's discouragement provisions are "necessary to protect applicants against discriminatory acts occurring before an application is initiated." *Id.* at 49299. Two years later, after passage of the 1976 Act, the Board extended Regulation B's discouragement protections to all of the 1976 Act's prohibited bases. 42 Fed. Reg. at 1254.

52.    Stretching as far back as 1978, the Board recognized the dangers of acts and practices that would discourage prospective applicants, such as discriminatorily selective advertising. The Board explained that it would be unlawful, "[f]or example, if a creditor advertises only for deposits in minority areas but directs loan advertising only to [W]hite neighborhoods"—a violation that would require the creditor to remediate by, among other things, "extend[ing] similar loan advertising to the minority areas."[7] Until the Final Rule was enacted, first the Board and later the CFPB recognized that barring selective advertising and other discriminatory discouragement is an essential part of ensuring equal access to credit across communities.

53.    Specifically, Regulation B prohibited "oral or written statement[s], in advertising or otherwise . . . that would discourage on a prohibited basis a reasonable person from making or

---

[7] Federal Reserve System, OCC, FDIC, FHLBB, NCUA, Equal Credit Opportunity Joint Notice of Proposed Enforcement Guidelines, 43 Fed. Reg. 29256, 29257 (July 6, 1978).

pursuing an application." 12 C.F.R. § 1002.4(b). In the 1985 Official Staff Commentary codifying existing Board interpretations, the Board confirmed that "[i]n keeping with the purpose of the [A]ct—to promote the availability of credit on a nondiscriminatory basis—[§ 1002.4(b)] covers acts or practices directed at prospective applicants." Equal Credit Opportunity; Revision of Regulation B; Official Staff Commentary, 50 Fed. Reg. 48050 (Nov. 20, 1985) *codified at* 12 C.F.R. pt. 1002, Supp. I, comment 4(b)-1.

54.    The Official Staff Commentary provided examples of practices prohibited under § 1002.4(b), including "[the] use of words, symbols, models or other forms of communication in advertising that express, imply or suggest a discriminatory preference or a policy of exclusion in violation of the Act." *Id.*, 12 C.F.R. pt. 1002, Supp. I, Paragraph 4(b)-1.ii.

55.    In 2011, the CFPB republished Regulation B without material change to the discouragement prohibition. 12 C.F.R. § 1002.4(b). These provisions thus stood uninterrupted for almost fifty years.

56.    Without these longstanding regulatory provisions, lenders could circumvent ECOA's protections by engaging in acts and practices to discourage people from applying for credit in the first place. Accordingly, these provisions, which are consistent with "the text of the ECOA as a whole," are a core method by which Regulation B implemented "the strong congressional direction that [the CFPB and DOJ] prevent 'circumvention and evasion,'" of ECOA. *See CFPB v. Townstone Financial, Inc.*, 107 F.4th 768, 776 (7th Cir. 2024).

**B.    *The Final Rule Drastically Narrows the Scope of Unlawful Discouragement.***

57.    The Final Rule substantially narrows the definition of prohibited discouragement in multiple respects. First, the Final Rule narrows what constitutes discouragement from a variety of potential "acts or practices" to only "spoken or written words, or visual images," 91 Fed. Reg. at 21668 (modifying 12 C.F.R. § 1002.4(b)). Second, the Final Rule narrows

discouragement from something that "would discourage on a prohibited basis a reasonable person from making or pursuing an application" to something the creditor "knows or should know would cause a reasonable person to believe that the creditor would deny their credit application, or would grant it on less favorable terms, because of" the applicant or prospective applicant's prohibited basis characteristics. *Id.* (modifying 12 C.F.R. § 1002.4(b) and adding Paragraph 4(b)-1).

58.    In addition, the Final Rule announces that encouraging only one group of consumers, and not other groups, cannot constitute discouragement. *Id*. at 21669 (modifying 12 C.F.R. pt. 1002, Supp. I, comment 4(b)-1).

59.    Finally, the Final Rule, through new explanatory comments to Regulation B, eliminates as a potential form of unlawful discouragement all (a) "[s]tatements in support of local law enforcement"; (b) "[s]tatements recommending that, before buying a home in a particular neighborhood, consumers investigate, for example, the neighborhood's schools, its proximity to grocery stores, and its crime statistics"; and (c) "[s]tatements encouraging consumers to seek out resources to develop their financial literacy." *Id*. at 21669–70 (modifying 12 C.F.R. § 1002.4(b), and adding 12 C.F.R. pt. 1002, Supp. I, comment 4(b)-1.ii.B, C, D).

60.    The CFPB's changes are not the result of reasoned expert agency decision-making. Rather, in a remarkable abdication of agency responsibility, the CFPB acknowledges that the Final Rule fosters the very circumvention and evasion of ECOA that Congress directed the CFPB to prevent: "Certain groups of consumers may be excluded from advertising campaigns or lenders may choose to engage less with certain groups of consumers." *Id*. at 21644. Put differently, the CFPB embraces that the Final Rule would no longer prohibit creditors from intentionally and explicitly excluding consumers from credit advertising on the

19

basis of their race, national origin, sex, age, or other protected characteristics. The CFPB does not explain why such conduct would not constitute an evasion of ECOA, despite commenters raising this concern.

61.     To support its profound revisions to Regulation B's discouragement provisions, the CFPB musters only general concern that Regulation B had been interpreted too broadly such that it "had an unnecessarily chilling effect on creditors' business practices and exercise of their rights to speak about matters of public interest." *Id*.

62.     The CFPB proffered no factual support, data, evidence, or even hypotheticals for these sweeping statements, nor any information suggesting that any changed facts or circumstances support this departure from its longstanding position on discouragement.

63.     By contrast, extensive data and studies (including the CFPB's own) in the administrative record show that pre-application discouragement is often effectuated through the "acts or practices" that Regulation B previously prohibited, requires comparison to the level of encouragement and assistance received by other groups, and is highly dependent on context.[8]

64.     For example, the Final Rule drastically restricts Regulation B's ability to prevent "redlining," which is a form of discrimination whereby creditors intentionally avoid lending in communities of color.[9] As commenters explained, redlining is largely carried out through acts and practices that discourage receipt of applications from communities of color. Accordingly, for decades, the DOJ, the CFPB, and other federal financial regulators that enforce ECOA have relied on circumstantial and comparative evidence of discriminatory intent—evidence such as bank service areas that exclude communities of color; refusals to advertise or locate branches or

---

[8] *See* NFHA Comment, *supra* note 3, at 33–37, 39–46.

[9] *Id.* at 33–36.

loan officers in communities of color; and significant disparities in receipt of applications and originations in minority areas, particularly as compared to peer lenders, revealing that efforts to discourage prospective applicants from those areas were successful.[10] Yet, the Final Rule narrows the definition of discouragement to no longer include these very acts and practices, shielding "decisions about where to locate branch offices, where to advertise, or where to engage with the community through open houses or similar events . . . even if they had some communicative effect that some consumers could arguably find discouraging." 91 Fed. Reg. at 21645. None of these acts and practices that would discourage applications from certain communities would violate the Final Rule, even if taken with discriminatory intent.

65. The CFPB's own investigations and enforcement actions up through January 2025 show that discriminatory redlining is still pervasive, as are the resulting stark disparities in credit access, homeownership, and wealth across racial lines.

66. The Final Rule does not dispute these ongoing risks of redlining, rebut the evidence connecting it to the previously prohibited discouragement practices, or provide any explanation of why these risks and harms do not merit maintaining the existing definition and interpretation of discouragement. Instead, the CFPB says only that the Final Rule would not permit redlining because "the Bureau is not eliminating the prohibition against discouragement of applicants and prospective applicants. Preapplication discrimination remains addressable under Regulation B and other discriminatory conduct remains addressable under ECOA's

---

[10] *Id*. at 34 (citing Office of the Comptroller of the Currency, Federal Deposit Insurance Corporation, Federal Deposit Insurance Corporation, Federal Reserve Board, Office of Thrift Supervision, National Credit Union Administration, Interagency Fair Lending Examination Procedures (Aug. 2009)).

antidiscrimination mandate." *Id*. But stating *when* ECOA and Regulation B coverage kick in does not address concerns about *what* conduct lies within that coverage.

67.     The CFPB relies solely on its "judgment" to conclude that the provision should be narrowed. *Id.* at 21643. The CFPB then lists acts that "may have some communicative effect"—such as determining where to advertise—and concludes that coverage of these acts and practices is "overly broad." Its reasoning for removing these acts and practices from coverage, however, is simply that such acts and practices "do not constitute 'oral or written statements.'" *Id*. at 21643–44. That reasoning is circular.

68.     The CFPB also does not address whether such conduct can be discriminatory, can discourage applicants on the basis of their protected class, or can be used to evade ECOA's protections.

69.     Beyond redlining, the CFPB's assertion that discouragement has been construed too broadly is flatly contradicted by voluminous evidence in the administrative record that pre-application discouragement remains persistent, including through discriminatory discouragement of small business entrepreneurs, with entrepreneurs of color, women, and religious-affiliated entities facing heightened obstacles.[11] A November 2024 study conducted by the CFPB and DOJ used matched-pair testing to measure the treatment of testers purporting to be

---

[11] *See, e.g.*, NFHA Comment, supra note 3, at 36 (citing Andre Perry, et al., *Black-owned Businesses in U.S. Cities: The Challenges, Solutions, and Opportunities for Prosperity*, Brookings Metro (Feb. 14, 2022), available at: https://www.brookings.edu/wp-content/uploads/2022/02/Black-business-report_PDF.pdf; Maura L. Scott, et al., *Revealing and Mitigating Racial Bias and Discrimination in Financial Services*, J. of Mktg. Rsch. 3, available at: https://doi.org/10.1177/00222437231176470; CFPB, *Supervisory Highlights 8* (Fall 2021), available at: https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_supervisory-highlights_issue-25_2021-12.pdf; Federal Reserve System, 2020 Fair Lending Interagency Webinar 36, 39 (Dec. 2020), available at: https://www.consumercomplianceoutlook.org/Outlook-Live/2020/2020-Fair-Lending-Interagency-webinar/).

well-qualified Black and White small business owners seeking credit at large bank lenders.[12] Through 100 visits across twenty-three financial institutions, the study revealed that Black testers received less encouragement to apply, were more often discouraged from applying than White testers, and were more often steered towards products they did not request.[13]

70.    The CFPB did not explain or justify why a significant constriction of the definition and interpretation of "discouragement" could be warranted in the face of such evidence. Rather, the Final Rule posits that narrowing discouragement "would facilitate compliance with ECOA and Regulation B and result in more targeted and effective enforcement." 91 Fed. Reg. at 21645. The Rule substantially contracts the type and amount of discriminatory conduct that is actionable under Regulation B.

71.    Commenters also presented extensive evidence showing that some forms of pre-application discouragement through "selective encouragement," like "digital redlining" or "digital steering," are on the rise, with widespread exclusionary effects. Through digital targeted marketing, creditors advertise their products on websites, social media, and other online platforms through "sophisticated data analytics that effectively preselect a precise target audience[,]" allowing them to target or exclude certain consumers based on where they live or information indicative of their demographics.[14] These technologies are fast becoming pre-application screening tools, allowing creditors to steer certain consumers to traditional

---

[12] *Id.* (citing CFPB, *Matched-Pair Testing in Small Business Lending Markets* (Nov. 2024), https://www.consumerfinance.gov/data-research/research-reports/matched-pair-testing-in-small-business-lending-markets/).

