**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, RISE ECONOMY, BLDS, LLC, and SOLASAI,<br><br>Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU and MARK PAOLETTA, *in his official capacity as Acting Director of the Consumer Financial Protection Bureau*,<br><br>Defendants. | Case No. 1:26-cv-01820 (BAH) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

I. Statutory and Regulatory History ..... 2

II. The November 2025 Notice of Proposed Rulemaking ..... 3

III. The April 2026 Final Rule ..... 4

IV. The Acting Director at the Time of the Rulemaking ..... 7

V. The Final Rule's Impact on Plaintiffs ..... 7

LEGAL STANDARD ..... 10

ARGUMENT ..... 11

I. The CFPB Failed to Follow Required Procedures. ..... 11

II. The CFPB's Failure to Conduct a Meaningful Cost-Benefit Analysis Was Arbitrary, Capricious, and Not in Accordance with Law. ..... 16

A. The CFPB Failed to Quantify the Final Rule's Costs and Benefits. ..... 17

B. The CFPB's Benefits Analysis Relies on Mere Speculation. ..... 20

C. The CFPB Refused to Consider Relevant Evidence of the Final Rule's Costs. ..... 21

III. The Final Rule Unlawfully Eliminates Disparate Impact Liability. ..... 26

A. The Elimination of Disparate Impact Liability Is Contrary to Law and Exceeds the CFPB's Authority. ..... 26

B. The Elimination of Disparate Impact Liability Is Arbitrary and Capricious. ..... 30

IV. The Final Rule Unlawfully Narrows ECOA's Discouragement Provisions. ..... 34

A. The Narrowing of Discouragement Provisions and Creation of Safe Harbors Is Contrary to Law and Exceeds the CFPB's Authority. ..... 34

B. The Final Rule's Discouragement Provisions Are Arbitrary and Capricious. ..... 37

V. The Final Rule Unlawfully Eliminates For-Profit SPCPs. ..... 39

A. The Elimination of For-Profit SPCPs Is Contrary to Law and in Exceeds the CFPB's Authority. ..... 39

B. The Final Rule's SPCP Changes Are Arbitrary & Capricious. ..... 40

VI. Because Acting Director Vought Was Unconstitutionally Serving, the Rule is Invalid. ..... 43

CONCLUSION ..... 45

## TABLE OF AUTHORITIES

**Cases** **Pages**

*AFL-CIO v. Chao*,
496 F. Supp. 2d 76 (D.D.C. 2007) ........ 16

*Albemarle Paper Co. v. Moody*,
422 U.S. 405 (1975) ........ 4

*Ass'n of Priv. Sector Colls. & Univs. v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012) ........ 17, 43

*Asylumworks v. Mayorkas*,
590 F. Supp. 3d 11 (D.D.C. 2022) ........ 43, 44, 45

*Bhandari v. First Nat'l Bank of Com.*,
808 F.2d 1082 (5th Cir. 1987) ........ 28

*Braeburn Inc. v. FDA*,
389 F. Supp. 3d 1 (D.D.C. 2019) ........ 10

*Bus. Roundtable v. SEC*,
647 F.3d 1144 (D.C. Cir. 2011) ........ 16, 20, 30

*Centro Legal de la Raza v. Exec. Office for Immigration Review*,
524 F. Supp. 3d 919 (N.D. Cal. 2021) ........ 15

*CFPB v. Townstone Fin., Inc.*,
107 F.4th 768 (7th Cir. 2024) ........ 5, 34, 35, 36

*CFPB v. Townstone Fin., Inc.*,
350 F.R.D. 32 (N.D. Ill. 2025) ........ 6

*Cigar Ass'n of Am. v. FDA*,
132 F.4th 535 (D.C. Cir. 2025) ........ 41

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ........ 23, 24

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003) ........ 36

*District of Columbia v. Dep't of Agric.*,
496 F. Supp. 3d 213 (D.D.C. 2020) ........ 38

*Florida Power & Light Co. v. United States*,
846 F.2d 765 (D.C. Cir. 1988) ........ 15

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006) ........................................ 28

*Genuine Parts Co. v. EPA*,
890 F.3d 304 (D.C. Cir. 2018) ........................................ 32

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) ........................................ 4, 27

*Judulang v. Holder*,
565 U.S. 42 (2011) ........................................ 39

*In re Lion Air Flight JT 610 Crash*,
110 F.4th 1007 (7th Cir. 2024) ........................................ 29

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ........................................ 29, 33

*Marzano v. Computer Sci. Corp. Inc.*,
91 F.3d 497 (3d Cir. 1996) ........................................ 36

*Miller v. Am. Express Co.*,
688 F.2d 1235 (9th Cir. 1982) ........................................ 28

*Miller v. Clinton*,
687 F.3d 1332 (D.C. Cir. 2012) ........................................ 44

*Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*,
463 U.S. 29 (1983) ........................................ 30

*Nasdaq Stock Market, LLC v. SEC*,
961 F.3d 421 (D.C. Cir. 2020) ........................................ 44

*Nat'l Cmty. Reinvestment Coal. v. CFPB*,
No. CV 20-2074 (BAH), 2022 WL 4447293 (D.D.C. Sept. 23, 2022) .......... *passim*

*Nat'l Fuel Gas Supply Corp. v. FERC*,
468 F.3d 831 (D.C. Cir. 2006) ........................................ 37

*Nw. Immigrant Rts. Project v. USCIS*,
496 F. Supp. 3d 31 (D.D.C. 2020) ........................................ 22

*Orion Rsrvs. Ltd. P'ship v. Salazar*,
553 F.3d 697 (D.C. Cir. 2009) ........................................ 39

*Pangea Legal Svcs. v. Dep't of Homeland Sec.*,
501 F. Supp. 3d 792 (N.D. Cal. 2020) ........................................ 15

*Paypal, Inc. v. CFPB*,
728 F. Supp. 3d 31 (D.D.C. 2024)....................16, 20, 37

*Petry v. Block*,
737 F.2d 1193 (D.C. Cir. 1984)....................14, 15

*Pulsifer v. United States*,
601 U.S. 124 (2024)....................27

*Sinclair Wyoming Ref. Co. v. EPA*,
114 F.4th 693 (D.C. Cir. 2024)....................40

*Sorenson Commc'ns Inc. v. FCC*,
755 F.3d 702 (D.C. Cir. 2014)....................20, 21, 30

*Soules v. HUD*,
967 F.2d 817 (2d Cir. 1992)....................37

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
997 F.3d 1247 (D.C. Cir. 2021)....................34

*Sugar Cane Growers Coop. of Fla. v. Veneman*,
289 F.3d 89 (D.C. Cir. 2002)....................14

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmties. Project, Inc.*,
576 U.S. 519 (2015)....................27, 28, 29

*Tripoli Rocketry Ass'n v. ATF*,
437 F.3d 75 (D.C. Cir. 2006)....................37

*U.S. Telecom Ass'n v. FCC*,
400 F.3d 29 (D.C. Cir. 2005)....................12

*United States v. Giraud*,
160 F.4th 390 (3d Cir. 2025)....................45

*United States v. Valencia*,
No. 5:17-cv-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018)....................44

*Widakuswara v. Lake*,
No. 832 F. Supp. 3d 55 (D.D.C. 2026)....................45

*World Shipping Council v. Fed. Mar. Comm'n*,
152 F.4th 215 (D.C. Cir. 2025)....................43

**Statutes**

5 U.S.C. § 604....................11

5 U.S.C. § 604(a). ....................11

5 U.S.C. § 605(b) ....................11, 14

5 U.S.C. § 706(2)(A)....................1, 10

5 U.S.C. § 706(2)(C)....................1, 10

5 U.S.C. § 706(2)(D)....................1, 10, 11

5 U.S.C. § 3345(a) ....................44

12 U.S.C. § 5481(b) ....................16

12 U.S.C. § 5491(b)(5) ....................44

12 U.S.C. § 5512(b)(2)(A)....................16

15 U.S.C. § 1691(a) ....................19, 26

15 U.S.C. § 1691(a)(1)....................27

15 U.S.C. § 1691(a)(2)....................27

15 U.S.C. § 1691(a)(3)....................27

15 U.S.C. § 1691(c) ....................39

15 U.S.C. § 1691(c)(1)....................43

15 U.S.C. § 1691(c)(2)....................43

15 U.S.C. § 1691(c)(3)....................6, 39

15 U.S.C. § 1691b(a) ....................2, 4, 34, 36

15 U.S.C. § 1691e(b) ....................27

15 U.S.C. § 1691e(g) ....................36

29 U.S.C. § 206(d)(1) ....................27

Pub. L. 93-495, 88 Stat. 1500 (1974)....................2, 29

Pub. L. No. 94-239, 90 Stat. 251 (1976)....................2

Pub. L. No. 102-242, 105 Stat. 2236 (1991)....................34

**Regulations and Federal Register Notices**

12 C.F.R. part 1002 ........ *passim*

Equal Credit Opportunity, Final Rule, 40 Fed. Reg. 49298 (Oct. 22, 1975) ........ 4, 34

Amendments to Regulation B to Implement the 1976 Amendments to the Equal Credit Opportunity Act, Final Rule, 42 Fed. Reg. 1242 (Jan. 6, 1977) ........ 2, 4, 6

Equal Credit Opportunity, Joint Notice of Proposed Enforcement Guidelines, 43 Fed. Reg. 29256 (July 6, 1978) ........ 34

Equal Credit Opportunity; Revision of Regulation B; Official Staff Commentary, Final Rule, 50 Fed. Reg. 48018 (Nov. 20, 1985) ........ 4, 5

Equal Credit Opportunity (Regulation B), Interim Final Rule, 76 Fed. Reg. 79442 (Dec. 21, 2011) ........ 2, 4

Home Mortgage Disclosure (Regulation C), Final Rule, 80 Fed. Reg. 66128 (Oct. 28, 2015) ........ 18

Small Business Lending Under the Equal Credit Opportunity Act (Regulation B), Final Rule, 88 Fed. Reg. 35150 (May 31, 2023) ........ 18, 19

Quality Control Standards for Automated Valuation Models, Final Rule, 89 Fed. Reg. 64538 (Aug. 7, 2024) ........ 13, 18, 19

Equal Credit Opportunity Act (Regulation B), Proposed Rule, 90 Fed. Reg. 50901 (Nov. 13, 2025) ........ *passim*

HUD's Implementation of the Fair Housing Act's Disparate Impact Standard, 91 Fed. Reg. 1475 (Jan. 14, 2026) ........ 33

Equal Credit Opportunity Act (Regulation B), 91 Fed. Reg. 21620 (April 22, 2026) ........ *passim*

**Legislative Materials**

Credit Discrimination: Hearings on H.R. 14856 and H.R. 14908 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency, 93d Cong., 2d Sess. 86 (1974) ........ 28

H.R. 1699, 104th Cong. (1995) ........ 28

H.R. 229, 105th Cong. (1997) ........ 28

H.R. No. 14856, 93d Cong. 2nd Sess. 3 (1974) ........ 28

S. Rep. No. 94-589 (Jan. 21, 1976) ........ 27, 40, 43

S. Rep. No. 102-167 (Oct. 1, 1991) ....................35

**Miscellaneous**

Exec. Order 12866, 58 Fed. Reg. 51735 (Sept. 30, 1993) ....................14, 15

Exec. Order 13563, 76 Fed. Reg. 3821 (Jan. 18, 2011) ....................14

Ben Miller-Gootnick, Note, *Boundaries of the Federal Vacancies Reform Act*, 56 Harv. J. on Legis. 459 (2019) ....................44

Small Business Administration, Office of Advocacy, A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act (Aug. 2017) ....................11

## INTRODUCTION

The Equal Credit Opportunity Act (ECOA) is the nation's hallmark civil rights law protecting against discrimination in lending. In April 2026, Defendant Consumer Financial Protection Bureau (CFPB) issued a Final Rule that guts some of ECOA's most effective tools by dramatically rewriting its implementing regulation, Regulation B. Reversing the government's previous fifty years of consistent and successful implementation of the statute, the Final Rule: (1) eliminates recognition of liability for practices that have a disparate impact on the basis of protected class; (2) dramatically narrows protections against discouraging prospective credit applicants from applying; and (3) functionally eliminates all Special Purpose Credit Programs (SPCPs) offered by for-profit lenders. These changes will increase credit discrimination and disparities, harming the very consumers ECOA is designed to protect, as well as organizations and service providers that work to effectuate ECOA's protections, including Plaintiffs National Fair Housing Alliance (NFHA), Rise Economy, BLDS, LLC, and SolasAI.