[13] *Id.* (citing CFPB, *Matched-Pair Testing in Small Business Lending Markets*, supra note 11, at 2, 26, 48).

[14] *Id.* at 41 (citing Jason Cover, *Digital Targeted Marketing, Business Regulation & Regulated Industries* (Feb. 9, 2022), available at: https://businesslawtoday.org/2022/02/digital-targeted-marketing-fair-lending-clickbait/).

products while steering others into inferior products.[15] Plaintiff NFHA, the DOJ, and others have successfully challenged these technologies for their discriminatory targeting or exclusion of prospective consumers on the basis of protected traits.[16]

72.    Because the serious discriminatory risks posed by emerging technologies like targeted digital advertising have been clear for years and were extensively discussed by commenters,[17] the CFPB's unjustified curtailment of provisions that could tackle these growing threats to the circumvention or evasion of ECOA's protections is arbitrary and capricious.

73.    The CFPB incorrectly asserts that its revisions benefit consumers in historically underserved communities "by explicitly permitting lenders to make encouraging statements directed at any group of consumers." 91 Fed. Reg. at 21644. That statement misunderstands or ignores that for decades Regulation B has allowed creditors to "affirmatively solicit or encourage

---

[15] *Id.* (citing Cover, *Digital Targeted Marketing*; Jinyan Zang, *Solving the Problem of Racially Discriminatory Advertising on Facebook*, The Brookings Institution (Oct. 19, 2021), available at: https://www.brookings.edu/research/solving-the-problem-of-racially-discriminatory-advertising-on-facebook/; Carol Evans and Westra Miller, *From Catalogs to Clicks: The Fair Lending Implications of Targeted, Internet Marketing*, Federal Reserve Board Consumer Compliance Outlook (2019), available at: https://www.consumercomplianceoutlook.org/2019/third-issue/from-catalogs-to-clicks-the-fair-lending-implications-of-targeted-internet-marketing/).

[16] *Id.* (citing *Nat'l Fair Hous. All., et al. v. Facebook, Inc.*, No. 1:18-cv-02689-JGK (S.D.N.Y. June 25, 2018); Facebook Settlement, NFHA (Mar. 14, 2019), available at: https://nationalfairhousing.org/facebook-settlement/#:~:text=NFHA%20and%20the%20other%20plaintiffs,%2C%20Hispanics%2C%20and%20Asian%20Americans; Consent Order, *In re Facebook, Inc.*, No. 18-2-18287-5SEA (Wa. Super. Ct., July 24, 2018), ECF No. 4; Dep't of Justice, *Justice Department Secures Groundbreaking Settlement Agreement with Meta Platforms, Formerly Known as Facebook, to Resolve Allegations of Discriminatory Advertising* (June 21, 2022), available at: https://www.justice.gov/opa/pr/justice-department-secures-groundbreaking-settlementagreement-meta-platforms-formerly-known).

[17] *See, e.g.*, *id.* (citing Carol Evans and Westra Miller, *From Catalogs to Clicks: The Fair Lending Implications of Targeted, Internet Marketing*, Federal Reserve Board Consumer Compliance Outlook (2019), available at: https://www.consumercomplianceoutlook.org/2019/third-issue/from-catalogs-to-clicks-the-fair-lending-implications-of-targeted-internet-marketing/).

members of traditionally disadvantaged groups to apply for credit, especially groups that might not normally seek credit from that creditor." 12 C.F.R. pt. 1002, Supp. I, comment 4(b)-2. In other words, creditors were already permitted to encourage consumers to apply for credit if the creditor's purpose is to ensure they are not unnecessarily excluding certain consumers, and so the CFPB's purported benefit is not correct. The difference made by the Final Rule is that creditors can now target consumers because of their protected class with the intent of discriminating against others, whereas before creditors could do so only to reach disadvantaged or neglected groups. The CFPB does not explain why that is a benefit to consumers or to creditors.

74.     In response to well-supported concerns about the risks posed by emerging technologies, the CFPB blithely states that "[w]hile digital advertising and marketing technologies that allow lenders to target consumers may present new risks for consumers, the 'knows or should know' standard sufficiently addresses the risk." 91 Fed. Reg. at 21647. This speculation is nonresponsive because the changes made by the Final Rule remove from Regulation B's coverage the primary danger presented by targeted digital advertising: namely, that creditors will intentionally exclude consumers from credit offers or advertising because of their protected class characteristics.

75.     The Final Rule also finds that "encouraging" one group of applicants is not "discouraging" other groups. *Id*. at 21644. This determination ignores that, as commenters explained, assessing discriminatory conduct frequently involves comparisons between groups. A sign announcing that "whites Are Encouraged to Apply" could certainly discourage Black applicants. And a lender could efficiently discourage receipt of applications from minority communities and borrowers by encouraging only whites to apply by advertising and locating branches and loan officers exclusively in White areas.

76.     Extensive evidence in the administrative record supports this commonsense understanding, revealing that pre-application discouragement is often assessed and understood in relative terms, by comparing how different groups are treated in the pre-application stage. A 2019 study considered whether and how Black small business entrepreneurs seeking loans were discouraged from applying by conducting matched-pair tests of Black and White prospective applicants.[18] The tests revealed significant differences in the level of encouragement and assistance offered to the Black testers as compared to their White counterparts.[19] Black testers also reported substantially worse treatment than their White counterparts, such as being subjected to a higher level of scrutiny about their business status and standing.[20] Similarly, the CFPB's November 2024 study also measured differential treatment by comparing the level of encouragement provided to Black testers to that provided to White testers.[21]

77.     The CFPB grappled with none of this evidence. It made no effort to explain why a rule that will reduce discouragement protections is justifiable in the face of data demonstrating how discouraging practices result in discriminatory outcomes. The Final Rule instead announces, without explanation or support, that "[a]ffirmative encouragement directed at one group of consumers does not automatically convey that other consumers will be treated unfavorably or are disfavored from applying, as asserted by opponents of the proposal." 91 Fed. Reg. at 21646. The question is not whether such conduct "automatically" indicates discrimination, which has never been the law. Instead, the question—which the CFPB ignores or misunderstands—is whether

---

[18] *See id.* at 40 (citing Sterling A. Bone et al., *Shaping Small Business Lending Policy Through Matched-Pair Mystery Shopping*, Journal of Public Policy & Marketing 38:3 (July 2019), 391–99, available at: https://journals.sagepub.com/doi/epub/10.1177/0743915618820561).

[19] *Id.*

[20] *Id.*

[21] *Id.* (citing CFPB, *Matched-Pair Testing in Small Business Lending Markets*, supra note 12).

targeting advertisements only to certain consumers because of their protected class could ever indicate a discriminatory intent to discourage receipt of applications from other groups. As commenters explained, the answer to that question is yes, particularly if such targeting is done to intentionally discriminate against those groups. The CFPB's changes remove such conduct from the ambit of Regulation B and ECOA without reasoned explanation.

78.    The Final Rule vaguely refers to concern for "constrain[ing] free speech and commercial activity." *Id.* at 21638. The CFPB provides no examples of such constraints, despite decades of application. As commenters explained, the CFPB's focus on free speech as a justification does not provide a reasoned explanation for the Final Rule's changes with respect to discouragement, because the discouragement provisions continue to apply to oral and written statements. Moreover, the speech at issue is commercial speech, which can be properly restricted given the substantial public interest in prohibiting discrimination and the threat that creditors will use pre-application acts and practices to evade ECOA.[22]

79.    The CFPB also failed to engage in any meaningful consideration of the likely consequences of the Final Rule's changes, beyond conclusory assertions that they will facilitate compliance or avoid chilling creditors' speech.

80.    For example, while the Final Rule raises the bar to prove discouragement, it does not explain how that standard can be met, nor does it grapple with the myriad ways in which satisfying the new standard is impracticable and inconsistent with other prevailing standards. For instance, the Final Rule's new requirement that a plaintiff show that a creditor knew or should have known a challenged statement would discourage based on protected class is inconsistent with the standard of proof courts apply to similar claims in the Fair Housing Act context. The

---

[22] *Id.* at 37–39.

Final Rule declined to engage with comments pointing out these issues, deeming it unnecessary "to provide additional clarification" because "the term 'knows or should know' is a common term." 91 Fed. Reg. at 21647.

81.    Nor did the CFPB consider potential reliance interests. It ignored the interests of entities like Plaintiffs that have spent years and significant resources in creating products to advise on redlining risk under Regulation B. And it failed to consider the reliance interests of consumers, organizations, communities, financial institutions, and other federal agencies, as well as state and local governments—who have for five decades relied on the well-settled and consistent discouragement provisions the Rule dismantled, and who will likely be financially and otherwise impacted by the Rule.

82.    The Final Rule's discouragement provisions are also squarely inconsistent with ECOA's text and purpose. ECOA's text states that the Bureau "shall prescribe regulations to carry out the purposes" of the Act, including regulations "to prevent circumvention or evasion" of the purposes of ECOA. 15 U.S.C. § 1691b(a). After the Board enacted Regulation B's expansive discouragement provisions, Congress ratified and extended the power of these provisions in 1991 by requiring a referral to the Attorney General where there was a reason to believe that a creditor engaged in a "pattern or practice of *discouraging* or denying applications for credit."[23] This amendment necessarily assumes a substantive ban on discriminatory discouragement.

83.    The Final Rule also exceeds the CFPB's authority by purporting to control how judges and juries assess circumstantial evidence of discrimination, including statements that

---

[23] FDIC Improvement Act of 1991, Pub. L. No. 102-242, § 223, 105 Stat. 2236, 2306 (1991) (emphasis added), *codified at* 15 U.S.C. § 1691e(g).

could potentially carry racial motivations and implications. The Final Rule purports to create ad hoc safe harbors from liability for broad categories of statements—for example, statements "in support of local law enforcement," and recommendations to investigate "crime statistics," 91 Fed. Reg. at 21669—but such an action is inconsistent with well-established standards of adjudication in the context of discriminatory statements.

84.     In antidiscrimination actions, courts consistently emphasize that just because a statement is facially neutral, "does not mean that [it does] not indicate an impermissible preference in the context in which [it was] made."[24] And "language appearing neutral at first blush can nonetheless" have discriminatory meanings.[25] The categories included in the Final Rule are not exceptions to this rule. References to "crime," for example, can be "nothing more than 'camouflaged racial expressions.'"[26] Courts therefore consider circumstantial evidence in discrimination cases, and the Supreme Court has cautioned courts against limiting the types of evidence that can be presented to prove discrimination.[27] Whether and how courts can consider such evidence is beyond the CFPB's authority to determine.

85.     The CFPB failed to respond to comments making these points, explaining simply that the CFPB "concluded that the examples of statements" in the Final Rule cannot convey a discriminatory intent. 91 Fed. Reg. at 21648.

---

[24] *See Soules v. HUD*, 967 F.2d 817, 824 (2d Cir. 1992).

[25] *Children's All. v. City of Bellevue*, 950 F. Supp. 1491, 1496 (W.D. Wash. 1997).