The Final Rule is arbitrary, capricious, and contrary to law. In its rulemaking, the CFPB attempted to justify its about-face from decades-long practice with a cursory cost-benefit analysis that eschews data in favor of speculation about the trickle-down benefits of deregulation. The CFPB also posited a statutory interpretation that fails to assess ECOA's text, history, or purpose. And it relied on an ahistorical view of discrimination and hypothetical concerns disproven by the record, while dismissing substantial foreseeable harms and significant reliance interests. The CFPB left unaddressed the significant comments pointing out these and other flaws, making no changes to its initial proposal. The Final Rule was also issued by an unlawfully installed "Acting Director" after a truncated comment period and without observing required procedures.

For all these reasons, the Court should set aside the Final Rule under the Administrative Procedure Act (APA). *See* 5 U.S.C. § 706(2)(A), (C), (D).

## FACTUAL BACKGROUND

### I. Statutory and Regulatory History

Congress enacted ECOA in 1974 and 1976 to require, with limited exceptions, that lenders make credit "equally available to all creditworthy customers without regard" to race, color, religion, national origin, sex, marital status, age, receipt of public assistance, and exercise of a right protected by the Consumer Credit Protection Act. Pub. L. No. 93-495, § 502, 88 Stat. 1500, 1521 (1974); Pub. L. No. 94-239, § 701, 90 Stat. 251, 251 (1976).

Congress required the Federal Reserve Board to promulgate regulations "necessary or proper to effectuate the purposes of [ECOA], to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." 15 U.S.C. § 1691b(a); Pub. L. 93-495, § 703, 88 Stat. 1500, 1522 (1974). First issued in 1977, those regulations, known as Regulation B, have consistently recognized that ECOA bars practices that have an unnecessary disparate impact based on the statute's protected classes. Regulation B has also prohibited actions that would discourage those consumers and businesses from applying for credit. And it has articulated reasonable standards for SPCPs, which are statutorily authorized credit programs designed to meet special social needs of particular groups, including those that share a common characteristic such as a protected trait. 42 Fed. Reg. 1242, 1257 (Jan. 6, 1977). The 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act transferred responsibility for implementing ECOA to the CFPB, which republished Regulation B without substantive change. 76 Fed. Reg. 79442 (Dec. 21, 2011).

In the fifty years since it was first issued, Regulation B has been essential for redressing discrimination and expanding access to credit. Among other things, the federal government and private plaintiffs have asserted disparate impact claims under ECOA in myriad lending discrimination cases, achieving relief for thousands of consumers through civil penalties, settlement funds, loan subsidy funds, and community outreach. *See, e.g.*, National Consumer Law

Center (NCLC) Cmt. AR22316–27 (compiling enforcement actions and outcomes). In response, lenders have made their practices more inclusive and expanded access to credit, without sacrificing the ability to ensure creditworthiness. *See* NFHA Cmt. AR4575 (describing programmatic relief from Department of Justice's enforcement actions); BLDS, SolasAI, & Stratyfy (BSS) Cmt. AR30383–85 (describing how disparate impact has improved processes for lenders and consumers). The regulation's anti-discouragement provisions have likewise protected against redlining and other exclusionary practices. *See* NFHA Cmt. AR4571–77 (describing discouragement protections). SPCPs previously allowed by the rule have reduced credit gaps across various markets. *See, e.g.*, NCRC Cmt. AR895 (describing benefits for borrowers and credit markets); A. Rubio Cmt. AR820–21 (describing efficacy of SPCPs); Lawyers' Committee for Civil Rights and ACLU Cmt. AR13886 (similar); *infra* pp. 39, 42.

**II. The November 2025 Notice of Proposed Rulemaking**

On November 13, 2025, the CFPB issued a Notice of Proposed Rulemaking (NPRM) proposing major changes to Regulation B. 90 Fed. Reg. 50901 (Nov. 13, 2025). Without explanation, the CFPB required comments to be submitted within just thirty-two days, by December 15. *See id*. On November 25, NFHA, BLDS, and SolasAI requested that the CFPB extend the deadline to allow for meaningful comments, *see* BSS Cmt. AR664–65; LCCHR and NFHA Cmt. AR668, as did many others, *see, e.g.*, AR661 (requesting extension), AR666 (same), AR668 (same), AR1733 (same). AR3851 (same). Plaintiffs explained that just one month—extending over the Thanksgiving holiday and coextensive with another CFPB major rule comment period affecting the same stakeholders—was insufficient to comment on the most far-reaching changes to Regulation B ever contemplated. Other commenters similarly explained why the compressed period deprived them of the chance to submit data, views, or arguments. *See, e.g.*,

NFHA Cmt. AR4608–09; Better Markets Cmt. AR31188; Woodstock Inst. Cmt. AR12115. The CFPB neither responded to Plaintiffs' concerns nor extended the comment period.

### III. The April 2026 Final Rule

The CFPB published the Final Rule on April 22, 2026, with an effective date of July 21, 2026. *See* 91 Fed. Reg. 21620 (Apr. 22, 2026). Despite receiving over 60,000 comments, the vast majority opposing the changes, the CFPB made no substantive changes to its proposed rule. *Compare* 90 Fed. Reg. at 50920–23, *with* 91 Fed. Reg. at 21668–70.

***Elimination of Disparate Impact Liability.*** Regulation B previously acknowledged that "Congress intended an 'effects test' concept, as outlined in the employment field by the Supreme Court in the cases of *Griggs v. Duke Power Co*., 401 U.S. 424 (1971), and *Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975), to be applicable to a creditor's determination of creditworthiness." 42 Fed. Reg. 1242, 1255 (Jan. 6, 1977), *previously codified at* 12 C.F.R. § 1002.6(a). Regulation B also explained the doctrine. *See* 50 Fed. Reg. 48018, 48050 (Nov. 20, 1985) (*previously codified at* 12 C.F.R pt. 1002, Supp. I, cmt. 6(a)-2)); 76 Fed. Reg. 79442, 79475 (Dec. 21, 2011).

The Final Rule, however, declares that ECOA "does not provide that the 'effects test' applies for determining whether there is discrimination in violation of [ECOA]," 91 Fed. Reg. at 21668 (12 C.F.R. § 1002.6(a)), and that "[ECOA] does not provide for the prohibition of practices that are facially neutral as to prohibited bases, except to the extent that facially neutral criteria function as proxies for protected characteristics designed or applied with [discriminatory intent]," *Id.* at 21670 (12 C.F.R. pt. 1002, Supp. I, cmt. 6(a)-2).

***Narrowing of Discouragement.*** Since its promulgation in 1975, Regulation B has included provisions to prevent evasions of ECOA, as specifically authorized by 15 U.S.C. § 1691b(a), including by prohibiting creditors from discriminatorily discouraging prospective applicants from obtaining credit. *See* 40 Fed. Reg. 49298, 49307 (Oct. 22, 1975). In 1985, the Federal Reserve

Board reaffirmed that Regulation B's protections "cover[] acts or practices directed at potential applicants." 50 Fed. Reg. at 48050, *previously codified at* 12 C.F.R. pt. 1002, Supp. I, cmt. 4(b)-1.

The Final Rule substantially narrows prohibited discouragement through four significant changes. First, the Rule narrows what constitutes discouragement from a variety of potential "acts or practices" to only "spoken or written words, or visual images." 91 Fed. Reg. at 21668 (modifying 12 C.F.R. § 1002.4(b)). Second, the Final Rule narrows the definition of discouragement, which previously covered anything that "would discourage on a prohibited basis a reasonable person from making or pursuing an application" to now only cover what the creditor "knows or should know would cause a reasonable person to believe that the creditor would deny, or would grant on less favorable terms," their credit application because of protected characteristics. *Id.* (modifying 12 C.F.R. § 1002.4(b)). Third, the Final Rule announces that encouraging one group of consumers, but not other groups, cannot constitute discouragement. *Id.* at 21669 (modifying 12 C.F.R. pt. 1002, Supp. I, cmt. 4(b)-1). Finally, the Final Rule creates safe harbors from unlawful discouragement liability for three broad categories of statements: (a) "[s]tatements in support of local law enforcement"; (b) "[s]tatements recommending that, before buying a home in a particular neighborhood, consumers investigate, for example, the neighborhood's schools, its proximity to grocery stores, and its crime statistics"; and (c) "[s]tatements encouraging consumers to seek out resources to develop their financial literacy."[1] *Id.* at 21669–70 (modifying and adding 12 C.F.R. pt. 1002, Supp. I, cmt. 4(b)-1.ii.B, C, D).

---

[1] Some statements the Final Rule attempts to immunize mirror statements a mortgage lender called Townstone Financial allegedly made to discourage prospective applicants from Black neighborhoods in Chicago, resulting in a 2022 CFPB lawsuit. In that suit, the CFPB alleged Townstone redlined neighborhoods, including through derogatory statements about crime, credit scores, and a grocery store in downtown Chicago that Townstone described as the "Jungle Jewel." *CFPB v. Townstone Fin., Inc.*, 107 F.4th 768, 772 (7th Cir. 2024). The parties settled after the CFPB prevailed in the Seventh Circuit. But in 2025, under new leadership, the CFPB

***Functional Elimination of SPCPs Offered by For-Profit Organizations.*** ECOA provides an exception to its discrimination prohibitions for SPCPs "offered by a profit-making organization to meet special social needs which meet[ ] standards prescribed in regulations by the [CFPB]." 15 U.S.C. § 1691(c)(3). Since 1977, Regulation B has implemented this provision by permitting for-profit organizations to operate credit programs that were (1) established and administered pursuant to written plans identifying the classes of persons the program benefitted and setting forth the procedures and standards for extending credit; and (2) established and administered to "extend credit to a class of persons who, pursuant to the customary standards of creditworthiness used by the organization extending the credit, either probably would not receive such credit or probably would receive it on less favorable terms than are ordinarily available to other applicants." 42 Fed. Reg. at 1256–57, *previously codified at* 12 C.F.R. § 1002.8(a). For decades, for-profit lenders have used this authorization to create SPCPs such as lending programs for minority- or women-owned small businesses.

The Final Rule makes three significant changes with respect to these programs, functionally eliminating them. First, it explicitly eliminates race, color, national origin, and sex as potential SPCP bases. *See* 91 Fed. Reg. at 21669 (adding new 12 C.F.R. § 1002.8(b)(3)). Second, it narrows SPCPs pertaining to other bases to only for-profit lenders that will declare they would refuse to provide credit to every member of the relevant group except through its SPCP. *See id.* at 21668–70 (modifying 12 C.F.R. § 1002.8(a)(3)(ii), and 12 C.F.R. pt. 1002, Supp. I, cmt. 8(a)-5, and adding 12 C.F.R. § 1002.8(a)(3)(i)(D), and 12 C.F.R. § 1002.8(b)(4)). Third, it imposes

reversed course and asked the district court to vacate its judgment memorializing the settlement. The court denied the motion, describing the CFPB's legal position as an "act of legal hara-kiri that would make a samurai blush." *CFPB v. Townstone Fin., Inc.*, 350 F.R.D. 32, 39 (N.D. Ill. 2025); *see also* NFHA Cmt. AR4571–73 (describing background of case).

additional procedural requirements. *See id.* at 21668 (adding 12 C.F.R. § 1002.8(a)(3)(i)(E)). The CFPB did not explain why the Final Rule leaves unchanged Regulation B's SPCP provisions for creditors other than for-profit lenders. *See id*. at 21658–59.