[26] *Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Par.*, 641 F. Supp. 2d 563, 571 (E.D. La. 2009) (listing cases).

[27] *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (quoting *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 508 n.17 (1957)).

## IV.    REGULATION B: SPECIAL PURPOSE CREDIT PROGRAMS

### A. ECOA's Text Plainly Contemplates Broad Use of SPCPs.

86.    ECOA's text is unmistakably clear that, although the statute generally prohibits discrimination on the basis of certain protected characteristics, the statute permits for-profit lenders to create SPCPs designed to extend credit to meet special social needs that require participants to share one or more common protected characteristics such as race, national origin, or sex. *See* 15 U.S.C. § 1691(c)(3).

87.    In 1977, the Board implemented ECOA's statutory permission allowing for-profit lenders to offer special purpose credit programs without violating ECOA. Consistent with the statute, the regulation permitted:

> (3) Any special purpose credit program offered by a for-profit organization, or in which such an organization participates to meet special social needs, provided that:
>
> > (i) The program is established and administered pursuant to a written plan that (A) identifies the class or classes of persons that the program is designed to benefit and (B) sets forth the procedures and standards for extending credit pursuant to the program; and
> >
> > (ii) The program is established and administered to extend credit to a class of persons who, pursuant to the customary standards of creditworthiness used by the organization extending the credit, either probably would not receive such credit or probably would receive it on less favorable terms than are ordinarily available to other applicants applying to the organization for a similar type and amount of credit.

42 Fed. Reg. at 1256–57, *codified at* 12 C.F.R. § 1002.8(a). Thus, the regulation imposed specific requirements to ensure that any SPCP maintains a tight nexus to ECOA's statutory goals. The Board's Official Commentary, codified in Regulation B, provided additional detail regarding how lenders could establish such programs, including the type of information that would be appropriate to establish a need for the program and documentation required to justify the program.

88.     Prior to the Final Rule, these regulatory provisions had remained substantively unchanged for decades.

89.     For SPCPs organized by for-profit organizations, the Final Rule makes three significant changes. First, the Final Rule explicitly eliminates race, color, national origin, or sex as potential SPCP bases, 91 Fed. Reg. at 21669 (adding new 12 C.F.R. § 1002.8(b)(3)). Second, the Final Rule narrows SPCP eligibility on other bases only to organizations that will declare they would refuse to provide credit to every member of the relevant group except through its SPCP. *Id.* at 21668–70 (modifying 12 C.F.R. § 1002.8(a)(3)(ii), and 12 C.F.R. pt. 1002, Supp. I, comment 8(a)-5, and adding 12 C.F.R. § 1002.8(a)(3)(i)(D), and 12 C.F.R. § 1002.8(b)(4)). Third, the Final rule imposes additional procedural requirements. *Id.* at 21668 (adding 12 C.F.R. § 1002.8(a)(3)(i)(E)). These new standards and requirements are so stringent that they make it essentially impossible for any for-profit lender to establish any SPCP whatsoever, thus effectively nullifying the statutory provision establishing them.

90.     The Final Rule leaves unchanged Regulation B's other SPCP provisions, found at 12 C.F.R. § 1002.8(a)(1), (2) applicable to creditors other than for-profit organizations, without providing any reason for targeting only for-profit organizations.

91.     As the CFPB itself has previously acknowledged, SPCPs are effective in closing credit gaps, and thus advance ECOA's purpose,[28] and nowhere does the Final Rule dispute that SPCPs have provided substantial benefits to the borrowers they serve, nor does the Final Rule allege any concrete harm to those ineligible for a particular SPCP loan. The Final Rule

---

[28] Susan M. Bernard and Patrice Alexander Ficklin, *Expanding access to credit to underserved communities,* Consumer Financial Protection Bureau (July 31, 2020), https://web.archive.org/web/20260325041444/https://www.consumerfinance.gov/about-us/blog/expanding-access-credit-underserved-communities/.

31

effectively guts this provision of Regulation B without adequate explanation and in the face of evidence supporting the benefits of SPCPs.

### B.      The Final Rule's SPCP Provisions Are Inconsistent with ECOA.

92.     The Final Rule's changes to Regulation B's SPCP provision squarely conflict with ECOA's statutory text. The text of ECOA permits for-profit entities to offer SPCPs, 15 U.S.C. § 1691(c), and makes no distinction between protected groups, thus making SPCPs available for all covered classes. By eliminating for-profit organization race-, color-, national origin-, or sex-based SPCPs and placing crippling restrictions on all other for-profit organization SPCPs, the Final Rule is irreconcilable with ECOA's text.

93.     The Final Rule does not dispute the clear statutory meaning of ECOA's SPCP provisions—namely, that they allow creditors to establish programs that might otherwise implicate ECOA's protections—but justifies the effective elimination of all for-profit organization SPCPs by arguing they are "beyond what is presently necessary to meet the expressly limited congressional intent," 91 Fed. Reg. at 21652, and operate "counter to ECOA's purpose of preventing discrimination." *Id*. at 21654.

94.     According to the CFPB, "significant changes in the legal landscape and in credit markets" mean that such SPCPs based on certain prohibited bases no longer serve the particular social needs envisioned in the 1976 Act. 91 Fed. Reg. at 21653–54. That is, the Final Rule justifies ignoring statutory text because the CFPB believes that it can unilaterally determine when the policies that Congress enacted are no longer needed.

95.     With respect to "changes in the legal landscape," the CFPB points to the enactment of the Home Mortgage Disclosure Act, the Community Reinvestment Act, and state laws addressing credit discrimination. *Id.* The existence of these additional statutes, though, does not demonstrate that discrimination has ceased to exist. Moreover, neither federal statute

prohibits discrimination: the Home Mortgage Disclosure Act is a reporting statute. The

Community Reinvestment Act does not prohibit discrimination against protected classes.

Regardless, the CFPB failed to provide a reasoned response to commenters pointing out that the

mere existence of antidiscrimination laws cannot be used as a basis to conclude that

discrimination no longer occurs. The CFPB ignored, for example, that Sections 1981 and 1982 of

the Civil Rights Act of 1866 include antidiscrimination protections that extend to credit and were

promulgated over a hundred years *before* ECOA's enactment, when all agree discrimination still

existed. The CFPB does not deny that discrimination existed in 1976, despite those protective

laws, just as discrimination exists now, despite the statutes to which it points.

96.    With respect to changes in the "credit markets," the CFPB's determination

appears to rest on its novel conclusion that ECOA was intended to redress only complete credit

market exclusion, which the CFPB says no longer exists. In explaining the effective elimination

of for-profit organization SPCPs, the CFPB determined "there is no evidence (submitted by

commenters or otherwise) of any credit markets in which consumers 'would effectively be

denied credit' because of their race, color, national origin, or sex in the absence of SPCPs offered

or participated in by for-profit organizations." 91 Fed. Reg. 21654.

97.    Although the CFPB rejected the relevance of legislative history in its analysis of

disparate impact, the CFPB conjures its novel "effectively denied credit" standard by joining

together two isolated phrases from different legislative record sources. 91 Fed. Reg. at 21654

nn.171–72 (citing S. Rep. No. 94-589, at 7 (1976) and H. Rep. No. 94-879, at 8 (1976)).

98.    The CFPB construes "effectively be denied credit" to mean that, when ECOA was

enacted, Congress intended to permit SPCPs only when no credit was available to a protected

group at all. According to the CFPB, because it is not aware of any current instances of

categorical exclusion—i.e., any markets in which consumers would be "effectively denied credit" because of their protected class status—SPCPs are no longer needed, "[r]egardless of whether instances of credit discrimination continue to occur in the marketplace." *Id*. at 21654.

99.     The CFPB provides no evidence this categorical exclusion ever existed, and it ignores comments pointing out that, as a factual matter, it did not. Rather, as even the Final Rule notes, legislators supported enactment of ECOA and the SPCP provisions because they were aware of "'*instances* of discrimination against minorities'" and the "'*strong probability* of race discrimination in mortgage credit,'" not categorical exclusion. *Id*. at 21654 nn. 164–165 (quoting S. Rep. No. 94-589, at 3 (1976), Credit Discrimination: Hearing on H.R. 14856 and H.R. 14908 Before the H. Subcomm. on Consumer Affairs of the H. Comm. on Banking and Currency, 93d Cong., at 150–51)) (emphasis added). Moreover, credit discrimination can be found not just in credit denials but in higher pricing or worse terms based on an applicant's race or other protected characteristics. Commenters pointed out the continued prevalence of credit discrimination, which, consistent with this legislative history, justifies the continuation of SPCPs, not their elimination. The CFPB ignored comments pointing out this inconsistency.

100.    The CFPB's assertions of market-wide discrimination are undercut by its acknowledgment that, at the time of ECOA's enactment, certain lenders "sought to fill the [credit] gap by making credit available especially" to protected group members, demonstrating the availability of some credit to them. 91 Fed. Reg. at 21654 n. 166.

101.    The CFPB's insistence on complete credit market exclusion is further undermined by the Final Rule's treatment of SPCPs for protected statuses other than race, color, national origin, and sex. The CFPB presented no evidence of complete credit market exclusion arising from religion, marital status, age, or income derived from a public assistance program, either at

34

the time of the 1976 Act or now. Nonetheless, SPCPs on these bases are still permitted (at least in theory).

102.    The Final Rule offers no evidence on current rates of discrimination and thus does not support its contention that SPCPs based on "race, color, national origin, or sex as eligibility criteria [are] beyond what is *presently necessary*." *Id.* at 21652 (emphasis added). The CFPB made no attempt to draw on its own agency expertise—or any materials at all—to even explore the issue. Indeed, the CFPB's own research, enforcement, and supervisory activity all demonstrate the continued existence of discrimination in the credit markets based on race, color, national origin, and sex.

103.    As Commenters noted, a large body of evidence demonstrates that substantial credit barriers and "special social needs" continue to exist for many groups. These barriers are reflected in, for example, the myriad ECOA enforcement actions brought by the DOJ, sometimes with the CFPB, in the past ten years; research from the Federal Reserve Board documenting current credit denial disparities for protected groups; recent mystery shopping credit testing conducted by the CFPB and DOJ showing differential treatment based on race; and recent CFPB-published mortgage loan data showing disparities for Blacks and Hispanics. All of this evidence was brought to the CFPB's attention in comments.[29]

104.    In 2010, Congress created a separate Office of Fair Lending and Equal Opportunity ("OFLEO") within the newly formed CFPB, to focus exclusively on credit discrimination. In its first 15 years, OFLEO has engaged in a wide range of activities to address persisting discrimination in the credit markets. In promulgating the Final Rule, the CFPB ignored the wealth of evidence generated from OFLEO itself showing that credit discrimination persists

---

[29] *See, e.g.*, NFHA Comment, *supra* note 3, at 55–63.

to this day. The CFPB provided no reasoned response to this evidence, asserting simply that "the Bureau finds there is no evidence (submitted by commenters or otherwise) of any credit markets in which consumers could not receive credit because of their" protected class status in the absence of SPCPs. 91 Fed. Reg. at 21654.