## IV. The Acting Director at the Time of the Rulemaking

The Final Rule was issued during Russell Vought's tenure as putative Director of the CFPB, which lasted from February 7, 2025, to August 1, 2026. Exhibit 1, Decl. of L. Miller, ¶¶ 7, 9. President Trump fired the last Senate-confirmed Director, Rohit Chopra, on February 1, 2025. *Id.* ¶¶ 4–5. On February 7, President Trump named Office of Management and Budget Director Russell Vought as the agency's Acting Director. *Id.* ¶ 7. On February 11, 2025, President Trump nominated Jonathan McKernan to serve as Director. *Id.* ¶ 10. President Trump withdrew McKernan's nomination on May 12, 2025. *Id.* ¶ 11. On November 18, 2025, President Trump nominated Stuart Levenbach to serve as Director. *Id.* ¶ 12. At the time, a CFPB spokesperson reportedly described this nomination as a "technical" maneuver to extend Mr. Vought's tenure as Acting Director. *Id.* ¶¶ 14–15. On January 3, 2026, the Senate sent Mr. Levenbach's nomination back to the President without acting on it. *Id.* ¶ 13. Mr. Vought continued serving as Acting Director of the CFPB until August 1, 2026, when Mark Paoletta became Acting Director. *Id.* ¶ 9. Mr. Vought signed both the NPRM and the Final Rule. *See* 90 Fed. Reg. at 50923; 91 Fed. Reg. at 21670.

## V. The Final Rule's Impact on Plaintiffs

***NFHA*** is a non-profit organization that works to build inclusive, well-resourced, and resilient communities; ensure equitable housing opportunities for all people and communities; and eliminate housing discrimination. Exhibit 2, Decl. of L. Rice, ¶ 5. To carry out its mission, NFHA provides technical assistance regarding product fairness and consumer harm mitigation to financial institutions and other users and developers of algorithmic models. *Id.* ¶ 10. NFHA developed tools for these purposes, including an auditing framework called "Purpose, Process, and Monitoring"

and a platform to test underwriting models, FairLensKit. *Id.* ¶¶ 11–14. By eliminating disparate impact liability, the Final Rule removes the primary incentive for creditors to engage NFHA to assess the fairness of their lending programs and propose measures to mitigate harm, effectively devaluing NFHA's tools. *Id.* ¶¶ 13–15. NFHA also utilized SPCPs as a key component of its mission-driven work to advance homeownership for people who have historically confronted discriminatory barriers to credit. *Id.* ¶¶ 21, 26. Because the Final Rule functionally eliminates for-profit organization SPCPs, it directly impairs NFHA's homeownership promotion work and removes creditors' incentives to engage NFHA for SPCP-related services, such as analyses, training, and monitoring to support the creation and operation of SPCPs. *Id.* ¶¶ 19–31.

***Rise Economy*** is a non-profit that works to expand access to credit, financial services, and investments in low-income communities and communities of color. Ex. 3, Decl. of K. Stein, ¶ 4. To advance its mission, Rise Economy devotes substantial resources to negotiating Community Benefits Agreements (CBAs) with creditors. *Id.* ¶ 5. CBAs facilitate creditors' engagement with and service of the credit needs of communities of color, low-income communities, and women- and/or minority-owned small businesses. *Id.* SPCPs are a proven mechanism to ensure that creditors will provide loans to the communities that Rise Economy serves, and Rise Economy has therefore included them in CBAs. *Id.* Because the Final Rule effectively eliminates for-profit organization SPCPs, Rise Economy will not be able to negotiate their inclusion in future CBAs and thus will lose a critical tool for increasing access to credit. *Id.* ¶ 6. As a result, the elimination of for-profit organization SPCPs directly impairs Rise Economy's work to expand access to credit in communities of color. *Id.* When Rise Economy recently encouraged a for-profit organization to launch an SPCP, the organization responded by noting the NPRM's contemplated restriction of SPCPs and directed Rise Economy to raise its concerns with the CFPB. *Id.*

***BLDS, LLC*** is a financial consulting service that is hired by financial institutions, governmental entities, and other companies. Exhibit 4, Decl. of B. Siskin, ¶ 4. Financial institutions engage BLDS to provide statistical analyses of credit policies, procedures, automated models, and other credit-related practices to identify and mitigate legal and compliance risks related to disparate impact liability. *Id.* ¶ 6. These analyses include identifying potential unnecessary discriminatory effects and available alternatives that would ameliorate them while still meeting the client's business needs. *Id.* Creditors also engage BLDS to assist with preparing for and interacting with supervisory agencies during relevant fair lending examinations and to assist with creditors' defense in relevant enforcement actions and litigation. *Id.* ¶ 10. The Final Rule removes the primary incentive for creditors to hire BLDS for this work. *Id.* ¶¶ 18, 39, 47.

Financial institutions also engage BLDS to provide statistical analyses of credit advertising and marketing campaigns, branch location decisions, and application and origination distributions across geographic areas and demographic groups to mitigate potential legal and compliance risks related to ECOA and Regulation B prohibitions against discouragement. *Id.* ¶ 7. The Final Rule decreases creditors' demand for BLDS's services by eliminating protections against discriminatory "acts or practices" and "selective encouragement" of prospective applicants. *Id.* ¶ 38. For-profit financial institutions also engage BLDS to provide statistical and quantitative analyses to support their design and monitoring of SPCPs. *Id.* ¶ 8. Because the Final Rule effectively eliminates for-profit organization SPCPs, these organizations have no incentive to engage BLDS for quantitative and statistical support to develop or monitor these programs. *Id.* ¶ 47. BLDS has suffered economic and reputational harm as a direct result of the Final Rule. *Id.* ¶ 16. Some clients have reduced their expenditures on BLDS's services and other clients are likely to do the same. *Id.*

***SolasAI*** develops software and provides other services to help detect, explain, and reduce discrimination and bias in credit models and other algorithms, particularly in machine-learning models that use artificial intelligence. Exhibit 5, Decl. of L. Bradley, ¶ 4. SolasAI's business is built around its proprietary software and related services, and its clients pay to license its software to analyze their automated models, including machine-learning models and/or algorithms. *Id.* ¶ 6. SolasAI's clients include banking, lending, and fintech companies. *Id.* By eliminating disparate impact liability from ECOA, the Final Rule directly reduces demand for SolasAI's software and services. *Id.* ¶ 16. Clients also license SolasAI's products to assess and address risks related to advertising and marketing and the identification of viable, less discriminatory alternatives. *Id.* ¶ 20. Prior to the Final Rule, SolasAI anticipated application of its tools and services to marketing models to be a significant growth area because of the increasing use of models for marketing purposes by financial institutions. *Id.* The Final Rule's contraction of discouragement guardrails substantially diminishes creditors' incentives to use SolasAI to perform analyses of their marketing practices. SolasAI has suffered economic and reputational harm as a direct result of the Final Rule. *Id.* ¶ 27. Some existing clients have reduced the resources they expend on its services, while other prospective clients paused the engagement agreement process due to the Final Rule. *Id.* ¶ 26. As a result of reduced demand, SolasAI was also forced to delay a capital raise for its product. *Id.*

## LEGAL STANDARD

Under the APA, this Court shall "hold unlawful and set aside agency action" that is "found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," or "without observance of procedure." 5 U.S.C. § 706(2)(A), (C), (D). "In APA cases involving cross-motions for summary judgment, the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Braeburn Inc. v. FDA*, 389 F. Supp. 3d 1, 15 (D.D.C. 2019) (cleaned up).

## ARGUMENT

### I. The CFPB Failed to Follow Required Procedures.

The CFPB unnecessarily rushed the rulemaking and bypassed key procedural steps, stripping the process of informed analysis and participation, by failing to prepare a Final Regulatory Flexibility Analysis (FRFA) and failing to provide adequate time for comment. The agency thus failed to follow procedures required by law, and the Final Rule should be vacated and remanded. *See* 5 U.S.C. § 706(2)(D).

***The CFPB Failed to Prepare a FRFA.*** The Regulatory Flexibility Act (RFA) requires that, when issuing a rule subject to notice-and-comment rulemaking, agencies must prepare an initial regulatory flexibility analysis and then a FRFA. *See* 5 U.S.C. § 604. The FRFA should, among other things, describe the steps taken to minimize significant economic impact on small entities; include the factual, policy, and legal reasons for the approach reflected in the rule; describe why alternatives were rejected; and identify steps taken to minimize the additional cost of credit for small entities. *Id.* § 604(a). These requirements apply unless the agency provides a "factual basis" to support a certification that the rule will not have a significant economic impact on a substantial number of small entities. *Id.* § 605(b); *see* SBA, Office of Advocacy, A Guide for Government Agencies, How to Comply with the Regulatory Flexibility Act 12 n.50, 13 (Aug. 2017), https://advocacy.sba.gov/wp-content/uploads/2019/06/How-to-Comply-with-the-RFA.pdf (certification should, at minimum, describe the number of affected entities and size of economic impacts, and, if quantitative data is unavailable, explain why).

Here, the CFPB neither prepared a FRFA nor demonstrated that none was required. The Final Rule, like the NPRM, states that the statutory requirement is inapplicable because "[t]he Bureau does not expect the rule to impose significant economic impacts on small entities relative to the baseline." 91 Fed. Reg. at 21667; *see* 90 Fed. Reg. at 50920. This bare assertion does not

provide the "factual basis" required under Section 605. Although the CFPB noted in the Final Rule that commenters flagged the inadequacy of the "certification," it nonetheless failed either to prepare a FRFA or to provide an adequate factual basis for skipping required analysis. The CFPB merely offered the conclusory statement that "[b]y certifying that the final rule will not have a significant economic impact on a substantial number of small entities, the Bureau does not have to complete an initial/final RFA." *Id.* That statement comes nowhere near satisfying Section 605(a)'s requirements. *See, e.g.*, *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42-43 (D.C. Cir. 2005) (remanding to conduct a proper FRFA concluding its absence cannot be harmless).

Contrary to the CFPB's conclusory "certification," the record confirms that a FRFA was required for the Final Rule because of its significant economic impacts. The CFPB ignored comments showing that the impact on small business creditors is of the magnitude that should be addressed in a FRFA. *See, e.g.*, Citizens Rulemaking Alliance Cmt. AR632 (compliance costs "readily exceed nine figures in aggregate"); *see also* Ctr. for Mort. Access (CMA) Cmt. AR13742–43; CRL Cmt. AR5923. Commenters pointed out that the NPRM, in discussing its certification, referenced only impacts from the SPCP portion of the proposed rule, ignoring the CFPB's other changes. NFHA Cmt. AR4612–13; CMA Cmt. AR13742. The final "certification," however, continued to ignore costs to thousands of small entities arising from the non-SPCP changes, including changes to compliance systems, training programs, recordkeeping, and other systems to comply with the other two sections of the new rule. 91 Fed. Reg. at 21667; *see also, e.g.*, Nat'l Hous. Conf. Cmt. AR28166–67 (costs of uncertainty); Better Markets Cmt. AR31184 (similar); Nat'l Ass'n of Realtors Cmt. AR33238–39 (similar). These costs will harm credit access. *See, e.g.*, Hispanic Organization of Mortgage Experts Cmt. AR8550 (compliance uncertainty results in a reduction of credit offerings).

Even for the SPCP changes, the CFPB made no effort to ascertain the number of small-business creditors that offer such programs, the number of small businesses that might have benefitted from SPCPs that are no longer available, or the economic impact on those entities of the Final Rule's elimination of such programs. 91 Fed. Reg. at 21667. The Final Rule does assert that the compliance costs associated with the SPCP changes are similar to those for the CFPB's Automated Valuation Models (AVM) Rule, 91 Fed. Reg. at 21660–61. Notably, however, the CFPB deemed the impacts of the AVM Rule to be significant enough to warrant a FRFA, 89 Fed. Reg. 64538, 64560 (Aug. 7, 2024), yet it failed adequately to explain why the effects of the Final Rule do not merit the same result. As discussed below, the compliance costs here are in fact almost certainly higher than the AVM Rule given the significantly broader scope of the Final Rule.

The certification also ignored impacts on credit service providers, like Plaintiffs. BLDS, SolasAI, and NFHA are "small entities" hired by creditors to ensure that their products and services are offered in a fair, responsible, and nondiscriminatory manner. Siskin Decl. ¶¶ 17–49 (impact of Final Rule); Bradley Decl. ¶¶ 14–26 (similar); Rice Decl. ¶¶ 11–31 (similar). Plaintiffs' comments explained that the proposed changes would "throw decades of compliance efforts into disarray," disrupting compliance investments and creating uncertainty. *See* BSS Cmt. AR30387. As a direct result of the Final Rule, Plaintiffs, on behalf of their clients, have been forced to change their services, analyses, methodologies, monitoring, and consulting. *See supra* pp. 7–10. The Final Rule's significant impacts on Plaintiffs and others like them required the CFPB to prepare a FRFA.