105.    The CFPB ignored comments identifying very recent factual evidence that Black and Hispanic consumers continue to be denied mortgages at higher rates as compared to White applicants, including comments pointing to the CFPB's own analyses from 2024 showing that Black mortgage applicants were rejected more than twice as often as White applicants.[30] The CFPB also ignored comments noting, for example, that "a 2024 study from the Federal Reserve Bank of Minneapolis found that Black and Hispanic applicants were more likely to have their application denied than a White applicant with the same income and credit score who applied for a conventional mortgage of the same size for a similar home."[31]

106.    The Final Rule also selectively implements changes to SPCPs based on protected class without an adequate explanation. The Final Rule eliminates for-profit SPCPs based on some protected statuses—race, color, national origin, and sex—while leaving the option at least theoretically open for SPCPs for other protected classes, including religion, marital status and age. The CFPB indicates that this bifurcation is based on constitutional concerns, yet it expressly "decline[d] . . . to reach a conclusion" about such concerns. 91 Fed. Reg. at 21653. Nor did the CFPB explain why a regulatory provision clarifying the scope of the statute would implicate constitutional concerns. The CFPB also ignored comments explaining why the SPCP provision does not implicate constitutional concerns. The categories of SPCPs that the Final Rule explicitly

---

[30] *Id.* at 61–62.

[31] Comment Letter from the National Association of Realtors at 2 (Dec. 15, 2025).

eliminates, those based on race, color, national origin, and sex, are the only SPCPs previously known to exist.

107.    In addition to eliminating certain for-profit SPCPs, the Final Rule imposes draconian restrictions on remaining SPCPs. Namely, the Final Rule requires creditors to "provide evidence for each participant who receives credit through the program that, in the absence of the program, the participant would not receive such credit as a result of those specific characteristics." *Id*. at 21655.

108.    The CFPB did not provide a reasoned response to comments that the new restrictions would effectively eliminate all SPCPs—even those not explicitly eliminated— because no creditor could comply with the new restrictions. To comments emphasizing that no creditor would ever admit, "that, in the absence of the SPCP, they would essentially intend to violate ECOA by denying applicants credit because of their prohibited basis characteristics," the CFPB responded only that "the SPCP provision provides the ability for creditors to engage in practices that would otherwise be within ECOA's central prohibition," *id*., refusing to address its effective elimination of for-profit organization SPCPs. The CFPB did not provide any example of a program that could meet its new restrictive standards, and it ignored comments asking that it do so.

109.    The Final Rule also selectively implements changes to SPCPs based on type of financial institution. Without explanation, the Final Rule limits its severe SPCP restrictions only to programs offered by for-profit organizations, not to SPCPs offered by not-for-profit institutions or SPCPs authorized by law that are also created by the ECOA statute.

110.    Nor did the CFPB consider potential reliance interests that will be impacted by the elimination and/or restriction of SPCPs, including those of entities that provide or wish to

provide SPCPs, consumers, businesses, and communities that rely on such programs for access to credit—by definition, because they otherwise lack equal access to credit—organizations who rely on them as potential safe credit options for their constituents, and entities like Plaintiffs who provide consulting services. Various industry commenters expressed support for the importance of and need to preserve SPCPs, but these comments were minimized without reasoned explanation.

111.    The CFPB ignored comments explaining that it does not have statutory authority to eliminate SPCPs. Not only are the changes contrary to the text of ECOA; they also are not supported by the CFPB's invocation of its "adjustment authority." *Id.* at 21652. The CFPB ignored comments explaining that "adjustment authority" and other provisions invoked by the CFPB do not provide authority for the changes.

112.    Because SPCPs are a proven method for expanding access to credit for groups that have historically been denied it, and because such programs are explicitly permitted by ECOA, the elimination and restriction of SPCPs undermines congressional intent, conflicts with ECOA's text, and is arbitrary and capricious.

## V.    THE CFPB FAILED TO ENGAGE IN A MEANINGFUL ANALYSIS OF THE RULE'S COSTS AND BENEFITS

113.    Section 1022(b) of the Dodd-Frank Act requires the CFPB to consider the potential benefits, impacts, and costs of the Rule, including the "potential reduction of access by consumers to consumer financial products or services"; the impact on depository institutions and credit unions with $10 billion or less in total assets; and "the impact on consumers in rural areas." 12 U.S.C. § 5512(b)(2)(A) (cross-referencing 12 U.S.C. § 5516).

38

114.    For each of the Rule sections, the CFPB failed to meaningfully attempt to quantify costs or benefits, ignored existing data and studies that would have informed that analysis, and failed to grapple with foreseeable costs and effects, including reliance interests.

115.    In particular, for each provision, the CFPB overstates the benefits of the Final Rule by relying on unexplained or thinly justified supposition while downplaying or ignoring obvious and foreseeable costs. The CFPB justifies its failure to provide quantitative estimates of potential cost savings and benefits by pointing to a lack of available public data. 91 Fed. Reg. at 21659.

116.    With respect to potential benefits for covered entities, the CFPB highlights the deregulatory nature of the Final Rule to claim it will limit lenders' legal liability, reduce their compliance burden, and increase their profitability by allowing additional operational flexibility. But the CFPB does little to examine these broad assumptions. Industry commenters explained that ECOA's disparate impact framework provides clear rules of the road by offering a "common-sense way to check that policies that may disproportionately exclude protected class groups are, in fact, justified."[32] Commenters also noted that the CFPB's new discouragement standard "does not reflect the standard applied to the rest of the housing market through the Fair Housing Act."[33] Creditors may now have to use one set of compliance rules for mortgage lending (to comply with the FHA's prohibition on disparate impact) and a different set of rules for non-mortgage lending (to comply with ECOA).

117.    The CFPB largely fails to grapple with the potential for increased compliance burden and risk, given that at least as to disparate impact and discouragement, lenders are now

---

[32] Comment of the National Association of REALTORS on ECOA Proposed Rule at 2 (Dec. 15, 2025).

[33] *Id.*

met with conflicting legal landscapes and uncertainty. That is, the Final Rule conflicts with other civil rights statutes and regulations, which make clear that redlining and disparate impact continue to be actionable.

118.    The Final Rule also hypothesizes that it will "spur[] innovation" and invites covered entities to "experiment more with risk-based pricing and automated underwriting with reduced risk of facially neutral policies with disproportionate effects" without fear of exposure. 91 Fed. Reg. at 21660. But the CFPB provides no factual basis or evidence for this supposition, which was rebutted in comments to the NPRM.[34]

119.    Other suggested benefits are equally speculative and unreasoned. With respect to its changes to the discouragement provisions, the CFPB asserts that covered persons "will be able to conduct more targeted advertising campaigns and offer certain products to subsets of consumers (when they otherwise could not under the baseline)." 91 Fed. Reg. at 21661–62. The CFPB does not explain why covered persons will benefit by targeting ads explicitly because of protected class status to groups—for example, ads targeted only to men or White consumers.

120.    Other suggested benefits are also unexplained. For example, the CFPB posits that the changes to the discouragement provisions will allow covered persons to "choose to relocate branch locations that are less profitable," *Id*. at 21662, without any evidence or explanation that covered persons could not have done so under the prior Rule. The CFPB also claims covered persons can "reallocate resources" that were previously spent on "interactions with prospective applicants at call centers and branches to other uses." *Id*. But it fails to explain why this is so,

---

[34] *See, e.g.*, NFHA Comment, *supra* note 3, at 24–25; Comment Letter from The Innovation Council on ECOA Proposed Rule, *supra* note 3, at 1–2.

given that the Final Rule's discouragement provision still covers oral or written statements, which presumably occur during call center and branch interactions.

121.    As to covered entities' costs, the CFPB generally deemphasized the potential costs of compliance, mainly focusing on a one-time cost to update policies, practices, and other operations associated with the current Regulation B. Where the CFPB made any attempt to quantify these, it relied on cost estimates for other rules, without taking into account the fact that this Final Rule upended five decades of well-settled regulations and policies and creates conflicting legal landscapes. Despite disrupting business operations, the CFPB failed to properly account for the reliance interests of industry players who might in fact prefer a consistent regulatory framework.

122.    The CFPB also failed to account for the significant uncertainty it introduced by suggesting that disparate-impact liability encourages or requires entities to engage in the intentional use of racial balancing and by refusing to provide covered entities assurance that it would not penalize them for taking action to comply with overlapping laws that do provide for disparate-impact liability.

123.    The Final Rule also fails to take into account the potential benefits to lenders from the previous rule, namely, that lenders benefit from preventing and addressing disparate impact and discouragement. As commenters explained, such benefits include potential expansion of their market opportunities, enhancement of their reputation, increased community trust, and avoidance of liability under other federal, state, and local frameworks.

124.    With respect to consumers, the individuals whom ECOA is designed to protect, the CFPB acknowledged that the Rule may result in significant costs, but it did not meaningfully

41

consider them, nor did it grapple with how these potential costs directly and severely undermine the very purposes of ECOA.

125.    For instance, the CFPB acknowledged that the Final Rule's changes to the discouragement provisions may result in consumers losing avenues for legal redress, not applying for credit, or facing greater barriers to credit than they otherwise would have under the existing rule. *See, e.g.*, 91 Fed. Reg. at 21661–62. Consumers may be excluded from advertising campaigns or lose access to financial services if creditors alter branch location decisions because of the Final Rule. Overall, lenders may be more likely to discourage or "informally reject certain consumers" before they apply. *Id.* at 21662.

126.    The CFPB also concedes that, with the elimination of disparate impact, consumers may be more likely to be denied credit or to pay higher prices based on policies that have unjustified disparate impact, but it minimizes these risks by referring to continuing liability under other antidiscrimination statutes such as the Fair Housing Act. With respect to these other statutes, the CFPB tries to have it both ways: Apparently the *costs* in terms of increased discriminatory exclusions will be minimal because other statutes will continue to offer protections, yet lenders will realize significant *benefits* in terms of increased flexibility, implying that they will not be constrained by these other statutes. The CFPB makes no attempt to reconcile these two internally inconsistent positions.

127.    Commenters illustrated the real-world consequences of the costs that the CFPB has acknowledged will accompany the Final Rule, which limit opportunity, undermine innovative entrepreneurship, and harm communities. These costs include, for example, imposing harsher underwriting criteria on the elderly, unnecessarily restricting credit to certain types of housing or neighborhoods, reducing access to homeownership opportunities for underserved

groups, and ceasing to scrutinize automated decision making to ensure it accurately predicts likelihood of debt repayment rather than creating irrelevant associations sometimes founded on inaccurate data that disproportionately disadvantage certain protected groups.[35] Yet the CFPB failed to consider or meaningfully respond to these foreseeable costs.

128.    In terms of benefits to consumers, the CFPB hypothesizes that the Final Rule *may* "result in ongoing cost savings for covered entities, which *could* be passed on to consumers through lower prices," or may experience "faster credit application process and greater product variety." 91 Fed. Reg. at 21661 (emphasis added). These assertions, without support, are insufficient to justify the Final Rule. As explained above, lenders are not certain to realize significant cost savings as a result of the Final Rule, and any savings are not likely to be passed through to consumers.[36] That is particularly true because, as explained above, application of these protections—which the CFPB seeks to eliminate—has frequently resulted in *savings* for many consumers, which would no longer be realized under the Final Rule. And the CFPB fails to explain, much less demonstrate with evidence, how these provisions would result in faster credit applications or greater product variety, or proffer any support for those claims.