Moreover, only after commenters pointed out that the NPRM also did not mention impacts on small businesses as credit *applicants*, the CFPB belatedly purports in the Final Rule to have "assessed" those impacts in deciding not to prepare a FRFA. 91 Fed. Reg. at 21667. But that bare recognition did not address the significant impacts on this group, including for minority-owned

and women-owned small businesses, who will lose access to SPCPs. As a result of the other changes in the Final Rule, small business applicants also "may be more likely to be denied credit or to pay higher prices," as the CFPB acknowledges will be true for other consumer-applicants, *see* 91 Fed. Reg. at 21661, but ignores for small business applicants.

Seeking to avoid quantification or serious consideration of potential impacts, the CFPB referred to supposed "limitations on what data are available." 91 Fed. Reg. at 21659. But if it lacked data, the CFPB also lacked the "factual basis" necessary to certify that the Final Rule will not have a significant impact on a substantial number of small entities. *See* 5 U.S.C. § 605(b). And commenters identified data available to the CFPB, such as its own supervisory and enforcement data and other sources it has used for past analyses. *See* CMA Cmt. AR13738; NFHA Cmt. AR4587; CRL Cmt. AR5932. The CFPB was thus wrong that "[c]ommenters did not provide or suggest any additional data or analyses that would improve" its analysis, 91 Fed. Reg. at 21667, rendering its certification factually incorrect in addition to facially insufficient.

***The CFPB Failed to Provide Adequate Time for Comment.*** Agencies must "give an opportunity for interested persons to participate in the rulemaking through submission of written data, views, or arguments." *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002). Generally, a "meaningful opportunity to comment on [a] proposed regulation" must "include a comment period of not less than 60 days." Exec. Order 12866, 58 Fed. Reg. 51735, 51740 (Sept. 30, 1993); *see also* Exec. Order 13563, 76 Fed. Reg. 3821, 3822 (Jan. 18, 2011); *Petry v. Block*, 737 F.2d 1193, 1201 (D.C. Cir. 1984) (noting approvingly the Administrative Conference's position that thirty days is "inadequate" and sixty days should be the "minimum").

The comment period fell well below that minimum, lasting just thirty-two days. The CFPB ignored Plaintiffs' requests for additional time, and it identified no exigent circumstances

justifying a need to limit commenters to just one month. *Cf. Florida Power & Light Co. v. United States*, 846 F.2d 765, 772 (D.C. Cir. 1988) (holding fifteen-day period was sufficient only where "Congress gave [agency] only ninety days to report and forty-five more days to enact a final rule").

The truncated period was inadequate for a rule of this complexity, which is a "significant regulatory action" under Executive Order 12866. The NPRM announced major changes to three different aspects of Regulation B—the most significant changes since the regulation was first promulgated over fifty years ago. Complex technical data and analysis were needed to inform the rulemaking process. *Petry*, 737 F.2d at 1201. Worse, the comment period included a major holiday and coincided with the CFPB's simultaneous comment period for a separate significant proposal to amend Regulation B to implement independent ECOA data collection requirements. *See* 90 Fed. Reg. 50952 (Nov. 13, 2025) (proposed data collection rule); *see also Pangea Legal Svcs. v. Dep't of Homeland Sec.*, 501 F. Supp. 3d 792, 819 (N.D. Cal. 2020) (noting "short" thirty-day comment period and that intervening holidays "undercut" participation); *Centro Legal de la Raza v. Exec. Office for Immigration Review*, 524 F. Supp. 3d 919, 955 n.26 (N.D. Cal. 2021) (participation harmed by holiday during comment period and "overlap[]" with other comment periods).

That the CFPB received many comments does not cure the inadequacy. The volume of comments received is not probative of whether commenters were able to address all relevant topics or to gather and analyze materials and data for fully informed participation. On the contrary, the record shows that several commenters requested extensions and identified matters that they were unable to cover in such a short comment window. *See, e.g.*, HOPE Credit Union Enter. Corp. Pol'y Inst. Cmt. AR4920 (requesting extension); Ams. for Financial Reform Educ. Fund Cmt. AR11049 (specifying topics that could not be covered in period). Plaintiffs, too, could have had more robust participation had the comment period been longer. *See, e.g.*, Rice Decl. ¶ 33; Siskin Decl. ¶ 51;

Bradley Decl. ¶ 29. Relief on this basis is therefore appropriate. *Cf. AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 90 (D.D.C. 2007) (vacating the challenged rule where the agency failed to provide an opportunity for comment).

Because the agency failed to comply with required procedures, the Final Rule should be vacated.

## II. The CFPB's Failure to Conduct a Meaningful Cost-Benefit Analysis Was Arbitrary, Capricious, and Not in Accordance with Law.

Section 1022 of the Dodd-Frank Act requires the CFPB to "consider . . . the potential benefits and costs" of a regulation to both "consumers" and "covered persons" 12 U.S.C. § 5512(b)(2)(A). The agency's analysis must account for (1) "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to financial products or services"; and (2) "the impact on consumers in rural areas." *Id*. A "covered person" includes any person or affiliate that offers or provides a consumer financial product or service. 12 U.S.C. § 5481(b). This provision requires a "rigorous assessment," *Paypal, Inc. v. CFPB*, 728 F. Supp. 3d 31, 44 (D.D.C. 2024), not "mere lip service" or "superficial attention," *Nat'l Cmty. Reinvestment Coal. v. CFPB*, No. CV 20-2074 (BAH), 2022 WL 4447293, at *28 (D.D.C. Sept. 23, 2022) (*NCRC*); *see Paypal*, 728 F. Supp. 3d at 44 (finding that the CFPB's failure "to meaningfully assess the costs and benefits" violated "the APA's general requirement that an agency consider[] . . . all the relevant factors" (internal quotation omitted)); *see also Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (holding that the SEC acted arbitrarily and capriciously by failing adequately to assess the economic effects of a new rule).

The Final Rule's insubstantial discussion of potential costs and benefits falls short by: (1) failing to quantify and assess foreseeable costs and benefits; (2) relying on speculation and conjecture; and (3) ignoring relevant evidence, including substantial shortcomings raised by

commenters. These serious flaws render the Final Rule arbitrary, capricious, and contrary to law. On this basis alone, the Final Rule should be vacated.

### A. The CFPB Failed to Quantify the Final Rule's Costs and Benefits.

The CFPB did not attempt to assess the quantifiable effects of the Final Rule. The CFPB justified its cursory approach by claiming that "limitations on what data are available restrict[ed] [its] ability to quantify the potential costs, benefits, and impacts" of the Final Rule. 91 Fed. Reg. at 21659. Due to this purported data gap, the CFPB claimed that it "generally provide[d] a qualitative consideration" of effects with insights from "[g]eneral economic principles." *Id*. These assertions are both inaccurate and inadequate.

First, the CFPB did not lack access to data; it ignored available sources. As commenters explained, given the agency's years of supervisory, enforcement, and regulatory experience; its authority to conduct market monitoring; and its access to the expertise of other agencies, the CFPB had at its disposal extensive data to quantify and assess the effects of the Final Rule. *See, e.g.*, CMA Cmt. AR13737–41 (describing available data on costs, consumer impacts, market access and branch location decisions, prevalence of SPCPs, and benefits and costs of SPCPs); CRL Cmt. AR5924–26; Better Markets Cmt. AR31187. The CFPB's "failure to address these comments, or at best its attempt to address them in a conclusory manner, is fatal to its defense." *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012). If the CFPB provided adequate time, commenters could have marshalled even more data relevant to the proposal.

Second, even if data were limited or imperfect, the CFPB's "[m]ere reference" to potential effects, without "discussion or analysis of possible avenues to develop assessment tools for measuring or surveying the cost," failed to meet its obligation for "full consideration." *NCRC*, 2022 WL 4447293 at *28. The CFPB "is not excused from its statutory obligation to determine as best it can the economic implications of the rule it has proposed, even where it is without a reliable

basis for determining the precise costs of its action." *Id.* (internal quotation marks omitted). Commenters identified "evident and massively significant" impacts that would likely result from undoing more than fifty years of regulatory protections. *Id.* at *29. Such impacts "cannot be dismissed without further inquiry, even if [their] value is unquantified." *Id.*

The CFPB knows how to access relevant information and estimate impacts. For example, when the CFPB amended its rule implementing the Home Mortgage Disclosure Act (HMDA) in 2015, it estimated impacts using a "cost-accounting, case-study methodology" consisting "of interviews with 20 financial institutions of various sizes, nine vendors, and 15 governmental agency representatives," combined with information from the Regulatory Flexibility Analysis, historical data, regulatory datasets and expertise, and other sources. *See* 80 Fed. Reg. 66128, 66269–75 (Oct. 28, 2015). The CFPB assembled a matrix of eighteen compliance tasks to estimate one-time and ongoing costs across three tiers of financial institutions. *Id.*; *see also* 88 Fed. Reg. 35150, 35172, 35494–96 (May 31, 2023) (describing methodology used in separate rulemaking, including a "one-time cost survey" of over 100 entities, review of regulatory datasets, and estimates based on entity sophistication).

By contrast, here, claiming "not [to] have the data to provide quantitative estimates of the one-time costs that covered persons will incur," the CFPB instead only "provides a rough estimate based on one-time costs estimated for other rules." 91 Fed. Reg. at 21660. But those "other rules" do not provide a reasonable basis to estimate costs here. The CFPB first points to a rule regarding Automated Valuation Models (AVM Rule), which establishes "quality control standards" for a limited number of specific models used to estimate property values in certain mortgage transactions. 89 Fed. Reg. 64538 (Aug. 7, 2024), *codified at* 12 C.F.R. § 1026.42. The AVM Rule has almost nothing in common with the Final Rule. For one, the Final Rule is significantly broader

than the AVM Rule in terms of coverage. The Final Rule covers *all* creditors (not just entities that use AVMs), *all* credit transactions (not just mortgages involving AVMs, but all mortgages, small business loans, credit cards, student loans, auto loans, personal loans, etc.), and *all* "aspect[s] of a credit transaction," 15 U.S.C. § 1691(a) (ECOA's coverage), including underwriting, pricing, termination, and collection procedures. 12 C.F.R. § 1002.2(m) ("credit transaction" definition). Moreover, the AVM Rule estimates costs only for "small nondepository entit[ies]," 89 Fed. Reg. at 64569, which are not reflective of costs for the larger entities, including depositories, governed by the Final Rule. Finally, the Final Rule does not offer an honest cost comparison, as it limits the estimated one-time compliance costs for the Final Rule to just *one third* of the estimate for the drastically narrower AVM Rule without meaningful explanation of the percentage the CFPB selected. *See* 91 Fed. Reg. at 21660.

The CFPB also looked to cost estimates that it made in adopting a rule implementing Section 1071 of the Dodd-Frank Act, which requires certain institutions to report data on small business lending. *See* 91 Fed. Reg. at 21660 (citing 88 Fed. Reg. 35150 (May 31, 2023)). Although the 1071 rule demonstrates the CFPB *can* create detailed rule cost estimates, *see* 88 Fed. Reg. at 35496–503, its methodology is inapplicable to estimate the costs of the Final Rule. Moreover, the Final Rule again does not offer an honest cost comparison, ignoring over $50,000 in per lender costs estimated for the 1071 rule even though similar categories of compliance costs will be imposed by the Final Rule. *Compare* 91 Fed. Reg. at 21660–62 (Final Rule considering only estimated costs of up to $4,200 for policy development and $5,300 for training), *with* 88 Fed. Reg. at 35507, Table 11 (1071 rule including an additional $51,700 in other categories of costs such as "Preparation/planning," "Updating computer systems," "Testing/validating systems," "Legal/compliance review," and "Post-implementation review").

In short, the CFPB's "rough estimates" have no basis, and the CFPB made no attempt to improve them after commenters identified the deficiencies.

### B. The CFPB's Benefits Analysis Relies on Mere Speculation.

***Benefits to Creditors.*** To justify the Final Rule's disparate impact and discouragement provisions, the CFPB relies on its "belie[f]" that these provisions are "deregulatory in nature and hence will benefit covered persons in the long run by reducing compliance burden" and litigation costs. 91 Fed. Reg. at 21659–61. The CFPB hypothesizes that these changes "could increase" covered entities' "profitability" by "improving operational flexibility and spurring innovation." *Id.* at 21660, 21661. Narrower discouragement prohibitions, the agency asserts, might allow creditors to "relocate branch locations" or spend less on overseeing marketing and pre-application interactions. *Id.* at 21662. Further, it claims that covered persons may even "enjoy the benefits of expanded free speech with reduced legal risk." *Id.* As for the new SPCP provision, the CFPB identifies no benefits to covered entities. *Id.* at 21663.