129.    In the context of SPCPs, while the CFPB attempts to minimize potential costs by asserting that the "prevalence of SPCPs is quite low," 91 Fed. Reg. at 21666, commenters explained the number of SPCPs has steadily grown in recent years. The most recent mortgage data indicated, for example, that Fannie Mae and Freddie Mac "purchased approximately 57,282

---

[35] *See, e.g.*, NFHA Comment, *supra* note 3, at 15–21.

[36] *See id.* at 47 (citing Ryan Westphal, *What You Don't Know Can't Pass Through: Consumer Beliefs and Pass-Through Rates* (Oct. 2023), available at: https://dx.doi.org/10.2139/ssrn.4693216).

43

SPCP loans" between 2022 and 2024.[37] These totals do not account for other SPCP mortgage loans or for a variety of small business lending SPCPs.

130.    Commenters suggested various data and evidence sources the CFPB could have explored to inform its analysis: for example, FDIC BankFind data, Census demographic data, and the CFPB's and other regulatory agencies' supervisory and enforcement data. The CFPB failed to explore any of these sources and instead dismissed these suggestions largely on the grounds that they would not be comprehensive. 91 Fed. Reg. 21662, 21666.

131.    The CFPB also excluded small businesses from its Section 1022(b) analysis even though small businesses can be both creditors and credit consumers. The CFPB based its exclusion primarily on the theory that small businesses are not "individuals" and thus are not consumers as contemplated by the Dodd-Frank Act. Yet in a different rule to implement a separate section of ECOA—with the proposed rule issued on the same day as the NPRM at issue, and the final rule issued shortly after this Final Rule—the CFPB arbitrarily made the opposite choice and "elect[ed] to conduct this same analysis with respect to small businesses and the financial institutions that would be[]" affected by the rule, because "a section 1022(b)(2)(A) analysis that considers only the costs and benefits to individual consumers and to covered persons would not meaningfully capture the costs and benefits of the rule." Final Rule, Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), 91 Fed. Reg. 23530, 23578 (May 1, 2026). The Dodd-Frank Act thus does not constrain the CFPB from considering the very real impact its rulemaking has on small businesses: The agency regularly has considered

---

[37] *Id.* at 68 (citing Fed. Hous. Fin. Agency, Fair Lending, Fair Housing, and Equitable Housing Finance Plans, 90 Fed. Reg. 35475, 35481 (July 28, 2025)).

it, and should consider it, where a potential regulation will have a substantial impact on small businesses in their capacity as credit consumers.

132. The CFPB also attempted to justify the exclusion of small businesses from its analysis on the grounds that "the analysis for consumers would apply similarly to the small business applicants," 91 Fed. Reg. at 21660, ignoring comments in the administrative record that explained the unique challenges and harms small businesses face when they are denied credit or offered credit only on unfavorable terms due to discrimination.

133. The CFPB is statutorily required to consider costs and benefits, but it failed to explain why theoretical benefits, unsupported by specific facts and evidence, outweigh the costs carried by the Final Rule, which were described and documented at length in the comments.

## VI. THE CFPB'S RULEMAKING PROCESS WAS FLAWED

134. The CFPB's rulemaking process was procedurally defective because the agency failed to collect the requisite input from small business entities, to conduct the requisite flexibility analyses, to consult with the appropriate prudential regulators or other federal agencies, to provide adequate time for notice and comment, and to meaningfully respond to significant comments.

### A. The CFPB Failed to Comply with the Regulatory Flexibility Act.

135. The Regulatory Flexibility Act ("RFA"), as amended by the Small Business Regulatory Enforcement Fairness Act ("SBREFA") of 1996, requires each agency to consider the potential impact of its regulations on small entities, including small businesses, small governmental units, and small not-for-profit organizations. 5 U.S.C. § 601 *et seq*.

136. The CFPB is a "covered agency" under the RFA and therefore must solicit comments from small business entities when a rule will have a significant economic impact on a

substantial number of small entities, such as the Final Rule at issue here. *See generally* 5 U.S.C. § 609.

137.    The CFPB was obligated to ensure that small entities had an opportunity to participate in the rulemaking. 5 U.S.C. § 609(a). It could have accomplished this requirement by providing advanced notice of the proposed rulemaking, publishing a general notice of the proposed rulemaking, sending direct notice to interested small entities, conducting open conferences or public hearings concerning the rule, and/or modifying procedural rules to reduce the cost or complexity of participation.

138.    Despite all the available options and its obligation to ensure participation, the CFPB did not provide small entities with such opportunities to participate in the rulemaking process at issue. Instead, as described below, it offered an artificially shortened comment period, making it particularly difficult for small entities to participate.

139.    As a covered agency under 5 U.S.C. § 609(d), the CFPB was also required to convene a SBREFA panel to explore the potential impacts of the contemplated rule on small entities. 5 U.S.C. § 609(b). A SBREFA panel for CFPB rules ordinarily includes representatives from the CFPB, the Small Business Administration's Chief Counsel for Advocacy, and the Office of Information and Regulatory Affairs in the Office of Management and Budget. A SBREFA panel is required to consult with representatives of small business entities that will likely be subject to the rules under consideration and to issue a report on the comments of small entity representatives. Where appropriate, the CFPB shall modify its proposed rule and other materials in response to the small entity comments.

140.    The CFPB did not convene a SBREFA panel for the rulemaking at issue.

141.    The RFA also required the CFPB to prepare an initial regulatory flexibility analysis ("IRFA") for the rulemaking at issue in this case. *See generally* 5 U.S.C. § 603. The initial regulatory flexibility analysis or a summary shall be published in the Federal Register at the time of the publication of general notice of proposed rulemaking for the rule. These analyses must describe the impact of the proposed rule on small entities, including, *inter alia*, "a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities." 5 U.S.C. § 603(c).

142.    As a covered agency under 5 U.S.C. § 609(d), the CFPB must also include in its IRFAs any projected increase in the cost of credit for small entities; any significant alternatives to the proposed rule to accomplish the relevant statute's goals; and the advice and recommendations of small entities.

143.    The CFPB did not prepare an IRFA before issuing the NPRM. It thus did not analyze the economic impact of the Rule on small entities, provide a projection of increased credit costs, or explore significant alternatives.

144.    The RFA also required the CFPB to prepare a Final Regulatory Flexibility Analysis ("FRFA") before issuing the Final Rule. *See generally* 5 U.S.C. § 604. The FRFA should have, among other things, described the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes. The FRFA should also have included the factual, policy, and legal reasons for the approach reflected in the Final Rule and "why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." For

47

covered agencies like the CFPB, the FRFA should identify "the steps the agency has taken to minimize any additional cost of credit for small entities." 5 U.S.C. § 604(a)(6).

145. The CFPB did not prepare a FRFA. The CFPB did not describe any steps taken to minimize the economic impact on small businesses, explain why alternatives were rejected, or identify steps taken to minimize additional credit costs for small businesses.

146. Because the CFPB failed to prepare a FRFA, it did not provide "either a quantifiable or numerical description of the effects of a proposed rule or alternatives to the proposed rule, or more general descriptive statements if quantification is not practicable or reliable." 5 U.S.C. § 607.

147. The IRFA, FRFA, and SBREFA panel requirements apply to rules promulgated by the CFPB unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities and provides "a statement providing the factual basis for such certification." 5 U.S.C. § 605(b).

148. The CFPB's purported "certification" that the Final Rule will not impact small businesses is devoid of any facts. The CFPB said only that it "does not expect the rule to impose significant economic impacts on small entities relative to the baseline." 91 Fed. Reg. at 21667. The CFPB offered no support for this conclusory statement; rather, it merely cited to other portions of the NPRM, which themselves are based on "expectation," not evidence. And those sections pertain only to the SPCP-related amendments, meaning the CFPB offered no information whatsoever about the potential impacts of the disparate impact and discouragement amendments on small businesses.

149.    Even for the SPCP amendments, the CFPB made no effort to ascertain the number of small-business creditors that offer such programs, or the economic impact on those entities of its effective elimination of such programs.

150.    The economic impact resulting from the SPCP changes should consider not only the entities that offer such programs, who will no longer be able to do so, but also the small entities that will no longer be able to benefit from such programs. These entities include women- and minority-owned small businesses that will no longer have access to small business SPCPs. The RFA certification ignores these costs.

151.    The RFA certification also ignores the costs associated with the disparate impact and discouragement amendments, both of which carry substantial consequences for thousands of small entities.

152.    Small-business creditors will be required to change their compliance systems, training programs, recordkeeping, and other systems to comply with the new rule and to navigate how to comply with the legal and regulatory inconsistencies the proposal would introduce given that Regulation B would no longer align with other significant laws like the Fair Housing Act and state law. Commenters raised these costs. For example, one comment to the NPRM explained that, "[e]ven modest per-entity compliance costs, multiplied across this population, readily exceed nine figures in aggregate."[38] The RFA certification ignores these costs.

153.    The CFPB's certification also ignores costs on other entities, such as minority- and women-owned small businesses, which are more likely to experience discrimination that will manifest in less access to credit, more expensive credit, and credit provided on worse terms.

---

[38] Comment from Citizens Rulemaking Alliance on ECOA Proposed Rule at 1 (Nov. 14, 2025).

154.    The Final Rule states that "in preparing the proposal, the [CFPB] nonetheless assessed whether the consideration of small businesses as credit applicants was likely to change its conclusion and determined that it was not." 91 Fed. Reg. at 21667. The RFA in the proposed rule is silent as to costs to small business credit applicants.

155.    The RFA states that "[t]he Bureau is not aware of any small governmental units or not-for-profit organizations to which this final rule would apply." *Id*. at 21667 n.213.

156.    Not-for-profit organizations are regular credit applicants to which the Final Rule's provisions will apply.

157.    The CFPB has likewise ignored costs to small entities that work towards ensuring access to credit, particularly for underserved populations, such as credit counseling and repair organizations.

158.    There are service providers that help ensure creditors' products and services are offered in a fair, responsible, and nondiscriminatory manner—like Plaintiffs BLDS and SolasAI here. The CFPB made no attempt to identify costs to any of these types of entities, let alone assess the likely economic impact of the Final Rule on them.

159.    The CFPB incorrectly states that "[c]ommenters did not provide or suggest any additional data or analyses that would improve or change the Bureau's analysis." *Id*. at 21667. Commenters provided significant data on the continued discriminatory harms suffered by credit applicants, including small-business applicants, and on the continued need for SPCPs.[39] As noted above, commenters provided various additional data sources that would have improved the Bureau's analyses, including the CFPB's own supervisory and enforcement information.

---

[39] *See, e.g.*, NFHA Comment, *supra* note 3, at 58–63.

50

**B.**      ***The CFPB Failed to Consult with the Appropriate Agencies Prior to Proposing the Rule.***

160.      The Dodd-Frank Act requires the CFPB to "consult with the appropriate prudential regulators or other Federal agencies prior to proposing a rule and during the comment process regarding consistency with prudential, market, or systemic objectives administered by such agencies." 12 U.S.C. § 5512(b)(2)(B).