These purported benefits have "no basis beyond mere speculation." *Bus. Roundtable*, 647 F.3d at 1150. The CFPB presented no "independent analysis," no studies, no estimates, and no evidence to support its predictions. *Paypal*, 728 F. Supp. 3d at 44. Instead, it relied on "sheer speculation" without "articulat[ing] a satisfactory explanation." *Sorenson Commc'ns Inc. v. FCC*, 755 F.3d 702, 708–09 (D.C. Cir. 2014) (stating that deference to "agency's predictive judgments about the likely economic effects of a rule . . . must be based on some logic and evidence").

Other purported "benefits" are clearly not benefits at all. For instance, the CFPB touted that because the Final Rule would no longer cover marketing "acts or practices," such as targeting or excluding consumers on the basis of protected class, creditors will have freedom to "conduct more targeted advertising campaigns and offer certain products to subsets of consumers." 91 Fed. Reg. at 21666. That "freedom," though, simply means creditors can intentionally discriminate

against consumers because of their protected traits by excluding them from offers or advertisements. *See* NFHA Cmt. AR4575–76. Labeling creditors' freedom to intentionally market their products on the basis of race or other protected traits as a "benefit" is, at best, incomplete without some non-speculative assessment of the ultimate benefits, as well as careful consideration of the impact felt by those on the other side of the transaction.

***Benefits to Consumers.*** The CFPB's "consideration" of benefits to consumers is even more deficient. The CFPB hypothesizes that the Final Rule's cost savings for covered entities "could be passed on to consumers through lower prices," or that consumers may experience a "faster credit application process and greater product variety." 91 Fed. Reg. at 21661–62. As for the SPCP provision, the CFPB theorizes that some consumers might "see additional credit availability" if, for example, covered entities discontinue SPCPs and make any operational savings available to previously ineligible consumers. *Id.* at 21665. Commenters challenged the CFPB's unsupported theorizing, but the CFPB dismissed their concerns. *See* NFHA Cmt. AR4587.

These are precisely the kinds of claims that this Court has found to be "speculative" and, in the absence of "empirical data or even broader survey data," arbitrary and capricious. *NCRC*, 2022 WL 4447293, at *22 n.17 (holding that it was arbitrary and capricious to speculate that a rule "could be a boon to consumers" because financial institutions would "pass the [compliance] savings on to consumers and/or increase their presence in the mortgage market"); *see also Sorenson*, 755 F.3d at 708 (holding agency's predictive judgments must be based on evidence, "not sheer speculation"). Despite this admonishment, the Final Rule includes no evidence supporting the conjecture about pass-through savings, faster applications, or expanded offerings.

**C. The CFPB Refused to Consider Relevant Evidence of the Final Rule's Costs.**

***Costs to Creditors.*** The CFPB ignored extensive evidence undermining its speculation about cost savings. For instance, it minimized the potential costs of eliminating for-profit

organization SPCPs by declaring their "prevalence" to be "quite low." 91 Fed. Reg. at 21664. But the CFPB failed to meaningfully engage with comments challenging this characterization, *see* CMA Cmt. AR13740, and provided no factual basis for its claim, despite acknowledging that "[s]ince 2021, there has been growth in the number of SPCPs," 91 Fed. Reg. at 21664.

The CFPB also failed meaningfully to engage with comments highlighting the lost advantages to lenders (and consumers) that should be analyzed as costs. *See, e.g.*, Nat'l Ass'n of Realtors Cmt. AR33238–39 (stating that restricting SPCPs will "stop[] private market participants from innovating to offer the broadest possible services"); Consumer Bankers Ass'n Cmt. AR12716–17 (describing how SPCPs have been helpful for member banks); Indep. Cmty. Bankers of Am. Cmt. AR32093 (stating that the rule would "leave banks less able to comply with the requirements of fair lending laws and the CRA"); Consumer Fed. of Am. Cmt. AR15315 (explaining that SPCPs benefit lenders and small businesses). While the CFPB summarizes some of these comments, 91 Fed. Reg. at 21661, "[a] mere recitation of significant comments followed by a conclusory statement is not a hallmark of reasoned decisionmaking." *Nw. Immigrant Rts. Project v. USCIS*, 496 F. Supp. 3d 31, 76 (D.D.C. 2020) (stating that disagreement "without analysis or support" is inadequate). The CFPB's speculation also runs contrary to evidence explaining, for example, that disparate impact is a "pro-innovation" framework, another benefit lost under the Final Rule. *See infra* p. 31. Neither did the Final Rule take account of lost opportunities for market expansion, reputation enhancement, and risk mitigation resulting from the Final Rule. NFHA Cmt. AR4587; NCLC Appendices AR22342–82 (compiling industry opposition to other regulatory attempts to roll back disparate impact). The CFPB's "short shrift to the 'nonquantifiable harms' resulting from" the Final Rule is another serious flaw. *NCRC*, 2022 WL 4447293, at *27.

The CFPB further failed to consider evidence that purported compliance savings are overstated because the Final Rule creates uncertainty for creditors that still face disparate impact liability under other statutes. CRL Cmt. AR5928–29. The CFPB could have attempted to estimate the unique compliance burdens created by the Final Rule or to dissociate the estimated cost savings from remaining costs attributable to overlapping regulations. *See* NCRC, 2022 WL 4447293 at *23 (reasoning that failure to measure unique burdens of rule does not satisfy duty "to address significant comments in a reasoned manner"). It did not, even though numerous comments raised concerns about the conflicting schemes. *See, e.g.*, Nat'l Hous. Conf. Cmt. AR28166 (commenting that the proposed rule "creates unnecessary regulatory complexity and uncertainty" hampering "new product offering and markets"); BSS Cmt. AR30387 (similar); Beneficial State Found. Cmt. AR30962 (similar).

Given that the Final Rule drastically changed the agency's longstanding position, the CFPB should have "assess[ed] whether there were reliance interests, determine[d] whether they were significant, and weigh[ed] any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020). The CFPB ignored the reliance interests of industry players who rely on a consistent regulatory framework. *See, e.g.*, UNIDOS US Cmt. AR31676 (creditors are "familiar with [previous] requirements and have developed compliance systems" that match those). The CFPB failed to consider the reliance interests of entities like Plaintiffs, who have spent years and significant resources creating products to advise on disparate impact, SPCPs, redlining risk, and discouragement provisions under the displaced regulation. *See supra* pp. 7–10. The CFPB also ignored the reliance interests of entities that provide SPCPs; the consumers, small-businesses, and communities that rely on such programs

for access to credit; and the housing organizations that promote them. *See, e.g.*, Nat'l Hous. Conf. Cmt. AR28172 (describing need for SPCPs).

The Final Rule's sole reference to reliance interests is a recitation of comments discussing disparate impact liability, which it summarily dismisses to conclude that the "need to align" with the agency's reading of ECOA is "paramount." 91 Fed. Reg. at 21636. But that is far from the required assessment, especially as the CFPB relies on an erroneous reading of the law, *see infra* Section III. The CFPB's failure to address or weigh the significant reliance interests on the altered provisions is arbitrary and capricious. *See Regents of the Univ. of California*, 591 U.S. at 33.

***Costs to Consumers.*** The CFPB's speculation about pass-through savings runs counter to evidence that lenders are not likely to realize significant cost savings to pass through. *See supra* pp. 21–24. As to costs, the CFPB acknowledged that the Final Rule may result in significant harms for consumers, including an increased likelihood of pre-application discouragement or informal rejection, lost avenues for legal redress, more barriers to credit, decreased access to branches, exclusion from advertising campaigns, higher credit costs, and increased denial rates. 91 Fed. Reg. at 21644, 21663. Some of these harms would flow from policies that have unjustified disparate impact. *Id.* at 21661. Multiple commenters agreed, elaborating on extensive costs to consumers, such as the risk of increased discrimination, absent disparate impact and discouragement protections. *See, e.g.*, NFHA Cmt. AR4554–60, AR4573–77; CRL Cmt. AR5929–30 (describing the increased risks of economically irrational discrimination, statistical discrimination, and price elasticity); Nat'l Ass'n of Realtors Cmt. AR33239 (noting that the rule may exacerbate the homeownership crisis and "risk of making credit less available to our clients outweighs any benefit of these proposed changes"). The CFPB discounted these costs by suggesting that because some protections remain available under the Fair Housing Act (FHA) and state laws, "the incentives for

covered persons to significantly change their policies . . . may be limited." 91 Fed. Reg. at 21661–62. But this contradicts the agency's assertion that the Final Rule "*will likely allow*" covered entities to save on compliance costs, *id.* at 21660 (emphasis added). The CFPB cannot have it both ways: either the overlapping protections means the claimed benefits are illusory, or the costs are higher than the CFPB acknowledges. Either way, the cost-benefit analysis is deficient.

Moreover, as commenters explained, because ECOA reaches markets that other laws do not, the Final Rule opens the door to discrimination in auto lending, credit cards, and small business lending, among other markets. NFHA Cmt. AR4554–60, AR4576–77; NCLC Cmt. AR22333–36; State AGs Cmt. AR769–72, AR785. The CFPB neither assessed these harms nor did it seriously consider the Final Rule's impact on small businesses, including minority- and women-owned small businesses, despite evidence that they would be profoundly affected. *See* CRL Cmt. AR5923–24.

Similarly, the CFPB discounted or ignored extensive evidence of the severe impacts on consumers and communities served by SPCPs. *See, e.g.*, Nat'l Assoc. of Mortgage Brokers Cmt. AR5522 (commenting that the proposed rule would "effectively eliminate the programs most directly serving historically excluded homebuyer populations"); Indep. Cmty. Bankers of Am. Cmt. AR32093 (same for "historically underserved groups, including rural areas, small businesses, and the elderly"); Broker Action Coalition Cmt. AR7360 (stating that SPCPs are "structured, data-driven tools to address documented disparities in access to mortgage credit . . . [and] can expand access without compromising safety and soundness"); UNIDOS US Cmt. AR31679 ("SPCPs help promote equity, build wealth, and break down long-standing barriers").

The CFPB also failed to consider comments identifying the reliance interests of consumers, organizations, communities, and other federal agencies, as well as state and local governments

who had relied on well-settled disparate impact, discouragement, and SPCP provisions for five decades, and who will be financially and otherwise impacted. *See, e.g.*, State AGs Cmt. AR772 (state and local governments have relied on strong federal enforcement mechanisms to address credit discrimination); LA Cnty. Cmt. AR14579 (same); NCLC Cmt. AR22309, 22315–28 (consumer advocates' reliance on disparate impact and discouragement protections).

Taken together, the Section 1022 analysis here is more perfunctory than the analysis this Court found insufficient in *NCRC*, where the CFPB at least proffered a calculation of cost savings. *NCRC*, 2022 WL 4447293, at *22. There, the CFPB had exaggerated potential savings, understated costs, and failed to account for comments calling its analysis into question. *Id.* Here, the CFPB did not even attempt to quantify or estimate purported savings or costs, and it gave "minimal weight" to the extensive consumer harms it identified and failed to discuss or analyze ways to measure these harms. *Id.* at *28–29. Its deficient cost-benefit discussion failed to comply with Section 1022 and is arbitrary and capricious.

## III. The Final Rule Unlawfully Eliminates Disparate Impact Liability.

### A. The Elimination of Disparate Impact Liability Is Contrary to Law and Exceeds the CFPB's Authority.

ECOA's text, history, statutory purpose, consistent agency interpretation, judicial interpretation, and congressional ratification confirm that ECOA creates liability for practices that have a disparate impact on protected groups. The CFPB's newfound contention that ECOA's text cannot support disparate impact liability fails to engage meaningfully with that text, ignores well-established tools of statutory interpretation, and is contrary to law.

***ECOA's Text and Structure.*** ECOA prohibits discrimination "on the basis of" certain protected classes. 15 U.S.C. § 1691(a). The plain meaning of the term "on the basis of" refers to the consequences of actions, not just the mindset of actors. For example, a policy that intentionally

favors taller people over shorter people would also discriminate "on the basis of" sex because, on average, men are taller than women. "On the basis of" is the same effects-based language the Supreme Court used to hold that Title VII provides for disparate impact liability by requiring "the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate *on the basis of* racial or other impermissible classification." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) (emphasis added). Congress drafted ECOA's prohibitions with *Griggs* in mind. S. Rep. No. 94-589, at 4 (Jan. 21, 1976) (citing *Griggs*).