161.      The NPRM did not state that the CFPB consulted with the appropriate prudential regulators or other federal agencies prior to proposing the Rule, only that the CFPB "offered to consult" with the appropriate agencies. 90 Fed. Reg. 50901, 50904. Plaintiff NFHA noted this discrepancy in its comment letter and questioned whether the CFPB did in fact consult as required, particularly given the unprecedented timeline.[40] The preamble to the Final Rule asserted only that the "Bureau consulted or offered to consult with other agencies as required by the Dodd-Frank Act and ECOA, and considered the feedback the agencies provided," 91 Fed. Reg. at 21624, but provided no description or evidence of any such consultations or feedback from consultations regarding the NPRM's consistency with prudential, market, or systemic objectives administered by such agencies.

162.      The appropriate prudential regulators and other federal agencies—such as the Federal Reserve Board, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Federal Trade Commission, the Federal Housing Finance Agency, the Department of Transportation, the Department of Agriculture, the Securities and Exchange Commission, and the Small Business Administration—have decades of supervisory, enforcement, and other experience related to

---

[40] *See* NFHA Comment, *supra* note 4, at 73.

ECOA and Regulation B and relevant prudential, market, and systemic objectives within their respective jurisdictions.

163. The Administrative Record produced by the CFPB on July 24, 2026, does not show that the Bureau undertook the requisite consultation prior to issuing the NPRM. It contains only an email from an individual at the Office of Management and Budget to an individual at the CFPB that, in the body of the email, lists a number of other email addresses with domain names from several agencies, and which states: "[i]nteragency circulation for CFPB NPRM Regulation B." Neither that email nor anything else in the Administrative Record indicates that these individuals or their agencies were consulted regarding the NPRM.

### C.   The CFPB Failed to Provide Adequate Time for Notice and Comment.

164. The CFPB needlessly limited notice and comment on the NPRM to just thirty-two days.

165. The APA requires that agencies afford an opportunity for public participation through submission of written data, views, or arguments. 5 U.S.C. § 553(c).

166. Here, the NPRM was issued and published in the Federal Register on November 13, 2025, and comments were due by December 15, 2025. A month-long window for this sweeping rule, proposing the most far-reaching changes ever to the regulation, was necessarily challenging for commenters, but it was even more so because of the intervening Thanksgiving holiday. Moreover, on the same day, the CFPB issued another notice of proposed rulemaking that would overhaul a rule implementing a separate section of ECOA, in which Plaintiffs and other commenters also had a predictably significant interest.

167. On November 25, Plaintiffs requested an extension of the comment period by at least sixty days to allow for meaningful commentary. Their letters explained that while the proposed rules would make some of the most significant changes to Regulation B, the thirty-two-

52

day comment window would be insufficient for meaningful participation, particularly as the magnitude of the changes required careful, informed, and nuanced comments, the comment period coincided with Thanksgiving, and it also overlapped with the comment period for another sweeping CFPB rule affecting Plaintiffs.

168.    Other commenters also explained why this compressed period would deprive stakeholders of a meaningful opportunity to submit relevant data, views, or arguments. The CFPB did not respond, nor did it extend the comment period.

169.    The harm inflicted by the shortened comment period was particularly acute given the other defects in the CFPB's rulemaking process. The NPRM laid bare the CFPB's failure to undertake meaningful analysis or consider all relevant factors, yet the compressed comment period prevented commenters from fully filling the analytical vacuum.

170.    The shortened comment period prevented commenters from compiling and analyzing data on the information gaps recognized by the CFPB in the NPRM. For example, the CFPB stated that it was "unaware of any data that would help to quantify such costs [of the proposed rule] and seeks data from available sources to quantify the costs to covered persons and seeks comment or data that may help quantify these types of costs." 90 Fed. Reg. at 50915. Yet thirty-two days was hardly enough time to gather, analyze, and present a meaningful dataset on the quantitative and qualitative costs of the proposed rule.

171.    The CFPB likewise stated that it was "not aware of any credit markets in which consumers would be 'effectively denied credit' because of their race, color, national origin, or sex in the absence of SPCPs offered or participated in by for-profit organizations." *Id.* at 50910. Commenters were deprived of sufficient time to compile data about such credit denials, time that

was particularly necessary given that the NPRM raised questions that no one had previously had cause to study.

172.    Commenters also did not have enough time to do market research to test the CFPB's unsupported assertion in the NPRM that the prevalence of SPCPs was low. Without the opportunity to do such research, commenters were limited to information available at the time of the NPRM, which may not have been accurate or complete.

173.    The CFPB faulted commenters for not providing additional data sources or analyses to illuminate the CFPB's analyses. 91 Fed. Reg. at 21667. While that assessment is not correct, commenters were limited in their ability to provide information by the unnecessarily compressed deadline.

174.    The CFPB did not provide any justification for such a truncated comment period, particularly given that the CFPB's NPRM was disrupting the long-running status quo.

### D.    *The Bureau Failed to Respond to Significant Comments.*

175.    When the CFPB engages in notice-and-comment rulemaking, it is required to consider and respond to significant comments received during the period for public comment. The CFPB failed to do so here.

176.    The Final Rule spills much ink summarizing many comments submitted, yet it fails to respond with a reasoned explanation to the overwhelming majority of them, including several significant comments.

177.    The CFPB's failure to meaningfully engage with the comments it received is perhaps best illustrated by the fact that, despite receiving 64,000 comments from all corners of the credit marker, the CFPB made *zero* changes between the NPRM and the Final Rule, choosing instead to issue it as originally proposed.

178.     Even where the CFPB did purport to respond to particular comments, it generally did so with nonsensical explanation or without engaging meaningfully with their substance. For example, as noted above, the CFPB responded to concerns about elimination of disparate impact by pointing to the ongoing viability of disparate treatment, even though the two concepts are distinct, and the former protects against a broad swath of conduct that will no longer be actionable. And the CFPB responded to concerns that limiting what constitutes discouragement will facilitate redlining and discriminatory advertising with a non-sequitur that the acts and practices it removes from coverage are not "oral or written statements."

179.     As another example, a commenter noted that the CFPB's IRFA certification lacked a factual basis and the CFPB responded with the circular statement that "[b]y certifying that the final rule will not have a significant economic impact on a substantial number of small entities, the Bureau does not have to complete an initial/final RFA or convene a SBREFA panel and report." *Id.* at 21667. It provided no facts, nor did it even reassure the commenter that there were any facts on which it based its determination.

## VII.    THE FINAL RULE IS INDEPENDENTLY INVALID BECAUSE MR. VOUGHT LACKED LAWFUL AUTHORITY TO DIRECT THE CFPB

180.     The CFPB issued the Final Rule in the absence of a lawfully appointed or designated CFPB Director. Mr. Vought had been purporting to act as Director since February 2025, but he was never confirmed by the Senate, and none of the circumstances contemplated by the Federal Vacancies Reform Act apply.

181.     Rohit Chopra served as Director of the CFPB until February 1, 2025, when he was terminated by President Trump. Mr. Chopra did not die or resign, and he remained able to perform the functions and duties of the office, and in fact did perform his duties for the first week

of the current administration. President Trump's authority to name an acting director under the

Federal Vacancy Reform Act was therefore not triggered. 5 U.S.C. § 3345.

182.    On February 3, in the absence of lawful authority to do so, President Trump named Treasury Secretary Scott Bessent as the agency's Acting Director.

183.    On February 7, in the absence of lawful authority to do so, President Trump named White House Office of Management and Budget Director Russell Vought as the agency's Acting Director.

184.    On February 11, 2025, President Trump nominated Jonathan McKernan to serve as Director. President Trump withdrew McKernan's nomination on May 12, 2025.

185.    On November 18, 2025, President Trump nominated Stuart Levenbach to serve as Director. At the time, a CFPB spokesperson stated that this nomination was a "technical" maneuver designed to extend Mr. Vought's tenure as Acting Director.[41] On January 3, 2026, the Senate sent Mr. Levenbach's nomination back to the President without acting on it.

186.    Mr. Vought acted as Director of the CFPB throughout this period, until August 1, 2026, when Mark Paoletta became Acting Director. Like Mr. Vought, Mr. Paoletta has not been confirmed by the Senate and lacks lawful authority to direct the CFPB.

187.    The statute establishing the CFPB and prescribing its powers vests non-delegable rulemaking authority in the Director. 12 U.S.C. § 5512(b). Without a lawful Director, the CFPB cannot engage in rulemaking.

---

[41] Michael Stratford, *Trump picks new CFPB director amid efforts to close agency,* Politico (Nov. 19, 2025), https://www.politico.com/news/2025/11/19/trump-cfpb-nomination-levenbach-vought-00659032.

188. Mr. Vought signed both the NPRM and the Final Rule at issue. Thus, the Final Rule was issued by a Director who had no lawful authority to lead the CFPB or engage in rulemaking.

189. Commenters raised this concern to which the CFPB did not respond in the Final Rule.

### INJURY TO PLAINTIFFS

190. Plaintiff NFHA works to build inclusive, well-resourced, and resilient communities, ensure equitable housing opportunities for all people and communities, and eliminate housing discrimination.

191. Financial institutions, developers, and deployers of the algorithmic models that financial institutions rely on have engaged NFHA to provide technical advice and guidance on how to identify and mitigate potential legal and compliance risks related to disparate impact-liability by improving the fairness of their products. These analyses include identifying potential discriminatory effects and available alternatives that would ameliorate any discriminatory effects. Providing this technical assistance and guidance advances NFHA's mission by eliminating barriers to credit that disproportionately exclude protected groups and by promoting access to homeownership and neighborhood improvement opportunities.

192. The Final Rule removes the primary incentive for creditors, as well as the developers and deployers of the models used by creditors, to engage NFHA to help them avoid or mitigate disparate-impact risk under ECOA. Without the risk of disparate-impact liability, including the risk of liability for failure to search for and adopt available less discriminatory alternatives, many entities have diminished incentive to assess whether their policies and practices cause a disparate impact, or whether less discriminatory alternatives are available.

These diminished incentives to mitigate disparate-impact risks directly impair NFHA's mission-driven work to ensure equitable housing opportunities and to expand homeownership opportunities for all borrowers, and to build inclusive, well-resourced, resilient communities where people can thrive.

193.    NFHA also researches and develops techniques to test machine learning models for discriminatory impacts, improve models to mitigate such impacts, achieve fairer outcomes, and expand fair housing and lending opportunities. NFHA expended considerable resources to secure sufficient charitable contributions to fund this project. NFHA's Responsible AI Lab ("RAIL") develops and encourages adoption of "gold standard" algorithmic fairness techniques. RAIL developed and released an auditing framework, called "Purpose, Process, and Monitoring" (PPM), that provides a roadmap for assessing the fairness and efficacy of algorithmic systems. NFHA has worked with financial institutions and a fintech to use PPM to evaluate internal controls and mitigate risks that may be inherent in algorithmic systems and harm consumers. In addition, RAIL worked with a fintech entity to evaluate and apply an algorithmic fairness technique to mortgage underwriting and pricing models. RAIL also published an approach for selecting less discriminatory alternatives.

194.    The Final Rule effectively renders the framework obsolete because it removes the primary incentive for creditors as well as the developers and deployers of the models used by creditors to assess the fairness of their outcomes and mitigate potential harms to consumers. These diminished incentives directly impair NFHA's mission-driven work to ensure equitable housing opportunities and to expand homeownership opportunities for all borrowers.