That "on the basis of" is an effects-based phrase is evidenced by its use only with respect to ECOA's race, color, religion, national origin, sex, marital status, and age prohibitions, whereas ECOA's other prohibitions address discrimination "because of" enumerated traits. *Compare* 15 U.S.C. § 1691(a)(1), *with id.* § 1691(a)(2), (3); *see Pulsifer v. United States*, 601 U.S. 124, 149 (2024) ("In a given statute . . . different terms usually have different meanings."). The same "on the basis of" language is also used in other statutes to provide for disparate impact liability. *See, e.g.*, 29 U.S.C. § 206(d)(1) (Equal Pay Act, enacted prior to ECOA, prohibiting discrimination "on the basis of sex" by paying less wages for equal work); *see also* NFHA Cmt. AR4543–45 (citing cases and use of "on the basis of" for disparate impact under Americans with Disabilities Act).

Moreover, ECOA allows for punitive damages after considering whether, among other things, a violation was "intentional." 15 U.S.C. § 1691e(b). This provision is necessary only if some ECOA violations are *not* intentional. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmties. Project, Inc.*, 576 U.S. 519, 537 (2015) (stating that amendments that "would be superfluous" without disparate impact liability showed that Congress "assume[d] the existence of disparate-impact claims").

***ECOA's History.*** ECOA's drafting history confirms that Congress intended "on the basis of" to authorize disparate impact claims. *See* NFHA Cmt. AR4545–48 (citing Congressional reports, member statements, and hearing testimony). An early draft of the 1974 Act defined "discrimination" as an "invidious distinction." H.R. No. 14856, 93d Cong., 2nd Sess. 3 (1974). Congressional testimony on the draft objected to this definition, referencing the guiding *Griggs* standard and expressing concern that the new language "will be construed by the courts as imposing a degree of willfulness, malice, intent or pattern of discriminatory purpose not intended." *See, e.g.*, Credit Discrimination: Hearings on H.R. 14856 and H.R. 14908 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency, 93d Cong., 2d Sess. 86 (1974) (testimony of FTC Sec'y Charles A. Tobin). Subsequently, Congress struck reference to "invidious" discrimination from what became the 1974 Act. Congress later twice rejected attempts to limit ECOA's prohibitions to only intentional discrimination, *see* ECOA Amendments of 1995, H.R. 1699, 104th Cong. (1995); ECOA Amendments of 1997, H.R. 229, 105th Cong. (1997). *See Inclusive Cmties.*, 576 U.S. at 536 (finding that Congress's "reject[ion of] a proposed amendment that would have eliminated disparate impact liability" supported the availability of disparate impact liability under the Fair Housing Act).

***Judicial and Agency Interpretation.*** Courts have uniformly recognized disparate impact claims under ECOA. *See, e.g.*, *Bhandari v. First Nat'l Bank of Com.*, 808 F.2d 1082, 1101 (5th Cir. 1987) (allowing claim for policy that "had the effect" of discriminating under ECOA), *vacated and remanded on other grounds*, 492 U.S. 901 (1989); *Miller v. Am. Express Co.*, 688 F.2d 1235, 1239 (9th Cir. 1982) (affirming "[n]o showing of any specific intent to discriminate was required" under ECOA); *see also Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006) (assuming without deciding availability of disparate impact under ECOA); NFHA Cmt. AR4550–51 (citing

twenty-two decided cases). Congress has amended ECOA several times since its enactment without calling into question that uniform interpretation. *See* NFHA Cmt. AR4549 n.41 (enumerating amendments). "[I]f Congress leaves in place a unanimous or near-unanimous judicial interpretation for a sufficiently long period of time, it can be deemed to have acquiesced in or ratified that judicial interpretation." *In re Lion Air Flight JT 610 Crash*, 110 F.4th 1007, 1016 (7th Cir. 2024); *see Inclusive Cmties.*, 576 U.S. at 536.

Beginning immediately after ECOA's enactment, and for fifty years prior to the Final Rule, federal agencies with ECOA authority uniformly concluded ECOA provides for disparate impact liability in rulemaking, interpretation, guidance, enforcement, and supervisory activity. *See* NFHA Cmt. AR4551–53 (citing, *inter alia*, all prior Regulation B rulemakings). As the Supreme Court has instructed, "the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024) (quotation marks omitted).

***Consistency with Statutory Purpose.*** Recognition of disparate impact is also consistent with ECOA's broad remedial purposes because it operates to remove artificial barriers to credit. *See e.g.*, Pub. L. 93-495, 88 Stat. 1500, 1520 (1974) (noting Congress's purpose in enacting ECOA was "to make . . . credit equally available to all creditworthy customers"); *see also* NFHA Cmt. AR4549–50 (providing additional sources); *Inclusive Cmties.*, 576 U.S. at 539 (disparate impact is consistent with FHA's central purpose).

* * *

In sum, the best reading of ECOA, as confirmed by the drafting history, court decisions, and longstanding agency interpretations, is that the statute provides for disparate impact liability. The CFPB's conclusion otherwise is contrary to law.

### B. The Elimination of Disparate Impact Liability Is Arbitrary and Capricious.

In eliminating disparate impact liability, the CFPB relied on improper factors, disregarded an important aspect of the problem, and offered an explanation that runs counter to the evidence. The Final Rule is thus arbitrary and capricious. *See Motor Vehicles Mfrs. Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43 (1983).

***The Final Rule Rests on Counterfactual Speculation.*** The Final Rule justifies the elimination of disparate impact based on the assertion that the existence of such liability may contract access to credit. *See* 91 Fed. Reg. at 21635, 21661. But it offers no examples, data, or evidence to support this assertion. The Final Rule also claims disparate impact liability "may" or "could" deter creditors from adopting policies that "may generally expand access to credit . . . because of concerns about potential disparate impact liability." 91 Fed. Reg. at 21635. But it identifies no examples of such deterrence, despite a half-century of agencies and courts recognizing disparate impact liability under ECOA. *See Bus. Roundtable*, 647 F.3d at 1150 (stating that agency action that has "no basis beyond mere speculation" is unlawful); *Sorenson*, 755 F.3d at 708–09 (stating that failure to "articulate a satisfactory explanation" is arbitrary and capricious).

Moreover, contrary to the CFPB's conjecture, the record shows that disparate impact liability *removes* unnecessary barriers to credit for *all* borrowers and promotes innovation. As commenters explained, credit is not a zero-sum game in which a lender must deny one creditworthy applicant to approve another creditworthy applicant. *See* NFHA Cmt. AR4554; NCRC Cmt. AR8889–90; CRL Cmt. AR5930. Commenters pointed to the example of a creditor treating taxable and nontaxable income the same when qualifying borrowers for credit. This generally disadvantages the elderly, who more frequently depend on nontaxable retirement income. From an underwriting perspective, "grossing up" non-taxable income both addresses this disparity and allows creditors to more accurately predict the ability to repay debt. After federal agencies

implementing ECOA identified this disparate impact risk years ago, creditors now routinely "gross up" non-taxable income, benefitting all involved. *See* NFHA Cmt. AR4556–57 (citing interagency policy statement). Commenters provided other examples. *See, e.g.*, BSS Cmt. AR30384–85 (automated underwriting improvements).

The Final Rule also ignored evidence, including statements by financial services companies, indicating that disparate impact liability promotes a "pro-innovation framework for preventing discrimination" and has "the potential to increase financial inclusion." Innovation Council Cmt. AR20314 (including some of the nation's largest fintechs such as Block, Chime, Intuit, Plaid, and Upstart); *see* State AGs Cmt. AR772; Ctr. for Democracy & Tech. Cmt. AR14034–35; Beneficial State Found. Cmt. AR30961; BSS Cmt. AR30387; NCLC Appendices AR22346; NFHA Cmt. AR4564–65.

In addition, the record shows that disparate impact compliance remains critical to ensure equality of credit opportunity in the rapidly expanding world of automated models and targeted digital advertising that decide, within a black box, who gets credit offers, which applicants are approved, and the price each pays for credit. *See, e.g.*, NFHA Cmt. AR4558–60; EPIC Cmt. AR803; Public Justice Cmt. AR5046–48; Brookings Economic Studies, AR16235–37; BSS Cmt. AR30385–87. The Final Rule touts that it frees creditors to "experiment more with risk-based pricing and automated underwriting with reduced risk of facially neutral policies with disproportionate effects," 91 Fed. Reg. at 21660, but it fails to respond to commenters' uncontested warnings that the disparate impact framework is critical to meaningfully prevent discrimination caused by these same kind of automated technologies.

Because the Final Rule is "unsupported by substantial evidence" and "ignore[s] evidence contradicting [the CFPB's] position," it is arbitrary and capricious. *Genuine Parts Co. v. EPA*, 890 F.3d 304, 346 (D.C. Cir. 2018).

***The CFPB Did Not Adequately Consider Important Aspects of the Problem or Explain Its Rejection of Significant Alternatives.*** The CFPB failed to adequately consider that the Final Rule's treatment of disparate impact creates substantial legal uncertainty and did not provide a sufficient or reasonable explanation for its rejection of alternatives that would have avoided or mitigated such uncertainty.

The CFPB put fair lending compliance practices in doubt for the entire credit industry by asserting, without explanation, that consideration of disparate impact may "promote . . . intentional protected class discrimination" in violation of ECOA. 90 Fed. Reg. at 50905–06. Several industry commenters requested that the CFPB remove or clarify this language, explaining that it is not factually correct. These commenters also pointed out that, even if Regulation B no longer provides for disparate impact, other laws—including the FHA and state laws—still require avoiding practices with unnecessary disparate impact. Language suggesting creditors may be violating ECOA by complying with these laws puts them in an untenable bind. *See, e.g.*, Consumer Bankers Ass'n Cmt. AR12713–14 & nn.11, 13; U.S. Chamber of Commerce Cmt. AR921–22; Bank Policy Inst. Cmt. AR908–09. It also injures Plaintiffs. *See, e.g.*, Siskin Decl. ¶¶ 20–21 (stating that clients have reduced use of BLDS services due to regulatory risk and uncertainty); Bradley Decl. ¶¶ 22–26 (similar). The Final Rule did not remove or clarify this language. 91 Fed. Reg. at 21637. Instead, it fails to grapple with an important aspect of the problem, *see supra* pp. 23–24 (discussing costs imposed by uncertainty), and fails to respond to the significant comments identifying this problem.

Equally problematic, the CFPB did not adequately explain its rejection of viable alternatives that would have mitigated these challenges. For example, the NPRM proposed that the CFPB could eliminate reference to disparate impact from Regulation B entirely (rather than changing the regulation to explicitly reject the "effects test") and thus leave the question of statutory construction to courts. 90 Fed. Reg. at 50906. The Department of Housing and Urban Development (HUD) recently proposed this approach with respect to its regulations regarding disparate impact under the Fair Housing Act. 91 Fed. Reg. 1475 (Jan. 14, 2026). And Final Rule commenters endorsed this alternative as consistent with the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). *See* Housing Policy Council Cmt. AR27306. The CFPB summarily rejected this alternative, stating that because Regulation B previously endorsed inclusion of disparate impact liability, it was proper to include language reflecting the changed interpretation. 91 Fed. Reg. at 21637. But that conclusory statement does not resolve the tension with Supreme Court precedent, explain the deviation from HUD's approach, or respond to commenters' concerns about legal and compliance uncertainty. Another commenter suggested that the CFPB reconcile the new mismatch between the proposal and the Fair Housing Act by adopting a "safe harbor" approach that would clarify that neutral policies are permissible provided lenders conduct periodic analyses and adjust practices accordingly. Nat'l Assoc. of Mortgage Brokers Cmt. AR5520. The CFPB did not address this proposed alternative.

Commenters also suggested that the CFPB could remove the language suggesting that mitigation of disparate impact amounts to disparate treatment, but the CFPB refused, asserting that clarifying how creditors can navigate the conflict created by the Final Rule would "likely be too nuanced and detailed," and that it lacked the "expertise" to discuss ECOA's interactions with other laws. 91 Fed. Reg at 21637. But an agency cannot simply declare that it lacks competence to

understand the consequences of a proposed rule and to take the necessary time to create a workable compliance regime. The CFPB's failure to become sufficiently competent on important compliance issues, necessary to meaningfully consider alternatives to ameliorate those issues, is arbitrary and capricious. *Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) ("An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives.").