195.    NFHA also maintains the "FairLens" platform. Using FairLens, financial institutions, insurers, and other companies can test their underwriting models—or, in the case of

companies concerned about the exposure of proprietary information, use placeholder versions that operate substantially similarly—and see the disparate impact those models likely will cause. FairLens also enables users to see the ability of algorithmic fairness techniques to reduce that impact and increase housing and lending access in a responsible fashion. With FairLens, NFHA operates a common space for companies to test different techniques for reducing discriminatory outcomes; see how different debiasing techniques included in the platform can make their models less discriminatory while serving legitimate ends; use that information to determine which debiasing methodologies are best; and understand how using the fairness techniques will result in increasing housing and credit opportunities for underserved groups.

196. The Final Rule removes the primary incentive for creditors as well as the developers and deployers of the models used by the creditors to use FairLens to help them avoid or mitigate disparate impact risk under ECOA. Without the risk of disparate-impact liability, including the risk of liability for failure to search for and adopt available less discriminatory alternatives, many of the entities FairLens serves have diminished incentive to assess whether their policies and practices cause a disparate impact, or whether less discriminatory alternatives are available. These diminished incentives to explore fairer models directly impair NFHA's mission-driven work to ensure equitable housing opportunities and to expand homeownership opportunities for all borrowers.

197. The CFPB's Final Rule also diminishes demand for NFHA's mission-driven services because the CFPB takes the position that mitigating disparate-impact risks itself encourages or requires disparate treatment. Through this assertion, the CFPB has signaled that the agency believes that analyses like those offered by NFHA designed to mitigate disparate impact risks and expand housing and credit opportunities are, themselves, illegal. The Final

Rule's impairment of NFHA's organizational interests and activities has required NFHA to expend its resources to counteract that harm.

198.   NFHA's analyses do not encourage entities to treat individuals differently than other similarly situated individuals based on constitutionally implicated characteristics, or any other characteristics protected by ECOA and Regulation B. The CFPB's suggestion that mitigating disparate impact risk, a core part of NFHA's work, results in intentional discrimination is not only inaccurate, but it also damages NFHA's reputation and thwarts NFHA's mission.

199.   NFHA's Keys Unlock Dreams initiative is designed to provide consumers, lenders, municipalities, and other entities with the resources, tools, and expert information and technical assistance they need to make homeownership a reality and improve the quality and resiliency of neighborhoods. Keys Unlock Dreams is offered in partnership with major financial stakeholders and has the goal of increasing homeownership rates in underserved and historically disadvantaged communities as well as ensuring all neighborhoods have the amenities and resources that people need to thrive. As part of Keys Unlock Dreams, NFHA relies on the availability of SPCPs to advance homeownership opportunities for people who have historically confronted discriminatory barriers to credit, including Black, Latino, Asian, Native American, and Hawaiian and Pacific Islander borrowers. Among other things, NFHA created state-of-the-art toolkits to facilitate the use of SPCPs.

200.   The Final Rule effectively eliminates the ability of lenders to offer SPCPs, explicitly for programs that benefit certain groups and implicitly for programs that benefit other groups. The Final Rule explicitly prohibits a SPCP offered by a for-profit organization from using race, color, national origin, or sex, or any combination thereof, of the applicant, as a

common characteristic in determining eligibility for the SPCP. Because the Final Rule effectively prohibits lenders from creating any SPCPs, NFHA will not be able to use such SPCPs, a major tool to sustain and increase homeownership opportunities and neighborhood stabilization efforts. Without the availability of SPCPs, the Keys Unlock Dreams program will be demonstrably less successful.

201. Financial institutions and other entities engage NFHA to provide statistical and quantitative analyses to support their design and monitoring of SPCPs, including materials and information for designing SPCPs and monitoring such programs. NFHA has trained industry partners, including but not limited to lenders, on the benefits and mechanics of SPCPs. It has developed training materials geared toward meeting the CFPB's prior longstanding requirements for the creation and administration of SPCPs. It also has assisted lenders and other entities with the creation and administration of specific SPCPs, through technical assistance, providing grant funds, and related tasks.

202. As part of its homeownership promotion, NFHA's Inclusive Communities Program works to expand homeownership opportunities in neighborhoods that have previously experienced divestment and discrimination. The Inclusive Communities Program has resulted in more than 500 new homeowners, origination of more than 100 SPCP loans supported by grants from NFHA, rehabilitation of more than 1,200 homes, and construction of at least 235 new affordable homes. And to prevent discrimination from artificially depressing homeownership opportunities, in April 2022 NFHA launched a redlining toolkit, which it maintains, that helps civil rights and consumer advocates, as well as lenders, understand the public data relating to redlining risk to protect borrowers and their communities and ensure fair and equitable access to credit. The Final Rule impairs NFHA's homeownership promotion and neighborhood

61

improvement activities, thwarts its efforts to reduce discrimination, and interferes with NFHA's ability to ensure consumers can access safe and affordable credit.

203. Because the Final Rule effectively prohibits lenders from creating any SPCPs, lenders have no incentive to engage NFHA to provide quantitative and statistical support, to develop or monitor these programs, or to provide training or technical assistance. These diminished incentives impair NFHA's mission-driven efforts to advance homeownership opportunities for people who have historically confronted discriminatory barriers to credit.

204. NFHA also entered into a partnership with two other nonprofit organizations to jointly develop model SPCPs that lenders could implement and under which NFHA would offer technical assistance for lenders to launch the model among their products and services. NFHA provided some preliminary training to lenders under this program, but demand for NFHA to perform further work under this partnership has disappeared. Because of the Final Rule, the model and guidance for SPCPs that NFHA developed is no longer viable, meaning that NFHA can no longer work with lenders to implement it. The Final Rule thus impairs one of NFHA's mission-driven tools for creating new homeownership opportunities.

205. NFHA has expended considerable resources on generating materials for the very SPCPs that will now be prohibited, the value of which the Final Rule greatly reduces. For example, NFHA can no longer rely on or direct others to its SPCP toolkit because the contents no longer accurately reflect the regulatory landscape. The Final Rule also renders superfluous the SPCP expertise that NFHA has developed by eliminating the demand for lenders to confer with NFHA on SPCPs. The Final Rule's impairment of NFHA's organizational interests and activities has required NFHA to expend its resources to counteract that harm.

206. Plaintiff Rise Economy works to expand access to credit, financial services, and investments in low-income communities and communities of color. To advance its mission, Rise Economy devotes substantial resources to negotiating Community Benefits Agreements ("CBAs" or "Agreements") with lenders. These Agreements facilitate lenders' engagement with and service of the credit needs of communities of color, low-income communities, and women- and/or minority-owned small businesses. Through CBAs, Rise Economy obtains commitments from banks to provide loans, investments, and financial services in such communities, which have historically faced barriers to accessing credit. SPCPs are a proven mechanism to ensure that creditors will provide loans to the communities that Rise Economy serves. Rise Economy has therefore negotiated the inclusion of SPCPs in CBAs for several years. After negotiating the CBAs, Rise Economy continues dialogue with creditors regarding the design, implementation, and success of the SPCPs.

207. The Final Rule effectively eliminates the ability of lenders to offer SPCPs, explicitly for programs that benefit certain groups and implicitly for programs that benefit other groups. The Final Rule explicitly prohibits a SPCP offered by a for-profit organization from using race, color, national origin, or sex, or any combination thereof, of the applicant, as a common characteristic in determining eligibility for the SPCP. Multiple CBAs that Rise Economy has negotiated expressly contemplate the creation of SPCPs. Because the Final Rule effectively prohibits lenders from creating SPCPs, Rise Economy will not be able to negotiate their inclusion in future CBAs and thus will lose a critical tool for increasing access to credit. The elimination of SPCPs thus directly impairs Rise Economy's mission-driven efforts to expand access to credit in communities of color. Indeed, in response to recent encouragement from Rise Economy to launch a small-business SPCP, one lender responded by noting that the NPRM

restricts and eliminates the use of protected-class criteria when determining SPCP eligibility, and directed Rise Economy to raise its concerns with the CFPB instead.

208. Plaintiff BLDS, LLC was founded in 2011 to conduct and provide statistical, economic, and quantitative analyses to clients such as financial institutions and other companies, governmental entities, and others. The Final Rule impairs many of BLDS's core business activities and is causing BLDS economic and reputational injury.

209. Financial institutions engage BLDS to provide statistical analyses of credit policies, procedures, automated models, and other credit-related practices to identify and mitigate potential legal and compliance risks related to disparate impact liability under ECOA and Regulation B. These analyses include identifying potential discriminatory effects and available alternatives that would ameliorate any discriminatory effects while still meeting the client's business needs. Creditors also engage BLDS to assist with preparing for and interacting with supervisory agencies during fair lending examinations and to assist with creditors' defense in enforcement actions and litigation. Government, private, and nonprofit entities hire BLDS to prepare materials and provide expert witness services in litigation alleging disparate impact, redlining, discriminatory discouragement, and related fair lending claims.

210. The Final Rule removes the primary incentive for creditors to hire BLDS to help them avoid or mitigate disparate-impact risk under ECOA. Without the risk of disparate-impact liability, including the threat of liability for failure to adopt available less discriminatory alternatives, many of the entities BLDS serves have diminished incentive to assess whether their policies and practices cause a disparate impact, or whether less discriminatory alternatives are available.

211.    The CFPB's Final Rule also diminishes demand for BLDS's services because the CFPB takes the position that mitigating disparate-impact risks encourages or requires disparate treatment. Through this assertion, the CFPB has signaled that the agency believes that analyses like those offered by BLDS designed to mitigate disparate-impact risks are, themselves, illegal.

212.    BLDS's analyses do not encourage entities to treat individuals differently than other similarly situated individuals based on constitutionally implicated characteristics, or any other characteristics protected by ECOA and Regulation B. The CFPB's suggestion that mitigating disparate-impact risk, a core part of BLDS's work, results in intentional discrimination is not only inaccurate, but it also damages BLDS's reputation.

213.    Financial institutions also engage BLDS to provide statistical analyses of credit advertising and marketing campaigns, branch location decisions, and application and origination distributions across geographic areas and demographic groups to mitigate potential legal and compliance risks related to the ECOA and Regulation B prohibitions against discouraging prospective applicants. The Final Rule decreases creditors' demand for BLDS's services. Importantly, the Final Rule changes Regulation B so that it only reaches an "oral or written statement," and no longer covers "acts or practices" that could discourage a reasonable person, on a prohibited basis, from applying for credit. The Final Rule also no longer prohibits creditors' "selective encouragement" of certain groups through, for example, targeting advertisements only to primarily White consumers or neighborhoods while avoiding primarily minority consumers or neighborhoods. Together, the changes essentially exempt from ECOA and Regulation B a lender's decisions about where, or to whom, to advertise, market, or offer their products and services. Without the liability risks described above, creditors have a significantly diminished

incentive to perform such analyses of their business practices, which negatively impacts demand for BLDS to perform such analyses.

214. Because of the Final Rule, financial institutions will also be less likely to engage BLDS to assist with preparing for and interacting with supervisory agencies during fair lending exams and to assist with creditors' defense in enforcement actions and litigation related to discouragement of prospective applicants. Entities will also be less likely to engage BLDS to serve as a consultant and expert in preparing fair lending enforcement actions and litigation.