## IV. The Final Rule Unlawfully Narrows ECOA's Discouragement Provisions.

### A. The Narrowing of Discouragement Provisions and Creation of Safe Harbors Is Contrary to Law and Exceeds the CFPB's Authority.

"[D]iscouraging an applicant for credit is a violation of the ECOA." *CFPB v. Townstone Fin., Inc.*, 107 F.4th 768, 776 (7th Cir. 2024). Because discouraging applications is an obvious way for creditors to evade ECOA, Regulation B—since it was first issued in 1975—has prohibited discriminatory discouragement. *See* 40 Fed. Reg. 49299, 49307 (Oct. 22, 1975). The Federal Reserve Board, recognizing a serious risk of evasion through discriminatory advertising, explained early on that it would be unlawful "if a creditor advertises only for deposits in minority areas but directs loan advertising only to [W]hite neighborhoods." 43 Fed. Reg. 29256, 29257 (July 6, 1978). Ensuring Regulation B prevents such evasions is part of the CFPB's statutory mandate to "prescribe regulations to carry out the purposes" of the Act, including regulations "to prevent circumvention or evasion" of the Act's purposes. 15 U.S.C. § 1691b(a).

Congress in 1991 ratified and extended ECOA's discouragement provisions, requiring a referral to the Attorney General where a creditor might be engaged in a "pattern or practice of *discouraging* or denying applications for credit." FDIC Improvement Act of 1991, Pub. L. No. 102-242, § 223, 105 Stat. 2236, 2306 (1991) (codified at 15 U.S.C. § 169le(g)) (emphasis added). Congress sought to boost enforcement of ECOA and Regulation B, including the prohibition

against "discouraging applications on a prohibited basis and advertising which implies a discriminatory preference." S. Rep. No. 102-167, at 86 (Oct. 1, 1991). In affirming that ECOA's "prohibition against discouragement must include the discouragement of prospective applicants," the Seventh Circuit underscored the tight nexus between these protections and the CFPB's mandate: "In endowing the [agency] with authority to prevent 'circumvention or evasion,' Congress indicated that the ECOA must be construed broadly to effectuate its purpose of ending discrimination in credit applications." *Townstone*, 107 F.4th at 776.

The Final Rule contravenes ECOA's statutory mandate by constricting the discouragement prohibition to eliminate coverage of (and instead to encourage) broad swaths of discriminatory conduct and to make it extremely difficult to assert discouragement claims. *See supra* p.4 (describing discouragement changes in Final Rule). It allows unscrupulous creditors to circumvent ECOA by advertising only to consumers in certain protected class groups, making it unlikely for other consumers to apply. For example, "redlining"—the unequal provision of credit to residents of neighborhoods because of their protected-class demographics—almost always involves marketing only to predominantly White communities while avoiding communities of color, which Regulation B no longer prohibits. *See* NFHA Cmt. AR4573–76 (describing redlining). New technologies like digital targeted marketing exacerbate this risk, allowing creditors to exclude or steer potential applicants based on troves of data about their personal characteristics. *See Id.* AR4580–82; *see also, e.g.*, State AGs' Cmt. AR776–78 (explaining why these types of conduct and others can contravene ECOA); LDF Cmt., AR6473–74 (similar); BSS Cmt. AR303888–89 (similar). Indeed, the CFPB concedes that these changes "may result in consumers not applying for credit and facing greater barriers to accessing credit than they otherwise would have under the existing rule," consumers being "excluded from advertising campaigns," and lenders "choos[ing]

to engage less with certain groups of consumers." 91 Fed. Reg. at 21644. Thus, the Final Rule undermines ECOA's purpose. It also violates the CFPB's statutory duty to "prescribe regulations to carry out the purposes" of ECOA and "to prevent circumvention or evasion" of the Act. 15 U.S.C. § 1691b(a).

The Final Rule also improperly creates safe harbors for certain categories of statements, proclaiming them immune from liability irrespective of context or intent. ECOA prohibits, without exception, "discouraging . . . applications for credit." 15 U.S.C. § 1691e(g); *Townstone*, 107 F.4th at 776. The Final Rule, however, provides that *any* statements (1) "in support of law enforcement," (2) recommending that consumers investigate a particular neighborhood's schools and crime statistics before buying a home, or (3) encouraging consumers to "develop their financial literacy" are "*not* prohibited." 91 Fed. Reg. at 21669–70 (emphasis added). It further provides that "encouraging statements directed at one group of consumers *cannot discourage* consumers who were not the *intended* recipients of the statement." *Id.* at 21669 (emphasis added). In other words, advertisements targeted to White households explicitly encouraging only White people to apply for credit could not, under the Final Rule, discourage consumers of color who incidentally see the ads. Not only does the CFPB's position defy common sense, in doing so, the CFPB purports to restrict consideration of circumstantial evidence in juries' and judges' assessments of claims under ECOA, which it has no statutory authority to do. *See* NFHA Cmt. AR4585–87. Circumstantial evidence is often presented in discrimination cases, as defendants rarely declare their intention to discriminate. The Supreme Court has cautioned against limiting the types of evidence that can be presented to prove discrimination. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *see also Marzano v. Computer Sci. Corp. Inc.*, 91 F.3d 497, 507 (3d Cir. 1996). The Final Rule's safe harbors are also inconsistent with how courts routinely assess discriminatory statements,

recognizing that a facially neutral statement may "indicate an impermissible preference in the context in which [it is] made." *Soules v. HUD*, 967 F.2d 817, 824 (2d Cir. 1992). And the CFPB provides no rationale for why these particular categories were chosen for immunity. The CFPB lacks authority to direct whether or how courts consider evidence.

**B. The Final Rule's Discouragement Provisions Are Arbitrary and Capricious.**

The Final Rule should also be set aside as arbitrary and capricious because the record lacks evidence to justify the Final Rule's evisceration of longstanding discouragement protections.

The CFPB claims "concern" that Regulation B has been interpreted "overly broadly," with "an unnecessarily chilling effect on creditors' business practices and exercise of their rights to speak about matters of public interest." 91 Fed. Reg. at 21638, 21644. The CFPB points to nothing other than its "judgment" that these provisions "swe[pt] in substantially more speech and conduct than is necessary . . . to accomplish [ECOA's] goals." *Id.* at 21645. The CFPB identifies no changed facts or circumstances justifying the agency's stark departure from its longstanding position. Nor does it set forth any facts or even hypotheticals for its "concerns." An agency cannot "dream[] up a problem in search of a solution by making 'unsupported assumptions.'" *PayPal*, 728 F. Supp. 3d at 41; *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 843 (D.C. Cir. 2006) (stating that an agency has not engaged in "reasoned decisionmaking" where it lacks "evidence demonstrating that there is in fact an industry problem"). The CFPB's appeal to its "judgment" cannot alone support these changes; an agency's claimed "expertise" is not "a licence for making unarticulated findings." *Tripoli Rocketry Ass'n v. ATF*, 437 F.3d 75, 83 (D.C. Cir. 2006).

The CFPB's unsupported concerns are also contradicted by evidence in the record, including the CFPB's own investigations and enforcement actions. The record establishes that some of the most pervasive forms of pre-application discouragement are effectuated through the same "acts and practices" and selective encouragement that the Final Rule removed from

Regulation B's purview. *See* NFHA Cmt. AR4573–77; NCRL Cmt. AR671–74; NCRC Cmt. AR890–92. This evidence also establishes that the Final Rule's changes—cabining discouragement to only statements that "express" (rather than imply or suggest) a discriminatory preference; that a creditor "knows or should know" would discourage; or that actively discourage one protected group (rather than, alternatively, encourage only one protected group and not similarly encourage others)—reflect ignorance about how discrimination operates and would make challenging almost any discouraging behavior nearly impossible. *See* NFHA Cmt. AR4579–87; State AGs Cmt. AR781–86; NCLC Cmt. AR22310–15, 33–36; LDF Cmt. AR6477–79.

"Good reason requires more than nodding to commenters' concerns only to dismiss them in a conclusory manner." *District of Columbia v. Dep't of Agric.*, 496 F. Supp. 3d 213, 239 (D.D.C. 2020). Yet that is exactly what the CFPB did here. In response to commenters' evidence about the ongoing risks of redlining, the CFPB posited that the Final Rule would not allow redlining because "[p]reapplication discrimination remains addressable," 91 Fed. Reg. at 21645, which ignores that redlining is largely effectuated through "acts and practices" that the Final Rule no longer prohibits.

The CFPB's response to other comments is similarly illogical. There is extensive evidence of growing threats of pre-application discrimination through emerging technologies, supporting an *expansion* rather than constriction of protections against discouragement. As commenters noted, the increasing prominence and sophistication of digital marketing tools allow creditors to exclude or target consumers on the basis of protected traits. NFHA Cmt. AR4580–81; BSS Cmt. AR30388–89. While the CFPB acknowledged that these technologies "may present new risks for consumers," 91 Fed. Reg. at 21647, it contended without explanation that those risks are sufficiently addressed notwithstanding its new, heightened standard, *id*. It ignored altogether that the Final Rule covers only "statements," not (as previously) "acts or practices," and that because

*targeting* marketing to exclude consumers based on their protected class is not a "statement," such discriminatory conduct is no longer prohibited. 91 Fed. Reg. at 21669.

Finally, the CFPB does not explain why its goal of not "chilling" creditors' speech, 91 Fed. Reg. at 21638, advances ECOA's statutory purpose to end discrimination in credit applications. The CFPB's decision to "prioritize non-statutory objectives to the exclusion of the statutory purpose" runs afoul of the APA. *Judulang v. Holder*, 565 U.S. 42, 64 (2011) (agency action cannot be "unmoored from the purposes and concerns" of the statute).

## V. The Final Rule Unlawfully Eliminates For-Profit SPCPs.

### A. The Elimination of For-Profit SPCPs Is Contrary to Law and Exceeds the CFPB's Authority.

ECOA expressly authorizes SPCPs—credit programs designed to meet special social needs of particular groups, including those that share a common characteristic such as protected class status. Specifically, ECOA provides that "[i]t is not a violation" of the general prohibition against discrimination "for a creditor to refuse to extend credit offered pursuant to" SPCPs, including those "offered by a profit-making organization." 15 U.S.C. § 1691(c). This statutory permission has allowed lenders to offer a broad array of SPCPs tailored to respond to the challenges certain groups face in seeking credit, to the benefit of creditors, consumers, and small business applicants. *See, e.g.*, Nat'l Ass'n of Realtors Cmt. AR33238–39; Consumer Bankers Ass'n Cmt. AR1216–17; Indep. Cmty. Bankers of Am. Cmt. AR32093; Consumer Fed. of Am. Cmt. AR15315.

Although ECOA gives the CFPB limited discretion to "prescribe" for-profit organization SPCP "standards," 15 U.S.C. § 1691(c)(3), it does not afford discretion to effectively eliminate them by setting *insurmountable* standards. *See Orion Rsrvs. Ltd. P'ship v. Salazar*, 553 F.3d 697, 703 (D.C. Cir. 2009) ("The authority to issue regulations is not the power to make law, and a regulation contrary to a statute is void."). The Final Rule, however, eliminates for-profit

organization SPCPs related to race, color, national origin, and sex, 91 Fed. Reg. at 21653, and effectively eliminates all remaining for-profit organization SPCPs by requiring a creditor to show it otherwise discriminates to establish such a program. *See id.* at 21655. When commenters pointed out that no creditor would present such evidence, the CFPB had no answer. *Id.*

The CFPB asserts that for-profit organization SPCPs are "counter to ECOA's purpose of preventing discrimination" and "circumvent ECOA's central prohibition." 91 Fed. Reg. at 21654–55. Congress, however, explicitly included the SPCP provision in ECOA to ensure the Act would not be misconstrued to prevent such programs, precisely because they further ECOA's purposes. S. Rep. No. 94-589, at 404 (Jan. 21, 1976) (explaining the "utility and desirability of 'affirmative action[]' type credit programs" protected by the SPCP provision); *see also* NFHA Cmt. AR4594; NCLC Cmt. AR2238. An agency cannot "rewrite the balance established by Congress," or "render [statutory text] superfluous." *Sinclair Wyoming Ref. Co. v. EPA*, 114 F.4th 693, 711 (D.C. Cir. 2024). By eliminating for-profit SPCPs, the Final Rule does just that.