215. For-profit financial institutions also engage BLDS to provide statistical and quantitative analyses to support their design and monitoring of SPCPs, including materials for inclusion in written plans supporting SPCPs and monitoring such programs. The Final Rule effectively eliminates the ability of lenders to offer SPCPs, explicitly for programs that benefit certain groups and implicitly for programs that benefit other groups. The Final Rule explicitly prohibits an SPCP offered by a for-profit organization from using race, color, national origin, or sex, or any combination thereof, of the applicant as a common characteristic in determining eligibility for the SPCP. Because the Final Rule effectively prohibits lenders from creating any SPCPs, lenders have no incentive to engage BLDS to provide quantitative and statistical support to develop or monitor these programs.

216. The Final Rule drastically reduces the demand for BLDS's expert witness and other services in fair lending litigation.

217. BLDS has suffered economic and reputational harm as a direct result of the Final Rule, and BLDS expects this harm to increase once the Final Rule is effective. Clients have reduced the resources they expend on BLDS's services and other clients are likely to significantly reduce the resources they expend on BLDS's services in response to the Final Rule.

218.     Plaintiff SolasAI was founded in 2021 to develop software and provide other services to help detect, explain, and reduce discrimination and bias in credit models and other algorithms, particularly in machine learning models that use artificial intelligence.

219.     SolasAI's business is built around its proprietary software and related services. SolasAI's clients pay the company to license its software, which employs artificial intelligence to analyze its clients' automated models, including machine learning models and/or algorithms. SolasAI's clients include banking, lending, and fintech companies.

220.     Financial institutions license SolasAI's software to analyze whether their models and algorithms are unintentionally discriminatory, with the goal of mitigating potential legal and compliance risks related to disparate-impact liability under ECOA and Regulation B.

221.     The Final Rule directly reduces demand for SolasAI's software and services, which are designed to help companies measure and mitigate disparate-impact legal risk by identifying the factors driving the disparities and suggesting alternatives.

222.     The CFPB's Final Rule also diminishes demand for SolasAI's services because it expresses a view that mitigating disparate-impact risks encourages or requires disparate treatment. Through this assertion, the CFPB has signaled that it is likely to take the position that analyses like those offered by SolasAI designed to mitigate disparate-impact risks are, themselves, illegal. This new position further reduces demand for SolasAI's services.

223.     SolasAI's analyses do not encourage entities to treat individuals differently than other similarly situated individuals based on constitutionally implicated characteristics, or any other characteristics protected by ECOA and Regulation B. The CFPB's suggestion that mitigating disparate-impact risk, a core part of SolasAI's work, results in intentional discrimination is not only inaccurate, but it also damages SolasAI's reputation.

67

224.    Clients also license SolasAI's products to assess and address ECOA and Regulation B risks related to advertising and marketing models, for example, assessing whether models used for campaigns or offers include variables that may raise intentional discrimination risks—e.g., geographic variables such as whether consumers are located in predominantly White or minority areas or whether variables may act as "proxies" for protected class status—or disparate-impact risks, such as whether the models are likely to disproportionately exclude consumers on the basis of their protected class characteristics and whether viable less discriminatory alternatives exist.

225.    Prior to release of the Final Rule, SolasAI anticipated application of its tools and services to marketing models to be a significant growth area because of the increasing use of models for marketing purposes, especially by financial institutions. The Final Rule's changes to the discouragement provisions substantially diminish creditors' incentives to use SolasAI to perform advertising and marketing analyses of their business practices.

226.    SolasAI has suffered economic and reputational harm as a direct result of the Final Rule. Clients have reduced the resources they expend on SolasAI's services, while other entities have paused the engagement agreement process in anticipation of the Final Rule. SolasAI expects other clients and entities to continue to reduce resources expended on SolasAI's services. SolasAI was also forced to delay a capital raise based on its disparate-impact product because the CFPB's changes to Regulation B affected the market demand for SolasAI's disparate-impact product and services.

## CAUSES OF ACTION

### Count I
### Arbitrary and Capricious Rulemaking, 5 U.S.C. § 706(2)(A)

227.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

68

228.    The APA provides that a reviewing court "shall" "hold unlawful and set aside agency action" that is "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

229.    The Final Rule is a "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704.

230.    The Final Rule is arbitrary and capricious for several reasons, including but not limited to the following:

a.  The CFPB has reversed a longstanding rule on disparate impact without a reasoned explanation, without actual evidence supporting this dramatic departure, without acknowledgment or explanation for the departure from prior factual findings, without adequate consideration of reliance interests, without considering alternatives, and in contravention of available data on the need for and import of disparate impact liability.

b.  The dramatic narrowing of discouragement changed the CFPB's longstanding understanding of ECOA without adequate explanation, without adequate consideration of reliance interests, without actual evidence supporting this dramatic departure, without acknowledgment or explanation for the departure from prior factual findings, without considering alternatives, and in contravention of available data on the need for and import of robust discouragement protections.

c.  The elimination of for-profit SPCPs based on certain protected classes and the restriction of other SPCPs alter the CFPB's longstanding rule, without adequate explanation, without adequate consideration of reliance interests, without actual evidence supporting this dramatic restriction, without acknowledgment or explanation for the departure from prior factual findings, without considering

alternatives, and in contravention of the available data supporting the continued use of SPCPs for all protected groups.

## Count II
### Cost-Benefit Analysis that is Arbitrary, Capricious, and Contrary to Law, 5 U.S.C. § 706(2)(A)

231.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

232.    The APA provides that a reviewing court "shall" "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

233.    The Final Rule is a "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704.

234.    Section 1022(b)(2)(A) of the Dodd-Frank Act requires that, in prescribing rules under federal consumer financial laws, the CFPB shall consider: (i) "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule" and (ii) "the impact of proposed rules on covered persons[.]"

235.    The cost-benefit analysis required by Section 1022 must include a quantitative or qualitative analysis and must consider the important aspects of the issues.

236.    The CFPB's Section 1022 analysis was arbitrary, capricious, and contrary to law for several reasons, including the following:

   a.   The CFPB failed to meaningfully assess the costs and benefits of the Final Rule.

   b.   The CFPB did not rely on any data or evidence about the costs to consumers or covered entities.

   c.   The CFPB ignored proven costs to consumers and covered entities.

70

d.  The CFPB failed to conduct a quantitative or qualitative analysis.

e.  The CFPB failed to consider important aspects of the contemplated amendments.

## Count III
### Agency Action Contrary to Law, 5 U.S.C. § 706(2)(A)

237.  Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

238.  The APA provides that a reviewing court "shall" "hold unlawful and set aside agency action" that is "not in accordance with law." 5 U.S.C. § 706(2)(A).

239.  The Final Rule is a "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704.

240.  The Final Rule provisions eliminating disparate-impact liability, limiting protections against discouraging prospective applicants, and eliminating certain SPCPs and restricting others are contrary to ECOA. 15 U.S.C. § 1691, 15 U.S.C. § 1691b, 15 U.S.C. § 1691e.

## Count IV
### Agency Action in Excess of Statutory Authority, 5 U.S.C. § 706(2)(C)

241.  Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

242.  The APA provides that a reviewing court "shall" "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

243.  The Final Rule is a "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704.

244.  The Final Rule's amendments to the discouragement provisions purport to create safe harbors for certain statements and render them immune from liability under ECOA

71

irrespective of context or intent. The CFPB lacks authority to create these safe harbors from statutory compliance.

## Count V
### Failure to Observe Procedures Required by Law, 5 U.S.C. § 706(2)(D)

245.    Plaintiffs restate and reallege all paragraphs above as if fully set forth here.

246.    The APA provides that a reviewing court "shall" "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

247.    The Final Rule is a "final agency action for which there is no other adequate remedy in a court" and is "subject to judicial review." 5 U.S.C. § 704.

248.    Before issuing the Proposed Rule, the CFPB was required to convene a SBREFA panel, prepare an IRFA, prepare a FRFA, and consult with appropriate prudential regulators or other federal agencies, and after issuance, it was required to allow for adequate notice-and-comment and respond to significant comments.

249.    The CFPB failed to observe these required procedures when promulgating the NPRM and the Final Rule.

## Count VI
### Non-Statutory Review of Agency and Official Action and Agency Action in Excess of Statutory Authority, 5 U.S.C. § 706(2)(C)

250.    The Constitution mandates that the President obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States." U.S. Const. art. II, § 2, cl. 2.

251.    The Director of the CFPB is an Officer of the United States. Congress required that the CFPB Director be appointed by the President by and with the advice and consent of the Senate. 12 U.S.C. § 5491(b)(1). President Trump appointed Mr. Vought as Acting Director

without the advice and consent of the Senate. Mr. Vought was neither nominated nor confirmed by the Senate to that position.

252.   President Trump purported to appoint Mr. Vought under the Federal Vacancies Reform Act, which allows for temporary appointments without the advice and consent of the Senate when the prior holder of a Senate-confirmed office "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). But President Trump fired the last Senate-confirmed Director, Rohit Chopra. Mr. Chopra did not die, he did not resign, and he was not unable to perform the functions and duties of the office.

253.   The President's appointment of Mr. Vought as Acting Director of the CFPB was therefore unconstitutional and Mr. Vought had no power to direct the agency.

254.   Because Mr. Vought was not lawfully serving as Acting Director, his actions were *ultra vires* and the Final Rule was in excess of statutory authority, and it should therefore be vacated.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

(A) Declare that the Final Rule is arbitrary, capricious, or otherwise contrary to law; is in excess of statutory authority; and was issued without observance of procedure required by law.

(B) Vacate the Final Rule;

(C) Deem the Final Rule void and without effect because Mr. Vought acted *ultra vires* and without lawful authority;

(D) Award Plaintiffs their reasonable costs, including attorneys' fees, incurred in bringing this action; and

(E) Issue any other relief as the Court deems just and equitable.

Dated:  August 11, 2026

Johanna M. Hickman (D.C. Bar No. 981770)
Steven Y. Bressler (D.C. Bar No. 482492)
Robin Thurston (D.C. Bar No. 7268942)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
hhickman@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*

Janell M. Byrd* (D.C. Bar No. 376609)
Sasha Samberg-Champion
(D.C. Bar No. 1026113)
Morgan Williams*
National Fair Housing Alliance
1331 Pennsylvania Ave. NW, Ste. 650
Washington, DC 20004
Phone: 202-898-1661
jbyrd-chichester@nationalfairhousing.org
ssamberg-champion@nationalfairhousing.org
mwilliams@nationalfairhousing.org

*Counsel for Plaintiff National Fair Housing Alliance*

*\*Appearing Pro Hac Vice*

Respectfully Submitted,

*/s/ Lila Miller*
Lila Miller (D.C. Bar No. 1643721)
Stephen Hayes (D.C. Bar No. 1010531)
Timothy Lambert (D.C. Bar No. 475798)
Valerie Comenencia Ortiz
(D.C. Bar No. 90021485)
RELMAN COLFAX PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Tel: (202) 728-1888
Fax: (202) 728-0848
lmiller@relmanlaw.com
shayes@relmanlaw.com
tlambert@relmanlaw.com
vcomenenciaortiz@relmanlaw.com

*Counsel for All Plaintiffs*

Allison M. Zieve (D.C. Bar No. 424786)
Stephanie B. Garlock (D.C. Bar. No.
1779629)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
azieve@citizen.org
sgarlock@citizen.org

*Counsel for All Plaintiffs*