**B. The Final Rule's SPCP Changes Are Arbitrary & Capricious.**

The Final Rule's SPCP changes are also arbitrary and capricious because the agency's justification is unsupported by evidence and internally inconsistent.

***The Elimination of For-Profit SPCPs Lacks a Reasoned Basis.*** The CFPB justifies its turnabout by suggesting that Congress intended for-profit organization SPCPs only for situations in which the benefitting group would otherwise "effectively be denied credit" across an entire credit market were it not for the SPCP. 91 Fed. Reg. at 21654. The Final Rule divines its new standard, unknown in fifty years of prior rulemaking and guidance, from one sentence of legislative history that refers to for-profit organization SPCPs as available "when it has been clearly demonstrated on the public record that without such exemption the consumers involved would effectively be denied credit." 91 Fed. Reg. at 21622 (quoting Cong. Rec. H5493 (daily ed.

Mar. 4, 1976)). In the CFPB's view, when ECOA was passed, entire credit markets were inaccessible to those ECOA protected, save for isolated programs after which Congress patterned SPCPs, and Congress intended to limit SPCPs to such situations. *See* 91 Fed. Reg at 21654.

ECOA's statutory text contains no such limitation. The CFPB, moreover, cites no evidence to support its non-statutory justification that, at the time of ECOA's enactment, protected groups were effectively shut out of the credit markets. In fact, rather than citing evidence of wholesale exclusions, the CFPB relies on sources that note "*instances* of discrimination against racial minorities" and the "strong probability of race discrimination in mortgage credit." 91 Fed. Reg. at 21654 (quoting S. Rep. No. 94-589, at 3 (1976)); *see also id.* n.162 (citing Linda Charlton, *2-to-1 Turndown of Minorities for Mortgage Loans is Found*, N.Y. Times 26 (July 26, 1975) (comparing mortgage denial rates of 24.7% for minorities with 14.8% for Whites)). Comments likewise offered contrary evidence. *See also* NFHA Cmt. AR4592–94. Where a rule "rests upon a factual premise that is unsupported by substantial evidence," it is arbitrary and capricious. *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025).

The CFPB also hints that "changed circumstances" support amending Regulation B's prior SPCP standards, even if they "may have been appropriate when the [agency] promulgated them." 91 Fed. Reg. at 21656. It is Congress, however, that decides when a statutory provision is no longer needed. In any event, the Final Rule ignores the extensive evidence that commenters provided of persistent and substantial discrimination across protected class characteristics today—much of it, unfortunately, highlighting credit disparities similar to those found at the time of ECOA's enactment. *See, e.g.*, LDF Cmt. AR6480 (racial homeownership gap wider now than in 1960s). Such evidence includes the CFPB's own extensive experience in fair lending supervision, enforcement, research, outreach, convening, consumer education, and processing of over 10

million consumer complaints, in addition to other governmental and independent studies and data evidencing discrimination and unequal credit access. *See, e.g.*, NFHA Cmt. AR4595–603. Critically, the Bureau also ignores uncontested commenter evidence showing the SPCPs' efficacy in closing some of the existing credit gaps. *See, e.g.*, NAHREP Cmt. AR19588 ("an essential pathway"); Greenlining Inst. Cmt. AR19962 ("a lifeline"); Cal. Ass'n of Realtors Cmt. AR10879 ("effective tools"); TMC Cmt. AR847 ("direct and effective tool[]"); Consumer Fed'n of Am. Cmt. AR15315 (examples); NCRC Cmt. AR895 (similar); A. Rubio Cmt. AR820 (similar).

***Internal Inconsistencies.*** The Final Rule's application of this SPCP standard is replete with unsupported and internally contradictory conclusions. The CFPB foreclosed for-profit organization SPCPs for race, color, national origin, and sex because there is no credit market in which those groups are completely excluded. *See* 91 Fed. Reg. at 21654. At the same time, the Final Rule leaves the SPCP door open for ECOA's other protected groups—such as marital status—without finding that those groups face complete market exclusion.

In addition, when pressed by commenters to explain why *any* for-profit organization would create an SPCP when the Final Rule requires it to admit that it would otherwise blatantly discriminate against potential applicants in violation of ECOA, the CFPB responds that this draconian standard is appropriate because "the SPCP provision provides the ability for creditors to engage in practices that would otherwise be within ECOA's central prohibition." 91 Fed. Reg. at 21655. That response fails to address the comments. If a creditor discriminates with respect to a protected characteristic across the board, it must stop the underlying discriminatory practice—no SPCP is needed to do so. The statutory SPCP provision accomplishes something more: It ensures that ECOA is not misconstrued to prohibit programs that extend credit to groups with special social needs. *See* 91 Fed. Reg at 21654 n.166 (listing examples of such programs from legislative

history); S. Rep. No. 94-589, at 404 (Jan. 21, 1976) (acknowledging the "utility and desirability" of such programs); NFHA Cmt. AR4594–95 (discussing SPCP legislative history).

Tellingly, the CFPB was unable to include in the Final Rule *any* example of an SPCP that would meet its new standard, despite commenters' requests. *See* Nat'l Reverse Mort. Lenders Ass'n Cmt. AR14211. In fact, the CFPB admits that it included no examples of SPCPs in the proposed rule, and that the one program originally cited as an example in the proposed rule was actually not an SPCP at all, conceding that a program to assist the elderly would not require an SPCP. 91 Fed. Reg. at 21655. But the CFPB declined to delete the "example" from the Final Rule "because doing so . . . could introduce confusion." *Id*. The CFPB's inability to explain even its own false "example," let alone offer any actual examples, confirms that the rulemaking was arbitrary and capricious. *See Ass'n of Priv. Sector Colls. & Univs*., 681 F.3d at 449.

Finally, the Final Rule makes these changes only for for-profit organization SPCPs, not with respect to other statutory SPCPs. *See* 15 U.S.C. § 1691(c)(1)–(2). Although commenters noted the discrepancy, *see* NFHA Cmt. AR4589–90, the CFPB offered no basis for the distinction. "[I[nternally inconsistent" decisionmaking is, "of course," arbitrary and capricious. *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 221 (D.C. Cir. 2025).

## VI. Because Acting Director Vought Was Unconstitutionally Serving, the Rule is Invalid.

The Final Rule was issued by then-Acting Director Vought. Because, however, Mr. Vought was not lawfully appointed as Acting Director of the CFPB, the Final Rule was void *ab initio*, thereby rendering the rule without "force or effect" and requiring vacatur. *Asylumworks v. Mayorkas*, 590 F. Supp. 3d 11, 25–26 (D.D.C. 2022) (citing 5 U.S.C. § 3348(d)(1)).

The Federal Vacancies Reform Act (FVRA) allows the President to temporarily fill a role for which Senate confirmation is required when the prior office holder "dies, resigns, or is otherwise unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). "The

essential characteristic that 'dies' and 'resigns' share is that both are uncontrollable inabilities to serve from the president's perspective." Ben Miller-Gootnick, Note, *Boundaries of the Federal Vacancies Reform Act*, 56 Harv. J. on Legis. 459, 463 (2019). Under the principle of *ejusdem generis*, because the clause "otherwise unable to perform" follows an enumeration of specific items, it must be interpreted as "applying only to other items akin to those specifically enumerated." *Nasdaq Stock Market, LLC v. SEC*, 961 F.3d 421, 428 (D.C. Cir. 2020). An officer might be "otherwise unable to perform" their duties because, for example, they are ill or face a conflict of interest requiring recusal, but not because the President terminates them. Had Congress intended the FVRA to apply regardless of the cause of the vacancy, it could have permitted presidential designation "in the event of a vacancy," as it has done in many other agency-specific succession statutes. Miller-Gootnick, *supra*, at 467–70 (collecting examples); *see also Miller v. Clinton*, 687 F.3d 1332, 1340 (D.C. Cir. 2012). Instead, Congress enumerated specific circumstances when the FVRA applies, which is common for succession criteria. *Cf. Asylumworks*, 590 F. Supp. 3d at 21–22 (holding succession order that applied if prior Secretary's unavailability was caused by "disaster or catastrophic emergency" was not triggered when Secretary resigned).

The FVRA did not authorize Mr. Vought's service as Acting Director because the previous Senate-confirmed Director of the CFPB, Rohit Chopra, was fired. *See supra* p. 7. That is, he did not die or resign or become "unable to perform the functions and duties of the office." 5 U.S.C. § 3345(a). In that circumstance, the law directs that the "Deputy Director" of the CFPB "shall . . . serve as acting Director in the absence or unavailability of the Director." 12 U.S.C. § 5491(b)(5). Mr. Vought, thus, was not lawfully serving in the position. *See United States v. Valencia*, No. 5:17-cv-882, 2018 WL 6182755, at *4 (W.D. Tex. Nov. 27, 2018) (finding that if President "exercised his authority to fire" an officer, it "would make the statute inapplicable").

A contrary interpretation of the FVRA would allow a president to fire an agency head immediately and direct a replacement without intending to seek the Senate's advice and consent. In related contexts, courts have declined to interpret the FVRA in ways that would facilitate circumvention of the Senate's appointment responsibility. *See, e.g.*, *United States v. Giraud*, 160 F.4th 390, 399–400 (3d Cir. 2025) (rejecting an interpretation of the FVRA that would allow evasion of the Appointments Clause); *Widakuswara v. Lake*, No. 832 F. Supp. 3d 55, 57 (D.D.C. 2026) (similar), *reconsideration denied*, 2026 WL 1654001 (D.D.C. May 14, 2026).

The circumstances here present an especially stark example. On February 7, 2025, President Trump named Mr. Vought as the agency's Acting Director. President Trump then nominated Jonathan McKernan to serve as Director but withdrew the nomination shortly thereafter. On November 18, 2025, President Trump nominated Stuart Levenbach to serve as Director. A CFPB spokesperson reportedly stated that the nomination was a "technical" maneuver to extend Mr. Vought's tenure. The Senate sent Mr. Levenbach's nomination back to the President without acting on it. *See supra* p. 7. Through these machinations, Mr. Vought served from February 7, 2025, until August 1, 2026—approximately 540 days—until he was succeeded by Deputy Director Mark Paoletta, who had only become Deputy Director under Mr. Vought's tenure.

Because Mr. Vought's appointment violated the FVRA, the Final Rule promulgated during his tenure has "no force or effect," was issued "in excess of . . . authority" under the APA, and must be vacated under the "plain terms of the FVRA." *Asylumworks*, 590 F. Supp. 3d at 25–26.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of Plaintiffs and vacate the Final Rule.

Dated: September 29, 2026

Respectfully Submitted,

Johanna M. Hickman (D.C. Bar No. 981770)
Steven Y. Bressler (D.C. Bar No. 482492)
Robin Thurston (D.C. Bar No. 7268942)
Democracy Forward Foundation
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
hhickman@democracyforward.org
sbressler@democracyforward.org
rthurston@democracyforward.org

*Counsel for All Plaintiffs*

Janell M. Byrd* (D.C. Bar No. 376609)
Sasha Samberg-Champion (D.C. Bar No. 1026113)
Morgan Williams*
National Fair Housing Alliance
1331 Pennsylvania Ave. NW, Ste. 650
Washington, DC 20004
202-898-1661
jbyrd-chichester@nationalfairhousing.org
ssamberg-champion@nationalfairhousing.org
mwilliams@nationalfairhousing.org

*Counsel for Plaintiff National Fair Housing Alliance*

*Appearing Pro Hac Vice*

*/s/ Lila Miller*
Lila Miller (D.C. Bar No. 1643721)
Stephen Hayes (D.C. Bar No. 1010531)
Timothy Lambert (D.C. Bar No. 475798)
Relman Colfax PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
(202) 728-1888
lmiller@relmanlaw.com
shayes@relmanlaw.com
tlambert@relmanlaw.com

*Counsel for All Plaintiffs*

Allison M. Zieve (D.C. Bar No. 424786)
Stephanie B. Garlock (D.C. Bar. No. 1779629)
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
azieve@citizen.org
sgarlock@citizen.org

*Counsel for All Plaintiffs*