**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NATIONAL FAIR HOUSING ALLIANCE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>CONSUMER FINANCIAL PROTECTION BUREAU, *et al.*,<br><br>Defendants. | ) | Civil Action No. 26-1820 (BAH) |

**MEMORANDUM OF LAW**
**IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**
**AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS


INTRODUCTION ... 1

BACKGROUND ... 3

A. Statutory Background ... 3

B. Regulatory Background ... 4

C. The Notice of Proposed Rulemaking and Rule ... 5

D. Russell Vought's Service as Acting Director ... 8

E. Procedural History ... 9

LEGAL STANDARD ... 9

ARGUMENT ... 10

I. The Rule's Provisions Rejecting Disparate-Impact Liability Are Lawful ... 10

A. The ECOA's Text Does Not Confer Disparate-Impact Liability ... 10

B. Plaintiffs' Reading of the ECOA as Authorizing Disparate-Impact Liability Is Incorrect ... 12

C. The Constitutional Avoidance Canon Bolsters the Bureau's Interpretation of the ECOA ... 15

D. The Rule's Disparate-Impact Liability Provisions Are Not Arbitrary and Capricious ... 16

II. The Rule's Discouragement Provisions Are Lawful ... 18

A. The ECOA Authorizes CFPB to Exercise Judgment to Fashion Discouragement Regulations ... 18

B. The Rule's Discouragement Provisions Are Reasonable and Within CFPB's Statutory Authority ... 19

C. Plaintiffs Demonstrate No Legal Infirmity in the Discouragement Provisions ... 22

III. The Rule's SPCP Provisions Are Lawful ... 24

A. The Bureau Has Broad Statutory Authority to Set Standards for SPCPs ... 24

B. The Rule's SPCP Provisions Are Reasonable and Within CFPB's Authority ........ 25

C. Plaintiffs' Arguments Against the SPCP Provisions Are Erroneous........ 28

1. The SPCP Provisions Are Within the Bureau's Statutory Authority ........ 28

2. The SPCP Provisions Are Not Arbitrary and Capricious ........ 28

IV. The Bureau Validly Considered the Costs and Benefits of the Rule ........ 30

A. The Bureau Complied with the Statutory Requirement to Consider the Rule's Costs and Benefits ........ 30

B. Plaintiffs' Criticisms of the Bureau's Cost-Benefit Analysis Are Misguided ........ 32

1. The Bureau Validly Made Qualitative Assessments of Costs and Benefits........ 32

2. The Bureau Reasonably Assessed Benefits of the Rule ........ 34

3. The Bureau Adequately Responded to Comments ........ 35

V. Plaintiffs' Other Objections to the Rulemaking Process Are Meritless ........ 36

A. The Acting Director Validly Certified that No Final Regulatory Flexibility Analysis Was Required ........ 36

B. Plaintiffs' Objections to the Rule's Comment Period Are Meritless........ 39

1. The Bureau Gave Interested Parties Sufficient Time to Comment........ 39

2. Any Error Relating to the Comment Period Was Harmless ........ 42

VI. Russell Vought Validly Served as Acting Director ........ 43

CONCLUSION........ 45

# TABLE OF AUTHORITIES

**Cases**

*Adarand Constructors, Inc. v. Pena*,
515 U.S. 200 (1995) .......... 15

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 13

*Allen v. Milligan*,
608 U.S. 511 (2026) .......... 15

*American Great Lakes Post Ass'n v. Schultz*,
962 F.3d 510 (D.C. Cir. 2020) .......... 35

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
681 F.3d 427 (D.C. Cir. 2012) .......... 35

*Azar v. Allina Health Servs.*,
587 U.S. 566 (2019) .......... 40

*Babb v. Wilkie*,
589 U.S. 399 (2020) .......... 10

*Barnhart v. Walton*,
535 U.S. 212 (2002) .......... 13

*Bhandari v. First Nat'l Bank of Com.*,
808 F.2d 1082 (5th Cir. 1987) .......... 14

*Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*,
315 F. Supp. 3d 282 (D.D.C. 2018) .......... 37

*Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*,
No. 20-cv-03812 (APM), 2026 WL 861067 (D.D.C. Mar. 30, 2026) .......... 42

*Cayuga Nation v. Zinke*,
302 F. Supp. 3d 362 (D.D.C. 2018) .......... 36

*Cboe Glob. Markets, Inc. v. SEC*,
155 F.4th 704 (D.C. Cir. 2025) .......... 19, 24

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) .......... 17

*Chamber of Com. of U.S. v. SEC*,
85 F.4th 760 (5th Cir. 2023) .......... 40

*Cigar Ass'n of Am. v. FDA*,
5 F.4th 68 (D.C. Cir. 2021) ........................................................................................ 30, 32

*Conf. of State Bank Supervisors v. Off. of Thrift Supervision*,
792 F. Supp. 837 (D.D.C. 1992) .................................................................................... 42

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n,*
673 F.2d 525 (D.C. Cir. 1982) ...................................................................................... 40

*Consumer Elecs. Ass'n v. FCC*,
347 F.3d 291 (D.C. Cir. 2003) ...................................................................................... 30

*Council for Urological Interests v. Burwell*,
790 F.3d 212 (D.C. Cir. 2015) ...................................................................................... 39

*Crowell v. Benson*,
285 U.S. 22 (1932) ................................................................................................ 15, 16

*Ctr. for Auto Safety v. Peck*,
751 F.2d 1336 (D.C. Cir. 1985) .................................................................................... 30

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ...................................................................................................... 14

*FBME Bank Ltd. v. Mnuchin*,
249 F. Supp. 3d 215 (D.D.C. 2017) .............................................................................. 35

*FCC v. Nat'l Citizens Comm. for Broad.*,
436 U.S. 775 (1978) ...................................................................................................... 31

* *FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ............................................................................................. *passim*

*FCC v. Schreiber*,
381 U.S. 279 (1965) ...................................................................................................... 40

*Fed. Power Comm. v. Transcontinental Gas Pipe Line Corp.*,
365 U.S. 1 (1961) .......................................................................................................... 31

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ...................................................................................................... 31

*FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*,
608 U.S. 608 (2026) ...................................................................................................... 12

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006) ...................................................................................... 14

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002) .......... 42

*Golden v. City of Columbus*,
404 F.3d 950 (6th Cir. 2005) .......... 14

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) .......... 11

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) .......... 11

*Healthy Gulf v. Bureau of Ocean Energy Mgmt.*,
826 F. Supp. 3d 92 (D.D.C. 2026) .......... 30, 32

*Helicopter Ass'n Int'l, Inc. v. FAA*,
722 F.3d 430 (D.C. Cir. 2013) .......... 39

*Interfaith Ctr. on Corp. Resp. v. SEC*,
786 F. Supp. 3d 97 (D.D.C. 2025) .......... 32

*Jennings v. Rodriguez*,
583 U.S. 281 (2018) .......... 15, 16

*Lackey v. Stinnie*,
604 U.S. 192 (2025) .......... 10

*Lindeen v. SEC*,
825 F.3d 646 (D.C. Cir. 2016) .......... 32

* *Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... *passim*

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 19

* *Mid-Tex. Elec. Coop., Inc., v. FERC*,
773 F.2d 327 (D.C. Cir. 1985) .......... 37, 39

*Miller v. Am. Express Co.*,
688 F.2d 1235 (9th Cir. 1982) .......... 14

*Mourning v. Fam. Publ'ns Serv., Inc.*,
411 U.S. 356 (1973) .......... 25

*Murray v. UBS Sec., LLC*,
601 U.S. 23 (2024) .......... 10

*N.M. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*,
148 F.4th 755 (D.C. Cir. 2025) ........ 24

*Nat'l Ass'n of Home Builders v. EPA*,
682 F.3d 1032 (D.C. Cir. 2012) ........ 30, 32

*Nat'l Ass'n of Mfrs. v. SEC*,
748 F.3d 359 (D.C. Cir. 2014) ........ 33

*Nat'l Cmty. Reinvestment Coal. v. CFPB*,
No. 1:20-cv-2074, 2022 WL 4447293 (D.D.C. Sep. 23, 2022) ........ 33

*Nat'l Lifeline Ass'n v. FCC*,
921 F.3d 1102 (D.C. Cir. 2019) ........ 3, 40

*Nat'l Rest. Ass'n v. Solis*,
870 F. Supp. 2d 42 (D.D.C. 2012) ........ 37

*Nat'l Tel. Coop. Ass'n v. FCC*,
563 F.3d 536 (D.C. Cir. 2009) ........ 37

*Nicopure Labs, LLC v. FDA*,
266 F. Supp. 3d 360 (D.D.C. 2017) ........ 32

*Nicopure Labs, LLC v. FDA*,
944 F.3d 267 (D.C. Cir. 2019) ........ 32

*Omnipoint Corp. v. FCC*,
78 F.3d 620 (D.C. Cir. 1996) ........ 42

*Paypal, Inc. v. CFPB*,
728 F. Supp. 3d 31 (D.D.C. 2024) ........ 32

*PDK Lab'ys. v. DEA*,
362 F.3d 786 (D.C. Cir. 2004) ........ 42

*Phillips Petroleum Co. v. EPA*,
803 F.2d 545 (10th Cir. 1986) ........ 40

*Pub. Citizen, Inc. v. FAA*,
988 F.2d 186 (D.C. Cir. 1993) ........ 35

*Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*,
332 F.3d 654 (D.C. Cir. 2003) ........ 13

*Revenue Based Fin. Coal. v. Consumer Fin. Prot. Bureau*,
Case No. 23-24882-CIV, 2025 WL 1312966 (S.D. Fla. Feb. 17, 2025) ........ 30-31

*Reytblatt v. NRC*,
105 F.3d 715 (D.C. Cir. 1997) ........................................................................................ 35

*Ricci v. DeStefano*,
557 U.S. 557 (2009) ........................................................................................................ 15

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) .......................................................................................................... 12

*Shinseki v. Sanders*,
556 U.S. 396 (2009) ........................................................................................................ 42

*Smith v. City of Jackson*,
544 U.S. 228 (2005) .................................................................................................. 11, 17

*Snyder v. McDonough*,
1 F.4th 966 (Fed. Cir. 2021)..................................................................................... 34-35

*Spirit Airlines, Inc. v. U.S. Department of Transportation*,
997 F.3d 1247 (D.C. Cir. 2021) ...................................................................................... 18

* *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .................................................................................................. 16, 26

* *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
576 U.S. 519 (2015) ................................................................................................ *passim*

*U.S. Cellular Corp. v. FCC*,
254 F.3d 78 (D.C. Cir. 2001) .......................................................................................... 37

*United States v. Valencia*,
No. 5:17-cr-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018) .................................. 44

*ValueVision Int'l, Inc. v. FCC*,
149 F.3d 1204 (D.C. Cir. 1998) ................................................................................... 3, 38

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) ........................................................................................................ 40

*Wyoming v. USDA*,
661 F.3d 1209 (10th Cir. 2011)........................................................................................ 40

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ........................................................................................................ 16

**<u>Statutes</u>**

5 U.S.C. § 553 .................................................................................................................. 39

* 5 U.S.C. § 605(b) ........ 7, 37, 39

5 U.S.C. § 611 ........ 37

* 5 U.S.C. § 706 ........ *passim*

* 5 U.S.C. § 3345(a) ........ *passim*

5 U.S.C. § 3346 ........ 8, 45

12 U.S.C. § 5491(b)(5)(B) ........ 8

12 U.S.C. § 5512(b)(2)(A) ........ 7, 30

12 U.S.C. §§ 2801-2810 ........ 33

* 15 U.S.C. § 1691(a) ........ *passim*

* 15 U.S.C. § 1691(c) ........ *passim*

* 15 U.S.C. § 1691b(a) ........ *passim*

15 U.S.C. § 1691e ........ 12, 23

42 U.S.C. § 3604(a) ........ 11

42 U.S.C. § 3605(a) ........ 24

Equal Credit Opportunity Act,
Pub. L. No. 93-495, 88 Stat. 1500 (1974) ........ 3

Pub. L. No. 94-239,
90 Stat. 251 (1976) ........ 3, 13

Federal Deposit Insurance Corporation Improvement Act of 1991,
Pub. L. No. 102-242, § 223, 105 Stat. 2236, 2306 (1991) ........ 23

Dodd-Frank Wall Street Reform and Consumer Protection Act,
Pub. L. No. 111-203, 124 Stat. 1376 (2010) ........ 3

**Rules**

Fed. R. Civ. P. 56(a) ........ 9

**Regulations**

12 C.F.R. § 202.4(a) ........ 4

12 C.F.R. § 202.8(a)(3) ........ 5, 25

12 C.F.R. § 1002.4 ........ *passim*

12 C.F.R. § 1002.6 ........ 5, 6

12 C.F.R. § 1002.8 ........ *passim*

Equal Credit Opportunity,
40 Fed. Reg. 49298 (Oct. 22, 1975) ........ 4, 20, 23

Equal Credit Opportunity,
42 Fed. Reg. 1,242 (Jan. 6, 1977) (codified at 12 C.F.R. pt. 202) ........ 4, 14, 25

Equal Credit Opportunity (Regulation B),
76 Fed. Reg. 79442 (Dec. 21, 2011) ........ 5

2012 Truth in Lending Act (Regulation Z) Mortgage Servicing,
77 Fed. Reg. 57318 (Sep. 17, 2012) ........ 41

Ability To Repay Standards Under the Truth in Lending Act (Regulation Z),
78 Fed. Reg. 6622 (Jan. 30, 2013) ........ 41

Home Mortgage Disclosure (Regulation C),
80 Fed. Reg. 66128 (Oct. 28, 2015) ........ 33

* Equal Credit Opportunity Act (Regulation B),
91 Fed. Reg. 21620 (Apr. 22, 2026) ........ *passim*

Legal Standard Applicable to Supervisory Designation Proceedings,
90 Fed. Reg. 41520 (Aug. 26, 2025) ........ 41

Prohibition on Inclusion of Adverse Information in Consumer Reporting in Cases of Human Trafficking (Regulation V),
87 Fed. Reg. 20771 (Apr. 8, 2022) ........ 41

Protections for Borrowers Affected by the COVID-19 Emergency Under the Real Estate Settlement Procedures Act (RESPA), Regulation X,
86 Fed. Reg. 18840 (Apr. 9, 2021) ........ 41

Qualified Mortgage Definition Under the Truth in Lending Act (Regulation Z): Seasoned QM Loan Definition,
85 Fed. Reg. 53568 (Aug. 28, 2020) ........ 41

Remittance Transfers Under the Electronic Fund Transfer Act (Regulation E),
89 Fed. Reg. 79456 (Sep. 30, 2024) ........ 41

Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work,
89 Fed. Reg. 61358 (July 31, 2024) ........ 41

Equal Credit Opportunity Act (Regulation B),
90 Fed. Reg. 50901 (Nov. 13, 2025) ........ 5, 8, 37

**Other Authorities**

Black's Law Dictionary (rev. 4th ed. 1968) ........ 10

*Constitutionality of Disparate-Impact Liability Under Title VII*, 50 Op. O.L.C. ___ (June 9, 2026), https://perma.cc/FV3Z-DQCD........ 16

Designating an Acting Director of the Bureau of Consumer Financial Protection,
41 Op. O.L.C. 99 (2017) ........ 44

Guidance on Application of Federal Vacancies Reform Act of 1998,
23 Op. O.L.C. 60 (1999) ........ 44

H.R. No. 14856, 93rd Cong. 2d Sess. 3 (1971) ........ 14-15

Merriam-Webster's Collegiate Dictionary (10th ed. 1998)........ 43

Office of Legal Counsel, Whether the Equal Credit Opportunity Act Creates Disparate-Impact Liability, 50 Op. O.L.C. __, at 6-12 (June 12, 2026),
https://perma.cc/DZ7Y-GBCQ ........ 11

PN1079 — Brian Johnson — Bureau of Consumer Financial Protection,
https://perma.cc/H89D-V4EL ........ 8

PN11-22 — Russell Vought — Executive Office of the President,
https://perma.cc/2CBX-9ZRT ........ 8

Webster's Third New International Dictionary (1971)........ 10

## INTRODUCTION

Statutes "have a single, best meaning," and courts reviewing Administrative Procedure Act (APA) claims must assess whether the agency's interpretation of a statute accords with that single, best meaning. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024). In the Rule under review here, the Consumer Financial Protection Bureau ("CFPB" or "Bureau") amended Regulation B to align the regulation with the single best reading of the Equal Credit Opportunity Act ("ECOA"). *See* Equal Credit Opportunity Act (Regulation B), Final Rule, 91 Fed. Reg. 21620, 21621 (Apr. 22, 2026) (the "Rule"). Revising the Regulation to conform to statutory text is not arbitrary, capricious or contrary to law.

The Rule made three changes. First, applying the traditional tools of statutory construction, the Bureau correctly concluded that the ECOA's text does not authorize disparate-impact liability. The ECOA contains a straightforward disparate-treatment provision, prohibiting discrimination against credit applicants "on the basis of" or "because" of protected grounds. 15 U.S.C. § 1691(a). Unlike other statutes that the Supreme Court has construed to confer disparate-impact liability, the ECOA contains no text that "refers to the consequences of actions and not just to the mindset of actors." *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 533 (2015). Plaintiffs argue that disparate-impact liability is good policy, but that is beside the point. The Bureau lacks authority to create liability that is not provided for by statute.

Second, the Bureau lawfully amended Regulation B's provisions that prohibit certain discouragement of potential credit applicants. Although the ECOA does not directly prohibit discrimination of *potential* credit applicants, the Bureau has authority to prohibit discouragement to the extent that doing so is "necessary or proper to effectuate the purposes of [the ECOA]" and "prevent circumvention or evasion thereof" "in the judgment of the Bureau." 15 U.S.C. § 1691b(a). The Bureau reasonably exercised its judgment to better tailor the line between lawful

conduct and unlawful discouragement. Specifically, the Bureau concluded that while it was necessary to prohibit discouraging oral or written statements, it was not necessary to prohibit supposedly discouraging acts or practices in a manner that would sweep in routine business practices. The Bureau likewise reasonably decided to prohibit statements that would cause a reasonable person to believe that the creditor would unlawfully discriminate, but not all controversial statements about matters of public interest, which would chill creditors' speech. Again, Plaintiffs believe that it is better policy to draw the line differently, but that is not enough to find the Bureau's actions violated the APA.

Third, the Bureau reasonably exercised its express authority to set standards for for-profit special purpose credit programs ("SPCPs"), which allow creditors to discriminate on otherwise prohibited grounds as a remedial measure. *Id.* U.S.C. § 1691(c)(3). Such programs risk undermining the ECOA's purposes by authorizing the very forms of discrimination that the ECOA is designed to prohibit. Therefore, the Bureau required creditors who offered such SPCPs to provide evidence that discriminating on otherwise prohibited grounds was necessary to provide credit to persons who would otherwise be denied credit because of unlawful discrimination.

Apparently recognizing the weakness of their substantive legal arguments, Plaintiffs devote a substantial portion of their brief to nitpicking various procedural aspects of the Bureau's rulemaking. Contrary to Plaintiff's assertions, the Bureau reasonably assessed the Rule's costs and benefits, explaining that qualitative analysis was sufficient to assess the costs and benefits, given limitations on available data. The Bureau also validly certified that no Final Regulatory Flexibility Analysis was necessary because the Rule would not have a significant economic impact on a substantial number of small entities. Although Plaintiffs would have preferred a different outcome, their mere "disagree[ment] with [the Bureau's] analysis" is not grounds to invalidate the

Rule, *ValueVision Int'l, Inc. v. FCC*, 149 F.3d 1204, 1213 (D.C. Cir. 1998). Nor was the comment period inadequate. The 32-day comment period was "sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) (citation omitted). Plaintiffs can hardly assert they lacked a meaningful opportunity to comment when two Plaintiffs submitted *a 78-page single-spaced comment with 344 footnotes*. In any event, because the Rule was necessary to align Regulation B with statutory text, Plaintiffs could not show that any procedural infirmity caused "prejudicial error." 5 U.S.C. § 706.

Finally, Plaintiffs' attack on former Acting Director Russell Vought's service is baseless, as he was validly designated to serve as Acting Director by the President under the Federal Vacancies Reform Act.

## BACKGROUND

### A. Statutory Background

In 1974, Congress enacted the ECOA, which prohibited creditors from discriminating against applicants on the basis of sex or marital status. Pub. L. No. 93-495, § 701, 88 Stat. 1500, 1521 (1974). In 1976, Congress amended the ECOA to prohibit discrimination on the basis of race, color, religion, national origin, age, income from public assistance, or exercise of certain statutory rights. Pub. L. No. 94-239, § 701, 90 Stat. 251, 251 (1976). Congress authorized the Federal Reserve Board ("Board") to promulgate regulations implementing the ECOA. *See* Pub. L. No. 93-495, § 703, 88 Stat. at 1522. In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act. Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank Act"), which created the Consumer Financial Protection Bureau and transferred rulemaking and enforcement authority over the ECOA to the Bureau. *Id.* §§ 1002(12)(D), (14), 1011(a), 1013(c)(2)(A), 1021-22, 124 Stat. at 1957, 1964, 1970, 1979-80.

The ECOA makes it "unlawful for any creditor to discriminate against any applicant" for credit "on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract)," or "because" the applicant derives income from public assistance or has exercised rights under the Consumer Credit Protection Act (which includes the ECOA and several other consumer credit protection laws). 15 U.S.C. § 1691(a). As an exception to this prohibition on credit discrimination, the ECOA provides that "[i]t is not a violation of this section for a creditor to refuse to extend credit offered pursuant to . . . any special purpose credit program ['SPCP'] offered by a profit-making organization to meet special social needs which meets standards prescribed in regulations by the Bureau." *Id.* § 1691(c). The ECOA authorizes the Bureau to "prescribe regulations to carry out the purposes of this subchapter," including "such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." *Id.* § 1691b(a).

**B. Regulatory Background**

The Board first promulgated Regulation B, to implement the ECOA, in 1975. 40 Fed. Reg. 49298 (Oct. 22, 1975). Among other things, that regulation prohibited creditors from making "any statements to applicants or prospective applicants which would, on the basis of sex or marital status, discourage a reasonable person from applying for credit or pursuing an application for credit." *Id.* at 49307 (12 C.F.R. § 202.4(a)). In 1977, the Board expanded Regulation B to implement the expanded ECOA. *See* 42 Fed. Reg. 1242 (Jan. 6, 1977). A footnote in the 1977 Regulation B construed the ECOA as authorizing disparate-impact liability; it cited "[t]he legislative history" of the 1976 ECOA to conclude that "Congress intended an 'effects test' concept," but did not cite any text of the ECOA. *Id.* at 1255 n.7.

The 1977 Regulation B also set standards for SPCPs. For for-profit SPCPs, it required "a written plan that (A) identifies the class or classes of persons that the program is designed to benefit and (B) sets forth the procedures and standards for extending credit pursuant to the program." *Id.* at 1256 (12 C.F.R. § 202.8(a)(3)(i)). It required that the "class of persons" targeted by an SPCP "either probably would not receive such credit or probably would receive it on less favorable terms than are ordinarily available to other applicants applying to the organization for a similar type and amount of credit." *Id.* at 1256-57 (12 C.F.R. § 202.8(a)(3)(ii)). In 2011, the Bureau promulgated a version of Regulation B that made technical changes, but carried forward the substance of the Board's Regulation B. *See* 76 Fed. Reg. 79442 (Dec. 21, 2011).

**C. The Notice of Proposed Rulemaking and Rule**

On November 13, 2025, the Bureau published a Notice of Proposed Rulemaking proposing a rule that would amend Regulation B. Equal Credit Opportunity Act (Regulation B), Proposed Rule, 90 Fed. Reg. 50901 (Nov. 13, 2025) ("NPRM"). The NPRM invited comments through December 15, 2025. *Id.* at 50901. The Bureau received approximately 64,500 comments, and after reviewing those comments, the Bureau finalized the rule as proposed in the NPRM. *See* 91 Fed. Reg. at 21621. As the Bureau explained, "these amendments to Regulation B are to ensure consistency with the letter and intent of ECOA." *Id.* at 21623.

The Rule eliminated language in Regulation B authorizing disparate-impact liability, and added language stating that the ECOA "does not provide that the 'effects test' applies for determining whether there is discrimination in violation of the Act." *Id.* at 21668 (12 C.F.R. § 1002.6). The Bureau "determined that ECOA's statutory language does not authorize disparate-impact liability and that the application of disparate-impact liability in the credit context may undermine ECOA's purposes." *Id.* at 21629. Prior Federal Reserve Board and Bureau regulations

authorizing disparate-impact liability "relied solely on the legislative history of ECOA . . . and failed to consider whether ECOA's statutory language authorized disparate-impact liability." *Id.*

Pursuant to the Bureau's adjustment authority, 15 U.S.C. § 1691b(a), the Rule also made several changes to the provision prohibiting certain discouragement of prospective applicants. The previous version had prohibited "acts or practices" that could discourage applicants on prohibited bases, but the Rule prohibited discouraging "oral or written statement[s]," defined as "spoken or written words, or visual images such as symbols, photographs, or videos." *Id.* at 21638, 21668 (12 C.F.R. § 1002.4(b)). The prior version prohibited statements that "would discourage on a prohibited basis a reasonable person" from seeking credit, but the Rule provided that prohibited discouragement occurs only if the "the creditor knows or should know" that the statement "would cause a reasonable person to believe that the creditor would deny, or would grant on less favorable terms, a credit application" based on prohibited characteristics. *Id.* at 21639, 21668 (12 C.F.R. § 1002.4(b)). The Rule also clarified that "encouraging statements directed at one group of consumers cannot discourage other consumers who were not the intended recipients of the statements." *Id.* at 21669 (official interpretation of 12 C.F.R. § 1002.4). It also listed examples of permissible statements, such as "[s]tatements in support of local law enforcement." *Id.* The Bureau made these changes because the prior rule had "been interpreted to prohibit conduct that is not necessary or proper to prohibit in order to prevent the circumvention or evasion of ECOA's purposes" and "has had an unnecessarily chilling effect on creditors' business practices and exercise of their rights to speak about matters of public interest." *Id.* at 21638.

Finally, the Rule exercised the Bureau's authority to set standards for for-profit SPCPs, *see* 15 U.S.C. § 1691(c)(3), by revising Regulation B's standards in several respects. The Rule prohibited creditors from using race, color, national origin, or sex as eligibility criteria for a for-

profit SPCP. 91 Fed. Reg. at 21669 (12 C.F.R. § 1002.8(b)(3)). The Rule required that a for-profit SPCP may use other prohibited characteristics as eligibility criteria "only if the for-profit organization provides evidence for each participant who receives credit through the program that in the absence of the program the participant would not receive such credit as a result of those specific characteristics." *Id.* (12 C.F.R. § 1002.8(b)(4)). The Rule also added requirements for a for-profit SPCP's written plan. Such a plan must "[e]xplain[] why . . . the class of persons" targeted by an SPCP "would not receive such credit in the absence of the program." *Id.* at 21668 (12 C.F.R. § 1002.8(a)(3)(i)(D)). If the SPCP uses an otherwise prohibited basis as an eligibility criterion, the plan must "explain why" the plan's goals "[c]annot be accomplished through a program that does not use otherwise prohibited bases as participant eligibility criteria." *Id.* (12 C.F.R. § 1002.8(a)(3)(i)(E)(2)). The Bureau explained that these changes effectuated the ECOA's purpose because "it is inconsistent with ECOA's purpose (preventing discrimination) for an SPCP to use an otherwise prohibited basis (and thereby discriminate against ineligible individuals) unless the SPCP's use of the otherwise prohibited basis is necessary to overcome an inability to access credit that is specifically based on those same characteristics." *Id.* at 21652-53.

Pursuant to Section 1022(b) of the Dodd-Frank Act, 12 U.S.C. § 5512(b)(2)(A), the Bureau analyzed the costs and benefits of the Rule. *See* 91 Fed. Reg. at 21659-66. Although the Bureau explained that "limitations on what data are available restrict the Bureau's ability to quantify" the Rule's costs and benefits, *id.* at 21659, it qualitatively assessed the expected costs and benefits to covered persons (meaning regulated parties) and consumers of each aspect of the Rule, *see id.* at 21659-66. The Final Rule also certified that no Final Regulatory Flexibility Analysis was necessary under the Regulatory Flexibility Act because the Rule would not have a significant economic impact on a substantial number of small entities. *See id.* at 21666-67; 5 U.S.C. § 605(b).

### D. Russell Vought's Service as Acting Director

Russell Vought signed both the NPRM and the Rule in his capacity as Acting Director of the Bureau. *See* 90 Fed. Reg. at 50923; 91 Fed. Reg. at 21670. On or around February 1, 2025, President Trump removed Director Rohit Chopra. Pls.' Mot. for Summ. J. 7, ECF No. 28 ("Pls.' Mem."). President Trump then designated Treasury Secretary Scott Bessent as Acting Director pursuant to the Federal Vacancies Reform Act (FVRA), Am. Compl. ¶ 182, ECF No. 25, and Bessent briefly served in that role until President Trump designated Vought as Acting Director on February 7, 2025, Pls.' Mem. 7. The FVRA authorizes acting service by a person who holds "an office for which appointment is required to be made by the President, by and with the advice and consent of the Senate." 5 U.S.C. § 3345(a)(2); Pls.' Mem. 7. Vought was confirmed to such an office, the Director of Office of Management and Budget, on February 6, 2025. *See* PN11-22 — Russell Vought — Executive Office of the President, https://perma.cc/2CBX-9ZRT. The FVRA sets a general 210-day limit for acting service. 5 U.S.C. § 3346(a)(1). Consistent with the Act, that limit was extended by the President's nomination of Jonathan McKernan to serve as Director on February 11, 2025, the withdrawal of that nomination on May 12, 2025, and the nomination of Stuart Levenbach to serve as Director on November 18, 2025. *See Id.* § 3346(a)(2), (b). The Senate returned Levenbach's nomination on January 3, 2026, Pls.' Mem. 7, which started a final 210-day period for acting service under the FVRA, 5 U.S.C. § 3346(b)(2). That period ended on August 1, 2026, at which point CFPB Deputy Director Mark Paoletta became Acting Director pursuant to the CFPB's succession statute. *See* Pls.' Mem. 7; 12 U.S.C. § 5491(b)(5)(B).

On June 10, 2026, the President transmitted the nomination of Brian Johnson as Director to the Senate; his nomination was favorably reported out of the Senate Banking Committee on September 17, 2026, and remains pending. *See* PN1079 — Brian Johnson — Bureau of Consumer Financial Protection, https://perma.cc/H89D-V4EL.

### E. Procedural History

Plaintiffs filed the Complaint on May 27, 2026, Compl., ECF No. 1, and filed the operative Amended Complaint on August 11, 2026, Am. Compl., ECF No. 25. Plaintiffs bring claims under the APA, asserting that the Rule and cost-benefit analysis are arbitrary and capricious (Counts I and II), and the Rule is contrary to law (Count III), in excess of statutory authority (Count IV), and failed to observe required procedures (Count V). *See id.* ¶¶ 227-49. Plaintiffs also claim that the Rule was ultra vires because Vought was not lawfully serving as Acting Director (Count VI). *See id.* ¶¶ 250-54. Defendants produced the administrative record on July 24, 2026, ECF No. 23, and produced an amended administrative record on September 3, 2026, ECF No. 26. On September 29, 2026, Plaintiffs filed their Motion for Summary Judgment, ECF No. 28.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In APA cases, "courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 603 U.S. at 394. "When the best reading of a statute is that it delegates discretionary authority to an agency," the court should "recogniz[e] constitutional delegations, fix[] the boundaries of [the] delegated authority, . . . and ensur[e] the agency has engaged in reasoned decisionmaking." *Id.* at 395 (citations omitted). The APA calls for courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained. Judicial review under that standard is deferential, and a court may not substitute its own policy judgment for that of the agency. A court simply ensures that the agency has acted within a zone of

reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

## ARGUMENT

### I. The Rule's Provisions Rejecting Disparate-Impact Liability Are Lawful

#### A. The ECOA's Text Does Not Confer Disparate-Impact Liability

The "single, best meaning," *Loper Bright*, 603 U.S. at 400, of the ECOA's prohibition on credit discrimination, 15 U.S.C. § 1691(a), is that it prohibits only disparate treatment on protected bases and does not authorize disparate-impact liability. The ECOA lacks any language providing for liability based on disparate impact. Instead, it contains a straightforward prohibition against discrimination "on the basis of" or "because" of protected characteristics, *id.* U.S.C. § 1691(a), with no statutory text authorizing disparate-impact liability. Under *Loper Bright*, the plain text of the ECOA controls, and the Bureau cannot deviate from the best interpretation of that text.

"When interpreting a statute, [courts] begin with the text." *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025). The ECOA makes it "unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction," "on the basis of" race, color, religion, national origin, sex, marital status, or age, or "because" of income derived from a public assistance program or exercising rights under the ECOA. 15 U.S.C. § 1691(a). The phrase "discriminate against" generally signifies an awareness of difference and an intent to treat a person poorly based on that difference. A contemporaneous dictionary defined "discriminate" as "to . . . recognize as being different from others" or "to . . . distinguish between or among." Webster's Third New International Dictionary 648 (1971 ed.); *see also* Black's Law Dictionary 553 (rev. 4th ed. 1968) (defining "discrimination" to mean, "[i]n general, a failure to treat all equally; favoritism"). "[T]he 'normal definition' of 'discrimination' is 'differential treatment.'" *Murray v. UBS Sec., LLC*, 601 U.S. 23, 34 (2024) (quoting *Babb v. Wilkie*, 589 U.S. 399, 405 (2020)). "[T]he ordinary meaning"

of causation requirements, such as the ECOA's language stating that discrimination must be "because" of or "on the basis of" a prohibited ground, "is that [the protected characteristic] was the 'reason' that the [defendant] decided to act." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). Disparate-impact liability goes beyond the ECOA's plain text because it covers situations where a person does not intentionally discriminate because of a protected characteristic and may be unaware of the characteristic. Such a theory dispenses with the causal link required by statute. *See* Office of Legal Counsel, *Whether the Equal Credit Opportunity Act Creates Disparate-Impact Liability*, 50 Op. O.L.C. __, at 6-12 (June 12, 2026), https://perma.cc/DZ7Y-GBCQ.

The Supreme Court has found that antidiscrimination laws authorize disparate-impact liability only in narrow circumstances that do not apply here. In *Inclusive Communities*, the Court held "that antidiscrimination laws must be construed to encompass disparate-impact claims when their text refers to the consequences of actions and not just to the mindset of actors, and where that interpretation is consistent with statutory purpose." 576 U.S. at 553. The Court held that the Fair Housing Act had the requisite effects-based language in prohibiting "*otherwise mak[ing] available* . . . a dwelling to any person because of" protected grounds. *Id.* (quoting 42 U.S.C. § 3604(a)) (emphasis added). Two earlier cases finding disparate-impact liability (in Title VII and the ADEA, respectively), *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and *Smith v. City of Jackson*, 544 U.S. 228 (2005), are consistent with that approach. In *Griggs* and *Smith*, the statutes prohibited actions that "*otherwise adversely affect* [an individual's] status as an employee," because of such individual's race or age. *See Inclusive Communities*, 576 U.S. at 532-33 (quoting *Smith*, 544 U.S. at 235 (plurality opinion)); *Griggs*, 401 U.S. at 426 n.1.

By contrast, the ECOA contains no effects-based language. It simply prohibits a covered entity from "discriminat[ing] against" a person, "on the basis of" or "because" of a prohibited

ground. 15 U.S.C. § 1691(a). As explained above, that language is most naturally read to focus on "the mindset of actors," rather than "the consequences of actions." *Inclusive Communities*, 576 U.S. at 533.[1] Thus, properly understood, *Griggs* (as interpreted and clarified by *Inclusive Communities*) does not support reading disparate-impact liability into the ECOA. However, if the Court concludes that *Griggs* mandates the conclusion that the ECOA encompasses disparate-impact liability, then Defendants preserve the argument that *Griggs* should be overruled. The Supreme Court has now "rejected the practice of fashioning rights of action as we see fit," *FS Credit Opportunities Corp. v. Saba Capital Master Fund, Ltd.*, 608 U.S. 608, 613 (2026), and as explained below, *see infra*, pp. 15-16, broad disparate-impact liability raises series constitutional equal protection concerns.

**B. Plaintiffs' Reading of the ECOA as Authorizing Disparate-Impact Liability Is Incorrect**

Plaintiffs fail to identify any text of the ECOA that confers disparate-impact liability. They argue that "the term 'on the basis of' refers to the consequences of actions, not just the mindset of actors." Pls.' Mem. 26. Yet the Supreme Court has indicated that the equivalent phrase "based on" "indicates a but-for causal relationship and thus a necessary logical condition." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63 (2007). An action is taken "on the basis of" a prohibited ground only if the prohibited ground caused the action.

Plaintiffs also cite 15 U.S.C. § 1691e(b), which instructs courts to consider "the extent to which the creditor's failure of compliance was intentional" in determining punitive damages. They

[1] The Supreme Court's analysis of Section 805(a) of the Fair Housing Act is not to the contrary. There, the Court recognized that the "term discriminate" can encompass disparate-impact liability in the context of a statute's text, history, purpose and structure. *Inclusive Communities*, 576 U.S. at 534 (cleaned up). As the Bureau explained in the Rule, "the wording . . ., structure, and context all . . . counsel reaching a . . . conclusion" that ECOA does not recognize disparate impact liability. 91 Fed. Reg. at 21632.

argue that "[t]his provision is necessary only if some ECOA violations are *not* intentional." Pls.' Mem. 27. Yet as the Bureau explained, its interpretation "is entirely consonant with the Act's punitive damages provision," which "cover[s] varying degrees of intentional conduct." 91 Fed. Reg. at 21634. For example, wanton or malicious conduct might support punitive damages more than conduct which merely exhibits a reckless disregard for the law. *Id.* A provision analyzing the *extent* of intentionality does not imply that some covered conduct must be unintentional.

With no support for their interpretation in ECOA's text, Plaintiffs struggle in vain to find legal support to read an atextual disparate-impact provision into the ECOA. Plaintiffs argue that "[c]ourts have uniformly recognized disparate impact claims under ECOA," and that Congress should be deemed to have "ratified" that interpretation by amending the ECOA. Pls.' Mem. 28-29. But the "ratification canon" is "of limited utility here." *Pub. Citizen, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 332 F.3d 654, 668 (D.C. Cir. 2003). While Congress has amended other provisions of the ECOA several times, it has only amended the provision prohibiting credit discrimination once—in 1976—when it expanded the provision to include additional protected classes. *See* Pub. L. No. 94-239, § 701, 90 Stat. 251, 251 (1976). Because Congress has made "only isolated amendments" to *other provisions*, "[i]t is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of the Court's contrary statutory interpretation." *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) (citations omitted); *cf. Barnhart v. Walton*, 535 U.S. 212, 220 (2002) (according weight where "Congress has frequently amended or reenacted *the relevant provisions* without change" (emphasis added)).

In any case, Plaintiffs vastly overstate the extent of case law recognizing disparate-impact claims. The Sixth Circuit and D.C. Circuit have merely assumed without deciding that the ECOA

includes disparate-impact liability. *See Golden v. City of Columbus*, 404 F.3d 950, 963 (6th Cir. 2005) ("we assume that disparate impact claims are permissible under ECOA"); *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006) ("[a]ssuming without deciding that a disparate impact claim is cognizable under ECOA"). In rejecting a plaintiff's ECOA claim, the Fifth Circuit stated in unreasoned dicta that the plaintiff "could have" shown discrimination based on disparate impact. *Bhandari v. First Nat'l Bank of Com.*, 808 F.2d 1082, 1101 (5th Cir. 1987). And the Ninth Circuit has held that "[n]o showing of any specific intent to discriminate [is] required" when a party violates "a regulation promulgated under the ECOA." *Miller v. Am. Express Co.*, 688 F.2d 1235, 1239 (9th Cir. 1982). This is better read as a broad conception of the agency's authority to promulgate regulations than a specific endorsement of disparate-impact liability. The situation here is nothing like in *Inclusive Communities*, where the Supreme Court found it important that Congress retained the relevant statutory text when amending the FHA after "all nine Courts of Appeals to have addressed the question had concluded the Fair Housing Act encompassed disparate-impact claims." 576 U.S. at 535.

Plaintiffs also point out that in the past, agencies with ECOA authority have interpreted the statute as allowing disparate-impact liability. *See* Pls.' Mem. 28-29. Yet those interpretations ultimately derive from an early Board regulation, which relied solely on legislative history, and did not even mention the ECOA's text. *See* 42 Fed. Reg. at 1255 n.7 ("The legislative history of the Act indicates that the Congress intended an 'effects test' concept . . . ."). But "legislative history is not the law." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 523 (2018). For similar reasons, the Court should not give weight to Plaintiffs' argument that the ECOA should be construed as reaching disparate-impact liability because Congress did not enact an early draft law, that would have defined "discrimination" as an "invidious distinction." Pls.' Mem. 28 (quoting H.R. No.

14856, 93rd Cong. 2d Sess. 3 (1971)). What matters is the language Congress enacted, not the language Congress did not enact. And the ECOA's text includes no effects-based language giving rise to disparate-impact liability.

### C. The Constitutional Avoidance Canon Bolsters the Bureau's Interpretation of the ECOA

To the extent Court finds the textual question close, the constitutional avoidance canon counsels in favor of rejecting Plaintiffs' reading of the ECOA. That canon provides that "[w]hen 'a serious doubt' is raised about the constitutionality of an Act of Congress, 'it is a cardinal principle that [the Supreme] Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'" *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (quoting *Crowell v. Benson*, 285 U.S. 22, 62 (1932)).

Here, Plaintiffs' interpretation of the ECOA as requiring broad disparate-impact liability would raise serious questions as to whether ECOA conflicts with the Due Process Clause of the Fifth Amendment, which guarantees that the federal government will not deprive a person of the equal protection of the laws. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). That is because disparate-impact liability tends to incent, or even coerce, parties to make decisions based on protected statuses such as race or sex to avoid liability or the threat of liability. Indeed, the Supreme Court recently explained that standards for vote-dilution claims, which aim to benefit racial groups that have historically suffered discrimination, needed to be "updated" "to resolve the tension between" such claims "and our colorblind Constitution." *Allen v. Milligan*, 608 U.S. 511, 512 (2026) (per curiam). Disparate-impact liability theories present that same tension with the constitutional guarantee of equal protection. *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (noting, under a different statutory scheme, that "disparate-impact liability

. . . place[s] a racial thumb on the scales, often requiring employers to evaluate the racial outcomes of their policies, and to make decisions based on (because of) those racial outcomes").

Nor can disparate-impact liability be justified on the basis that in many applications, it tends to benefit "minority" groups. As the Supreme Court recently affirmed, "[e]liminating racial discrimination means eliminating all of it. And the Equal Protection Clause, we have accordingly held, applies 'without regard to any differences of race, of color, or of nationality'—it is 'universal in [its] application.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023) ("*SFFA*") (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)). Indeed, in *Inclusive Communities*, the Court acknowledged that "serious constitutional questions . . . might arise" if "liability were imposed based solely on a showing of a statistical disparity," and that disparate-impact liability must therefore be "limited in key respects." 576 U.S. at 540; *cf. Constitutionality of Disparate-Impact Liability Under Title VII*, 50 Op. O.L.C. ___ (June 9, 2026), https://perma.cc/FV3Z-DQCD (concluding that EEOC guidance on disparate-impact liability under Title VII violated the Constitution).

Broad disparate-impact liability would cause Regulation B to transgress constitutional limitations, or at least raise "serious doubt" about its constitutionality. *Jennings*, 583 U.S. at 296 (quoting *Crowell*, 285 U.S. at 62). The Bureau's construction of the ECOA would "avoid[]" that constitutional doubt and is not merely "fairly possible," *id.*, but it is the best reading of the ECOA's text, *see supra*, pp. 10-12. Thus, the constitutional avoidance canon supports adopting the Bureau's construction.

**D. The Rule's Disparate-Impact Liability Provisions Are Not Arbitrary and Capricious**

Plaintiffs err in arguing that it was arbitrary and capricious to amend Regulation B to provide that ECOA does not encompass disparate-impact liability. Pls.' Mem. 30-34. The Bureau

did so because the ECOA's text requires such a result. Courts no longer defer to any "permissible construction of the statute" by agencies; rather, statutes "have a single, best meaning." *Loper Bright*, 603 U.S. at 397, 400. The question of disparate-impact liability is not a policy decision delegated to the agency,[2] but a legal question with a definite answer. *See Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237 (D.C. Cir. 2026) (holding that, following *Loper Bright*, "[o]nce the court determines the meaning of [the statute], there is no reason to seek an agency's explanation as to why it may have changed its view on the meaning of the statute. The court's judgment is the final word."). Amending a rule so that it aligns with the statute's single, best meaning does not make the rule "arbitrary" and "capricious", 5 U.S.C. § 706(2)(A); it complies with the requirement that agency action must be within "statutory . . . authority," *id.* § 706(2)(C).

In asserting that the rejection of disparate-impact liability was arbitrary and capricious, Plaintiffs make a variety of policy arguments. *See* Pls.' Mem. 30-34. Yet "policy cannot override the law." 91 Fed. Reg. at 21623. The Rule's provisions, and particularly the rejection of disparate-impact liability, were necessary "to ensure consistency with the letter and intent of ECOA." *Id.*

Nonetheless, the Bureau considered and responded to the policy arguments that Plaintiffs wrongly accuse the Bureau of ignoring. For example, Plaintiffs argue that the Final Rule "fails to respond" to comments arguing that disparate-impact liability "is critical to meaningfully prevent discrimination caused by" automated underwriting technologies. Pls.' Mem. 31. Yet the Rule acknowledged concern about discrimination by "automated credit models" and explained that "ECOA will continue to provide important protections against discrimination in the credit markets

[2] In *Smith*, the controlling concurrence did not conclude that the best reading of the ADEA was that it conferred disparate-impact liability, but merely extended *Chevron* deference to the agency's interpretation, calling it "an absolutely classic case for deference to agency interpretation." *Smith*, 544 U.S. at 243 (Scalia, J., concurring in part and concurring in the judgment).

and that, under disparate-treatment claims, facially neutral policies may still violate the law if they are proxies or pretexts for discrimination on a prohibited basis." 91 Fed. Reg. at 21636; *see also id.* (noting that disparate-impact liability could hinder the "use of AI-driven models to expand credit access"). Plaintiffs also suggested that participants in the credit industry have reliance interests in the prior disparate-impact regime. *See* Pls.' Mem. 30-31. The Bureau explained "that any reliance interests in the existing regulatory interpretation do not outweigh revising Regulation B to bring it into alignment with the statutory text." 91 Fed. Reg. at 21625.

Finally, Plaintiffs argue that the Bureau did not consider the alternative of deleting the prior rule's disparate-impact language, without adding language rejecting disparate-impact liability. Pls.' Mem. 33-34. Yet the Bureau explained that "because Regulation B contained a contrary interpretation, the Bureau believes that it is necessary and appropriate to now clarify in Regulation B that under the best reading of ECOA disparate-impact claims are not available." 91 Fed. Reg. at 21637. Thus, Plaintiffs' reliance (at 34) on *Spirit Airlines, Inc. v. U.S. Department of Transportation*, 997 F.3d 1247, 1255 (D.C. Cir. 2021), to argue that the Bureau failed to consider how its "chosen policy" would interact with other laws is misplaced. Pls.' Mem. 34 (quoting *Spirit Airlines*, 997 F.3d at 1255). The Bureau did not choose policy from a range of options; rather, it stated its view as to the single, best interpretation of ECOA. By aligning Regulation B with statutory text, the Bureau hardly acted outside "a zone of reasonableness," *Prometheus Radio Project*, 592 U.S. at 423, as necessary to sustain an arbitrary and capricious claim.

## II. The Rule's Discouragement Provisions Are Lawful

### A. The ECOA Authorizes CFPB to Exercise Judgment to Fashion Discouragement Regulations

By its terms, the ECOA does not directly prohibit discrimination against prospective applicants that would discourage them from applying for credit. Rather, the ECOA's basic

prohibition makes it "unlawful for any creditor to discriminate against any applicant," 15 U.S.C. § 1691(a), with "applicant" defined as "any person who applies to a creditor" for credit, *id.* § 1691a(b). The Bureau has statutory authority to address discouragement of prospective applicants because the ECOA empowers the Bureau to "prescribe regulations to carry out the purposes of" the ECOA, and "may provide for such adjustments and exceptions for any class of transactions, as in the judgment of the Bureau are necessary or proper to effectuate the purposes of this subchapter, to prevent circumvention or evasion thereof, or to facilitate or substantiate compliance therewith." *Id.* § 1691b(a). Accordingly, the Bureau may determine in its "judgment" the extent to which prohibiting discouragement of potential credit applicants is "necessary or proper . . . to prevent circumvention or evasion" of the ECOA. *Id.* The Court's role is to "ensure the agency has engaged in reasoned decisionmaking within [the] boundaries" of the statutory delegation to exercise such judgment. *Loper Bright*, 603 U.S. at 395 (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

### B. The Rule's Discouragement Provisions Are Reasonable and Within CFPB's Statutory Authority

The Bureau engaged in reasoned decisionmaking and exercised the judgment called for by the ECOA in determining that the Rule's discouragement provisions were necessary to prevent circumvention of the ECOA, but that a broader prohibition on discouragement was not necessary. This is necessarily a line-drawing exercise. *See Cboe Glob. Markets, Inc. v. SEC*, 155 F.4th 704, 722 (D.C. Cir. 2025) (noting that agencies have "wide discretion in making line-drawing decisions."). As the Bureau explained, "[a] well-tailored discouragement provision that prohibits" statements that would discourage credit applications on a prohibited basis "protects ECOA's purpose of making credit available on a non-discriminatory basis"; however, based on "its expertise," the Bureau concluded "that, in the years since the Board first adopted the

discouragement provision, the provision has been interpreted to prohibit conduct that is not necessary or proper to prohibit in order to prevent the circumvention or evasion of ECOA's purposes." 91 Fed. Reg. at 21638. Specifically, the previous discouragement regulation was "overbroad" with "potential interpretations" that "may constrain free speech and commercial activity in ways that are unwarranted." *Id.* This is not surprising given that the Board established the original discouragement line shortly after ECOA's enactment without any analysis or discussion of the specific parameters for unlawful discouragement. *See* 40 Fed. Reg. at 49298 (merely stating that the discouragement regulation "is necessary to protect applicants against discriminatory acts occurring before an application is initiated"). With the benefit of 50 years' experience, the Bureau has now tailored that line to better serve ECOA's purposes while not "impos[ing] unnecessary constraints in the marketplace." 91 Fed. Reg. at 21638. In doing so, the Bureau made three changes that Plaintiffs challenge.

***The "oral or written statement" requirement.*** Although the prior rule had prohibited discouraging "acts or practices," CFPB amended Regulation B to prohibit discouraging "oral or written statement[s]." 91 Fed. Reg. at 21668 (12 C.F.R. § 1002.4). The Bureau explained that the prior rule had been "interpreted overly broadly to apply to business practices that, though they may have some communicative effect, do not reflect the circumvention or evasion of ECOA's prohibition against discrimination that the discouragement provision was designed to address." *Id.* at 21643. The prior rule had been interpreted to prohibit "routine business practices" such as "business decisions about where to locate branch offices," and where to "advertise" or "engage with the community through open houses or similar events." *Id.* at 21641, 21643-44. The Bureau acted within its authority in judging that prohibiting such routine business practices was not necessary to prevent circumvention or evasion of the ECOA.

***Excluding encouraging statements from discouragement.*** CFPB also amended the regulation so that it no longer prohibited "[s]tatements directed at one group of consumers, encouraging that group of consumers to apply for credit." *Id.* at 21669 (official interpretation of 12 C.F.R. § 1002.4). As the Bureau explained, prohibiting such encouragement was "overbroad relative to the intended purposes of the discouragement prohibition," which was to "achieve" the ECOA's "purpose" of "mak[ing] credit available to all applicants on a nondiscrimatory basis . . . by prohibiting creditors from *discouraging* applicants or prospective applicants." *Id.* at 21644 (emphasis added). Such encouraging statements "are not intended to (or even likely to) discourage *other* applicants or prospective applicants" who did not receive and may be unaware of the statements. *Id.* (emphasis added). For instance, selective encouragement in the form of "[t]argeted advertising and outreach to underserved populations can improve access to credit and advance the purpose of the ECOA by generating applications from qualified consumers who otherwise would not have known about the product or service being offered." *Id.* at 21646. And that in no way discourages others from applying for credit. The Bureau thus validly exercised its judgment in determining that while prohibiting *discouragement* of potential applicants was necessary to prevent circumvention of the ECOA, prohibiting *encouragement* of potential applicants was not.

***Standard for discouragement.*** The Rule clarified that the standard for discouragement is that "the creditor knows or should know" that a statement "would cause a reasonable person to believe that the creditor would deny, or would grant on less favorable terms, a credit application" because of a prohibited characteristic. *Id.* at 21668 (12 C.F.R. § 1002.4(b)); *see also id.* at 21669-70 (official interpretation of 12 C.F.R. § 1002.4) (examples of statements that do not meet this standard). As the Bureau explained, "[t]here is a difference between a statement by a creditor that an applicant or potential applicant may not like or may disagree with, and a statement that would

cause a reasonable person to be discouraged from applying for credit with that creditor." *Id.* at 21644. Citing industry comments indicating that the prior discouragement provision "had a chilling effect on lawful expression by creditors," *id.* at 21640, the Bureau explained that "[c]onstraints on these types of business practices and statements, as currently exist, harm the marketplace by unnecessarily regulating business practices and limiting expression." *Id.* at 21644. The Bureau rightly acknowledged that statements that would cause a reasonable consumer to believe that a creditor would discriminate on prohibited bases involve potential circumvention of the ECOA. Yet the Bureau acted reasonably in judging that it was not necessary to raise First Amendment concerns by prohibiting a creditor from making politically controversial statements on the grounds that certain protected groups may find them off-putting.

The Bureau's judgment that the revised discouragement provision effectuated the ECOA's purpose and was better tailored to prohibit circumvention of the ECOA than the prior version "was reasonable and reasonably explained. . . . The APA requires no more." *Prometheus Radio Project*, 592 U.S. at 426-27.

### C. Plaintiffs Demonstrate No Legal Infirmity in the Discouragement Provisions

Plaintiffs fail to show that the Final Rule's discouragement provisions are unlawful or arbitrary and capricious. In arguing that the discouragement provisions are contrary to law, Pls.' Mem. 34-37, Plaintiffs cite certain commenters' policy judgments in arguing that "the Final Rule undermines ECOA's purpose." *Id.* at 36. Yet the statute entrusts "the Bureau" — not this Court or members of the public — to exercise "judgment" to determine what "adjustments . . . are necessary or proper to effectuate the purposes of" the ECOA. 15 U.S.C. § 1691b(a). Plaintiffs' mere disagreement with that judgment does not render it unlawful. Plaintiffs also point out that in 1991, Congress provide that agencies shall refer a matter to the Attorney General when a creditor "has engaged in a pattern or practice of discouraging or denying applications for credit in violation

of [15 U.S.C. § 1691(a)]." FDIC Improvement Act of 1991, Pub. L. No. 102-242, § 223, 105 Stat. 2236, 2306 (1991) (codified at 15 U.S.C. § 1691e(g)). This provision fairly reflects Congress's recognition that the ECOA had long been implemented to prohibit discouragement, yet it nowhere withdrew the Board's authority (later transferred to the Bureau) to exercise judgment in fashioning a proper discouragement provision. *See* 15 U.S.C. § 1691b(a).

Plaintiffs get no further in arguing that the Rule is arbitrary and capricious. Plaintiffs argue that the Bureau failed to justify its concern that the prior discouragement provisions had unnecessarily chilled creditors' speech. Pls.' Mem. 37. But the Bureau based that concern both on its experience in enforcing the ECOA, and on "[i]ndustry commenters," who "agreed that" the prior rule "had a chilling effect on lawful expression by creditors." 91 Fed. Reg. at 21640; *see also*, *e.g.*, AR726-29 (Alliance Defending Freedom); AR20345-60 (Mid-Size Bank Coalition of America); AR32089-93 (Independent Community Bankers of America (ICBA)).

Plaintiffs' argument that the Rule "would make challenging almost any discouraging behavior nearly impossible," Pls.' Mem. 38, is baseless. The Rule prohibits "statement[s] . . . that the creditor knows or should know would cause a reasonable person to believe that the creditor would" discriminate based on a prohibited characteristic. *See* 91 Fed. Reg. at 21668 (12 C.F.R. § 1002.4(b)). The Rule thus continues to prohibit statements like "Credit available only to applicants under age 65," *id.* at 21638, that are the core of what the discouragement provision was designed to address. *See* 40 Fed. Reg. at 49299.

Plaintiffs next argue that Defendants ignored commenters' concerns about the oral or written statement requirement, Pls.' Mem. 38, but that is wrong.[3] The Bureau discussed these

---

[3] Plaintiffs are incorrect to suggest that the Rule would allow redlining. Pls.' Mem. 38. As the Bureau explained, the Rule "does not permit redlining. ECOA and Regulation B prohibit a creditor from denying an application or providing an applicant less advantageous credit terms because of

comments at length, 91 Fed. Reg. at 21640-41, along with opposing comments arguing the existing rule incorrectly prohibited "routine business decisions," *id.* at 21641, rather than discouraging statements. CFPB then explained why, in its judgment, prohibiting discouraging acts and practices would "sweep[] in substantially more speech and conduct than is necessary . . . to accomplish [the] goals" of "prevent[ing] circumvention or evasion of ECOA," *id.* at 21645.

Plaintiffs raise policy disagreements with the Bureau's judgment about what sort of discouragement provision is necessary and proper to effectuate the ECOA's purposes and prevent circumvention or evasion. But the Bureau's judgment "was reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 426. A litigant's "disagreement" with an agency's "reasonable assessment" does not render it "arbitrary and capricious." *N.M. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 148 F.4th 755, 764 (D.C. Cir. 2025); *see also Cboe Global Markets*, 155 F. 4th at 722 ("[a]gency leeway" in "line-drawing" "flows from the reality that Congress vested agencies—not courts—with the authority to make discretionary policy judgments").

## III. The Rule's SPCP Provisions Are Lawful

### A. The Bureau Has Broad Statutory Authority to Set Standards for SPCPs

Two provisions of the ECOA give the Bureau broad discretion to set SPCP standards by regulation. First, the ECOA's general rulemaking provision gives CFPB authority to "prescribe regulations to carry out the purposes of" the ECOA, including "such adjustments . . . as in the judgment of the Bureau are necessary or proper to effectuate the purposes of" the ECOA. 15 U.S.C. § 1691b(a). Second, the ECOA provides that it does not violate the ECOA's general

---

a prohibited basis characteristic." 91 Fed. Reg. at 21645. Further, the Rule's discouragement provision continues to prohibit a creditor from communicating to prospective applicants the creditors' intent to do these things. In addition, the Fair Housing Act prohibits redlining. *See* 42 U.S.C. § 3605(a). Thus, even if the ECOA did not cover some aspect of redlining, the Rule does not legalize or otherwise sanction the practice.

prohibition of credit discrimination "for a creditor to refuse to extend credit offered pursuant to . . . any [SPCP] offered by a profit-making organization to meet special social needs which meets *standards prescribed in regulations by the Bureau*." *Id.* § 1691(c)(2) (emphasis added). Thus, the Bureau has broad discretion to set standards for SPCPs that the Bureau determines, in its judgment, will advance the purposes of the ECOA, bounded by the APA's requirement of reasoned decisionmaking. For such broad grants of rulemaking authority, a regulation "will be sustained so long as it is reasonably related to the purposes of the enabling legislation." *Mourning v. Fam. Publ'ns Serv., Inc.*, 411 U.S. 356, 369 (1973) (quotation omitted).

### B. The Rule's SPCP Provisions Are Reasonable and Within CFPB's Authority

In the Rule, the Bureau lawfully exercised its authority to set standards for SPCPs, explaining why its amendments to SPCP standards served the ECOA's purposes. The Bureau looked to the ECOA's legislative history to determine that the purpose of the exemption for for-profit SPCPs was to allow creditors to extend credit where "without such exemption the consumers involved would effectively be denied credit." 91 Fed. Reg. at 21657 (quoting Joint Explanatory Statement of the Committee of the Conference, Cong. Rec. H5493 (daily ed. Mar. 4, 1976)).

After the ECOA's enactment, the Board's initial SPCP regulations granted wide latitude to establish SPCPs that used prohibited bases such as race and sex as necessary criteria. *See* 42 Fed. Reg. at 1256-57 (12 C.F.R. § 202.8(a)(3), (b)). Those standards "may have been appropriate when the Board promulgated them, given societal circumstances at that time," 91 Fed. Reg. at 21656, which included "market-wide intentional credit discrimination" that left many consumers unable to obtain credit absent remedial measures such as SPCPs, *id.* at 21654.

Yet the Bureau pointed to two developments that called for tightening the SPCP standards. First, as a practical matter, "50 years of legal prohibitions against credit discrimination" from the ECOA, other federal statutes, and state laws, "have substantially reshaped credit markets" since

1976, when inability to access credit based on prohibited grounds was pervasive. *Id.* Second, as a jurisprudential matter, the Supreme Court has issued "decisions highlighting the legal infirmity, under the Fifth and Fourteenth Amendments to the Constitution, of laws that enable such discrimination" based on suspect classifications. *Id.* at 21653 (citing *SFFA*, 600 U.S. at 181).

Where SPCPs use a prohibited basis as an eligibility requirement, they allow creditors to discriminate on grounds that are ordinarily prohibited by the ECOA. For example, an SPCP that is open only to Black applicants would reject a Latino or Asian applicant on the basis of race or color. The Bureau accordingly "determined that it is inconsistent with ECOA's purpose (preventing discrimination) for an SPCP to use an otherwise prohibited basis (and thereby discriminate against ineligible individuals) unless the SPCP's use of the otherwise prohibited basis is necessary to overcome an inability to access credit that is specifically based on those same characteristics." *Id.* at 21652-53. That overarching analysis, that SPCPs only serve the purposes of the ECOA when necessary to overcome an inability to access credit based on a prohibited ground, led to each of the specific changes the Bureau made to the SPCP regulations.

***Prohibiting SPCPs that discriminate based on race, color, national origin, or sex.*** The Bureau flatly prohibited for-profit SPCPs from "us[ing] the race, color, national origin, or sex, or any combination thereof, of the applicant, as a common characteristic or factor in determining eligibility for the program." 12 C.F.R. § 1002.8(b)(3). That was because the Bureau "[found] there is no evidence (submitted by commenters or otherwise) of any credit markets in which consumers 'would effectively be denied credit' because of their race, color, national origin, or sex in the absence of SPCPs offered or participated in by for-profit organizations." 91 Fed. Reg. at 21654. Accordingly, allowing such SPCPs is not necessary to advance the SPCP exemption's purpose of providing credit to consumers who otherwise would effectively be denied credit. To

the contrary, such SPCPs would hinder the ECOA's purposes and raise serious equal protection concerns by authorizing creditors to deny credit based on the suspect classes of race and sex.

***New requirements for SPCPs.*** The Rule allows SPCPs that use other prohibited bases (such as age or marital status) as a condition of eligibility, but imposes new requirements and conditions on such programs to align with the ECOA's purposes. While the prior version allowed SPCPs where the class of persons served "probably would not receive such credit or would receive it on less favorable terms than are ordinarily available to other applicants," 12 C.F.R. § 1002.8(a)(3)(ii) (2024), the Final Rule updated this to require that the class of persons "would not receive such credit" absent the SPCP, 91 Fed. Reg. at 21668 (12 C.F.R. § 1002.8(a)(3)(ii)). This revision was more consistent with the statutory purpose of facilitating service to consumers who "would effectively be denied credit." *Id.* at 21657. Such consumers "would *effectively* be denied credit if in the absence of the SPCP they 'would not receive' such or similar credit," *id.*, not that they *probably* would not receive credit or would receive credit on different terms.

The Rule also mandated that for-profit SPCPs "provide[] evidence for each participant who receives credit through the program that in the absence of the program the participant would not receive such credit as a result of" the prohibited characteristics used as eligibility criteria. *Id.* at 21669 (12 C.F.R. § 1002.8(b)(4)). The Bureau added this provision because "[i]f considerations other than [a prohibited basis] are what is causing the inability to obtain credit, then an SPCP based on protected class membership is not necessary to address the inability." *Id.* at 21656.

For similar reasons, the Bureau required an SPCP to provide evidence that the SPCP is needed to address special social needs that cannot be addressed absent "us[ing] otherwise prohibited bases as participant eligibility criteria." *Id.* at 21668 (12 C.F.R. § 1002.8(a)(3)(i)(C)-(E)). Because "the best reading of ECOA is that it generally prohibits discrimination on a

prohibited basis, with limited statutory exceptions where truly necessary to ensure credit access," it is "fully appropriate" to require creditors to "explain why" it is necessary to discriminate on what would otherwise be a prohibited basis to ensure credit access. *Id.* at 21655. In exercising its "judgment" about how "to effectuate the purposes of" the ECOA, 15 U.S.C. § 1691b(a), the Bureau lawfully exercised its authority to set "standards" for for-profit SPCPs, *id.* § 1691(c)(3).

### C. Plaintiffs' Arguments Against the SPCP Provisions Are Erroneous

#### 1. The SPCP Provisions Are Within the Bureau's Statutory Authority

Plaintiffs acknowledge, as they must, that the ECOA explicitly grants the Bureau "discretion to 'prescribe' for-profit organization SPCP 'standards.'" Pls.' Mem. 39 (quoting 15 U.S.C. § 1691(c)(3)). Plaintiffs' only argument that the Rule's SPCP standards violate the ECOA is that they purportedly "effectively eliminate" for-profit SPCPs. *Id.* Not so. The Rule continues to allow for-profit SPCPs that use otherwise prohibited characteristics other than race, color, national origin, and sex as eligibility criteria, provided that the creditor has evidence that use of such a characteristic is necessary to provide credit to consumers who otherwise would not receive credit. *See* 91 Fed. Reg. at 21668-69 (12 C.F.R. § 1002.8(a)(3)(i)(E), (b)(4)). Although these requirements may make it substantially more difficult for a creditor to launch a compliant SPCP, the Bureau explained that tightening the requirements for SPCPs was consistent with statutory purpose and justified by changed circumstances in credit markets.

#### 2. The SPCP Provisions Are Not Arbitrary and Capricious

Because the Bureau explained its reasoning in revising SPCP standards and considered relevant factors, Plaintiffs cannot demonstrate that the Rule is arbitrary and capricious. Plaintiffs first assert that the Bureau lacked a reasonable basis to limit SPCPs to situations where consumers would "effectively be denied credit" absent an SPCP. Pls.' Mem. 40 (quoting 91 Fed. Reg. at 21654). Yet as the Bureau pointed out, this standard reflects the purpose of the SPCP provision,

to provide an exemption for "consumers" who "would effectively be denied credit," as set forth in the joint explanatory statement of the Conference Committee. *See* 91 Fed. Reg. at 21662 & n.33 (quoting *Joint Explanatory Statement of the Committee of the Conference*, Cong. Rec. H5493 (daily ed. Mar. 4, 1976)). Because the statute instructs the Bureau to "prescribe[] . . . regulations" setting "standards" for SPCPs, 15 U.S.C. § 1691(c)(3), "to carry out the purposes of" the ECOA, *id.* § 1691b(a), the Bureau reasonably looked to legislative history to ascertain those purposes.

Plaintiffs next attack the Bureau's conclusion that circumstances have changed as a result of 50 years of laws protecting access to credit, asserting that "persistent and substantial discrimination across protected class characteristics" still exists. Pls.' Mem. 41. The Bureau does not dispute that credit discrimination still exists, which is why the ECOA and Regulation B prohibit such discrimination. *See* 15 U.S.C. § 1691(a); 12 C.F.R. § 1002.4(a). The Bureau merely concluded that creditors should not *add* to such discrimination by offering SPCPs that discriminate on protected bases unless doing so is necessary to ensure that consumers have access to credit.

Plaintiffs question why the Final Rule prohibits use of race, color, national origin, and sex as eligibility criteria for SPCPs, but not other prohibited grounds. Pls.' Mem. 42. Yet the Bureau explained that "there is no evidence" of credit markets where consumers are denied credit based on race, color, national origin, and sex, and allowing SPCPs that discriminate on those suspect classes would be "potentially inconsistent with constitutional guarantees of equal protection." 91 Fed. Reg. at 21654. Plaintiffs offer no such evidence, nor can they show that allowing SPCPs to discriminate on such suspect bases would survive heightened equal protection scrutiny.

Finally, Plaintiffs note that the Final Rule treats for-profit and non-profit SPCPs differently. But that distinction that Plaintiffs deride as an internal inconsistency, Pls'. Mem. 43, derives from statutory text, *compare* 15 U.S.C. § 1691(c)(3) (requiring SPCPs "offered by a profit-making

organization" to satisfy "standards prescribed in regulations by the Bureau"), *with id.* § 1691(c)(2) (no such requirement for "credit assistance program administered by a nonprofit organization").

**IV. The Bureau Validly Considered the Costs and Benefits of the Rule**

Plaintiffs spill much ink critiquing the Bureau's cost-benefit analysis to avoid engaging with what this rulemaking was actually about—conforming the Rule to the statute's text. Regardless, the Bureau appropriately considered the Rule's costs and benefits.

**A. The Bureau Complied with the Statutory Requirement to Consider the Rule's Costs and Benefits**

When the Bureau promulgates a rule, the Dodd-Frank Act requires the Bureau to "consider— (i) the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule; and (ii) the impact of proposed rules on covered persons, as described in section 5516 of this title, and the impact on consumers in rural areas." 12 U.S.C. § 5512(b)(2)(A). The Bureau did that here.

Courts "review[] cost-benefit analyses 'deferentially,'" so a plaintiff's "burden to show error is high." *Cigar Ass'n of Am.*, 5 F.4th at 76 (quoting *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012)). "Courts are especially careful 'not to substitute [their] judgment for that of the agency . . . when the agency is called upon to weigh the costs and benefits of alternative policies.'" *Healthy Gulf v. Bureau of Ocean Energy Mgmt.*, 826 F. Supp. 3d 92, 109-10 (D.D.C. 2026) (quoting *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 303 (D.C. Cir. 2003) (Roberts, J.)). That is because "[s]uch cost-benefit analyses epitomize the types of decisions that are most appropriately entrusted to the expertise of an agency." *Ctr. for Auto Safety v. Peck*, 751 F.2d 1336, 1342 (D.C. Cir. 1985) (Scalia, J.) (citation omitted); *see also Revenue Based Fin. Coal. v. Consumer Fin. Prot. Bureau*, Case No. 23-24882-CIV, 2025 WL 1312966, at *11 (S.D. Fla.

Feb. 17, 2025) (where CFPB "expressly addresse[s] the costs and benefits of the Final Rule" and "explain[s] its methodology, . . . '[t]he APA requires no more'") (quoting *Prometheus Radio Project*, 592 U.S. at 427).

Considerations of costs and benefits frequently involve predictive judgments. An agency may "ma[k]e a reasonable predictive judgment based on the evidence it ha[s]," and need not "conduct or commission [its] own empirical or statistical studies." *Prometheus Radio Project*, 592 U.S. at 427; *see also FCC v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 813-14 (1978) (an agency's determination of a "predictive nature" is within "the expert knowledge of the agency" (quoting *Fed. Power Comm. v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 29 (1961))).

Such deference is especially warranted because the purpose of this Rule was to conform Regulation B to the ECOA's text and the Constitution. For example, the ECOA's plain text, bolstered by constitutional equal protection principles, compels the conclusion that the ECOA does not confer disparate-impact liability. *See supra*, pp. 10-12. The Bureau lacks authority to authorize disparate-impact liability, regardless of whether the benefits of such liability outweighed the costs. Thus, even if the Court found CFPB's cost-benefit analysis deficient, that would not provide cause to vacate the rule. *See Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 590 (2025) (noting that an agency's action will not be disturbed where the "the agency's error had no bearing on the procedure used or the substance of the decision reached" (cleaned up)); 5 U.S.C. § 706 (APA review shall take account for "the rule of prejudicial error").

The Bureau's cost-benefit analysis easily surpasses the applicable deferential standards. The analysis spans more than seven single-spaced pages in the Federal Register. *See* 91 Fed. Reg. at 21659-66. It contains separate sections analyzing the costs and benefits of each aspect of the Final Rule (disparate impact, discouragement, SPCPs), with each section containing subsections

analyzing the benefits to covered persons, costs to covered persons, benefits to consumers, and costs to consumers. *See*, *e.g.*, *id.* at 21660-61 (considering the costs and benefits to covered persons and consumers of the Rule's "[p]rovisions [c]oncerning [d]isparate [i]mpact"). This easily distinguishes this case from *Paypal, Inc. v. CFPB*, 728 F. Supp. 3d 31 (D.D.C. 2024), cited by Plaintiffs, where the Bureau's cost-benefit analysis did "not once mention 'digital wallets,'" *id.* at 43-44—product regulated by the rule at issue in that case. Here, the Bureau complied with its statutory obligation by considering the costs and benefits of each aspect of the rule.

### B. Plaintiffs' Criticisms of the Bureau's Cost-Benefit Analysis Are Misguided

None of Plaintiffs' criticisms of the Bureau's cost-benefit analysis satisfy their "high" burden of overcoming "deferential[]" review. *Cigar Ass'n of Am.*, 5 F.4th at 76 (quoting *Nat'l Ass'n of Home Builders*, 682 F.3d at 1040). Though plaintiffs "would surely have assessed the various costs and benefits in a different manner, the Court does not have the power to take up the agency's analysis *de novo*." *Healthy Gulf*, 826 F. Supp. 3d at 110 (quoting *Nicopure Labs, LLC v. FDA*, 266 F. Supp. 3d 360, 407 (D.D.C. 2017), *aff'd* 944 F.3d 267 (D.C. Cir. 2019)).

#### 1. The Bureau Validly Made Qualitative Assessments of Costs and Benefits

Plaintiffs criticize the Bureau for offering qualitative assessments of the Rule's costs and benefits, rather than quantifying them. Pls.' Mem. 17-18. But where an agency "conclude[s] that it d[oes] not have information 'readily' available to aid in quantifying the costs" of a rule, a "qualitative analysis of the costs-benefits is sufficient to survive review under the APA." *Interfaith Ctr. on Corp. Resp. v. SEC*, 786 F. Supp. 3d 97, 128 (D.D.C. 2025); *see also Lindeen v. SEC*, 825 F.3d 646, 658 (D.C. Cir. 2016) ("We do not require the Commission 'to measure the immeasurable' and we do not require it to 'conduct a rigorous, quantitative economic analysis

unless the statute explicitly directs it to do so.'" (quoting *Nat'l Ass'n of Mfrs. v. SEC*, 748 F.3d 359, 369 (D.C. Cir. 2014))).

Here, the Bureau explained that "limitations on what data are available restrict the Bureau's ability to quantify the potential costs, benefits, and impacts of the final rule," and the Bureau accordingly engaged in "qualitative consideration" of costs and benefits based on "[g]eneral economic principles." 91 Fed. Reg. at 21659. Although Plaintiffs assert that data was available, Pls.' Mem. 17, the Bureau explained why this limited data did "not provide sufficient information to conduct an informative quantitative analysis." 91 Fed. Reg. at 21662; *see also id.* at 21666 (explaining why available information on SPCPs would not "provide meaningful information on the quantitative scale of the potential cost to consumers").

Plaintiffs argue that because CFPB quantified costs for a 2015 regulation implementing the Home Mortgage Disclosure Act (HMDA), they should have done so here. Pls.' Mem. 18 (citing 80 Fed. Reg. 66128, 66269-75 (Oct. 28, 2015)). But HMDA is a data collection and disclosure statute. *See generally* 12 U.S.C. §§ 2801-2810. The fact that CFPB was able to quantify costs to compile and report data says nothing about whether it is reasonably possible to quantify the costs and benefits of a regulation that sets broad antidiscrimination requirements. For that reason, this Court's rejection of the Bureau's cost-benefit analysis for the 2020 HMDA regulation is inapposite. *See Nat'l Cmty. Reinvestment Coal. v. CFPB*, No. 1:20-cv-2074, 2022 WL 4447293 (D.D.C. Sep. 23, 2022). Moreover, the Court found quantification (or lack thereof) important because a "central premise" of the HMDA rulemaking was the Bureau's assertion that "new data" put it "in a better position to assess both the benefits and burdens" of HMDA reporting. *Id.* at *25 (citation omitted). By contrast, here, the Bureau reasonably concluded that it could not quantify

the costs and benefits of this Rule, and quantification was less important given that the purpose of the Rule was to align Regulation B with the ECOA's text and the Constitution.

Plaintiffs also unfairly criticize the Bureau for using costs to implement another rule, the Automated Valuation Models Rule, to generate a "rough estimate" of the costs of covered persons updating compliance systems for the new disparate-impact provisions. Pls.' Mem. 18-19 (quoting 91 Fed. Reg. 21660). Yet because the Bureau "does not have the data to provide quantitative estimates" of these costs, 91 Fed. Reg. 21660, using such an estimate was appropriate.

**2. The Bureau Reasonably Assessed Benefits of the Rule**

Plaintiffs wrongly dismiss the Bureau's discussion of the Rule's benefits as "speculative." Pls.' Mem. 20-21. Although the Bureau lacked data to quantify benefits, it reasonably drew on "[g]eneral economic principles" to "qualitative[ly]" assess benefits. 91 Fed. Reg. at 21659. For example, basic economics supports the proposition that rules that reduce burdens on regulated parties benefit those parties, *see id.* at 21660 (disparate-impact provisions); *id.* at 21661-62 (discouragement provisions), and that in competitive marketplaces, businesses will pass at least some cost savings onto consumers, *id.* at 21661, 21662. Furthermore, the comments substantiated the Rule's benefits. *See*, *e.g.*, *id.* at 21629 (eliminating disparate impact would "result in more product offerings, more flexible lending standards and new market entrants, ultimately expanding access to credit") (discussing AR35915-22 (Online Lender's Alliance)); *id.* at 21640 (eliminating discouragement would improve existing restrictions on free speech) (discussing AR726-29 (Alliance Defending Freedom), AR20345-60 (Mid-Size Bank Coalition of America), and AR32089-93 (Independent Community Bankers of America (ICBA)); *id.* at 21641 (stating that existing discouragement provisions interfere with routine business decisions) (discussing AR14425-35 (American Bankers Association), AR4082-88 (America's Credit Unions), and AR32089-93 (Independent Community Bankers of America (ICBA)); *see generally Snyder v.*

*McDonough*, 1 F.4th 966, 1007 (Fed. Cir. 2021) (recognizing that supportive comments in a rulemaking record reinforce that agency's regulation is reasonable); *American Great Lakes Post Ass'n v. Schultz*, 962 F.3d 510, 516 (D.C. Cir. 2020) (finding the agency's reliance on comments reasonable when it was not possible to obtain empirical data).

**3. The Bureau Adequately Responded to Comments**

Plaintiffs next assert that the Bureau did not adequately engage with comments discussing potential costs of the Rule. *See* Pls.' Mem. 21-24. But "[a]n agency's obligation to respond" to significant comments "is not 'particularly demanding.'" *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C. Cir. 2012) (quoting *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993)). Nor is the Bureau required to respond to significant comments in a manner that satisfies Plaintiffs. *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017), *appeal dismissed*, 709 F. App'x 4 (D.C. Cir. 2017). It is required only to "address significant comments 'in a reasoned manner.'" *Id.* (quoting *Reytblatt v. NRC*, 105 F.3d 715, 722 (D.C. Cir. 1997)).

The Bureau easily surpassed this requirement. Dozens of times in the cost-benefit analysis, the Bureau directly grappled with specific arguments raised by commenters. *See*, *e.g.*, 91 Fed. Reg. at 21663 (noting that a "commenter also suggested using the information on settlements and supervisory actions to estimate the rule's impact on consumers," but explaining why "[t]he Bureau does not believe such analysis would be useful"). And CFPB specifically considered and responded to comments Plaintiffs accuse the Bureau of ignoring:

- Plaintiffs contend that the Bureau ignored comments highlighting costs to lenders by tightening the requirements for SPCPs. Pls.' Mem. 22. But the Bureau acknowledged at length that the Final Rule would impose new requirements on SPCPs and prohibit some types of SPCPs, and that this would impose costs on lenders who benefited from those types of SPCPs. 91 Fed. Reg. at 21663-64. Also, the Bureau explained that lenders could "mitigate[]" such costs by "redesign[ing] programs to use criteria that are not prohibited under the adopted changes to Regulation B," such as by using socioeconomic status instead of race as an eligibility criterion for a lending program. *Id.* at 21664.

- Nor did the Bureau ignore comments arguing that disparate-impact liability promoted innovation and expansion to new markets. Pls'. Mem. 22. Rather, the Bureau concluded "that the existence of disparate-impact liability under ECOA and Regulation B is not necessary to achieve these goals" given that lenders have economic incentives "to identify prohibitable opportunities for expansion." 91 Fed. Reg. at 21661.

- The Bureau recognized Plaintiffs' point that "compliance savings" from eliminating disparate-impact liability may be limited "for creditors that still face disparate impact liability under other statutes." Pls.' Mem. 23; *see* 91 Fed. Reg. 21660 ("These benefits, however, are bounded by the ongoing need to comply with other State and Federal fair lending laws.").

- The Bureau did not "fail[] to consider . . . reliance interests" of those who supported the prior rule, Pls.' Mem. 23; instead, it concluded that these reliance interests "do not outweigh revising Regulation B to bring it into alignment with the statutory text." 91 Fed. Reg. at 21535.

- The Bureau acknowledged that tightening SPCP requirements would impose costs on consumers who benefit from SPCPs—contrary to Plaintiffs' assertion (at 25) that the Bureau "discounted or ignored" such costs. In fact, the Bureau pointed to evidence "that the prevalence of SPCPs is quite low, and, at a market level, the total number of consumers receiving benefits under SPCPs likely represents a small portion of total credit." 91 Fed. Reg. at 21665; *see infra*, p. 38 (evidence of low prevalence of SPCPs).

Plaintiffs may disagree with the Bureau's responses to these comments, but their second-guessing does not change the fact that the Bureau reasonably considered and addressed those comments. *Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 370 (D.D.C. 2018) (mere disagreement is "not a sufficient basis for [a court] to overturn an agency decision under the APA").

## V. Plaintiffs' Other Objections to the Rulemaking Process Are Meritless

### A. The Acting Director Validly Certified that No Final Regulatory Flexibility Analysis Was Required

The Bureau complied with the Regulatory Flexibility Act ("RFA") by making the requisite certification to establish that no Final Regulatory Flexibility Analysis was required. The RFA permits an agency to certify "that no regulatory flexibility analysis is necessary when it determines that the rule will not have a significant economic impact on a substantial number of small entities

that are subject to the requirements of the rule." *Mid-Tex. Elec. Coop., Inc.*, *v. FERC*, 773 F.2d 327, 342 (D.C. Cir. 1985); 5 U.S.C. § 605(b). Such a certification must be published in the Federal Register, along with a "statement providing the factual basis for such certification." *Id.* "[T]he [RFA's] requirements are '[p]urely procedural'" and "impose[] no substantive constraint on agency decisionmaking." *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 540 (D.C. Cir. 2009) (Kavanaugh, J.) (quoting *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 88 (D.C. Cir. 2001)).

As an initial matter, Plaintiffs lack a cause of action to challenge Defendants' compliance with the RFA because they are not within the zone of interests protected by the RFA. "The RFA provides a cause of action for 'a small entity that is adversely affected or aggrieved by final agency action.'" *Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 315 F. Supp. 3d 282, 287 (D.D.C. 2018) (quoting 5 U.S.C. § 611). "[T]he RFA's requirements only apply to 'small entities that would be directly regulated' by a challenged rule." *Id.* (quoting *Mid-Tex Elec. Co-op.*, 773 F.3d at 342). The ECOA and Regulation B directly regulate creditors. *See* 15 U.S.C. § 1691(a) (making it "unlawful for any creditor to discriminate" on prohibited grounds); *accord* 12 C.F.R. § 1002.4. Plaintiffs are not creditors regulated by the Final Rule; rather, they are nonprofits and businesses that provide services to creditors and others. *See* Am. Compl. ¶¶ 15-18; *see also* Pls.' Mem. 13 (acknowledging that plaintiffs are entities "hired by creditors"). Therefore, they "do not fall within the zone of interests protected by the RFA." *Cal. Cattlemen's Ass'n*, 315 F. Supp. 3d at 287.

In any event, the Bureau complied with the RFA by providing the required certification in both the NPRM and the Final Rule. *See* 90 Fed. Reg. at 50920 (NPRM); 91 Fed. Reg. at 21667 (Final Rule); *see Nat'l Rest. Ass'n v. Solis*, 870 F. Supp. 2d 42, 60 (D.D.C. 2012) (providing such a certification "complied with the requirements of the RFA"), *appeal dismissed*, 2012 WL 3244056 (D.C. Cir. 2012).

The Bureau also explained the factual basis of the certification. As the Bureau explained, the "[p]otentially affected small entities" were those regulated by the ECOA: "providers of credit." 91 Fed. Reg. at 21667. The Bureau acknowledged that the SPCP provisions could impose costs on creditors that provided SPCPs, because the Rule tightens standards for SPCPs and prohibits certain SPCPs. *Id.* But the Bureau cited many sources to conclude that there were not a significant number of SPCPs, and that large lenders were more likely than small lenders to have SPCPs. *Id.* at 21664. Cited sources included responses to a CFPB request for information, a HUD statement on SPCPs, FHFA analysis on GSE acquisition of mortgages originated through SPCPs, an analysis of the American Banking Association, and a comment from J.P. Morgan Chase Bank.[4]

Regarding the disparate impact and discouragement provisions, the Bureau concluded that these were fundamentally deregulatory in nature; as such, they may impose small one-time adjustment costs on regulated entities, but they were unlikely to impose significant costs. *See id.* at 21659, 21660, 21662. Although Plaintiffs would have weighed the evidence differently, their "disagree[ment] with [the Bureau's] analysis" of certain factual issues "does not mean that [CFPB] failed to meet its obligations [under the RFA] to examine and discuss" them in supporting its certification. *ValueVision*, 149 F.3d at 1213.

Plaintiffs also miss the mark in arguing that the Bureau failed to consider the Rule's impact on "credit service providers" who provide services to regulated entities, and consumers of credit. *See* Pls.' Mem. 13. Under the RFA, an agency's consideration is "limited to small entities subject to the proposed regulation," and thus "an agency may properly certify that no regulatory flexibility

[4] *See* 91 Fed. Reg. at 21664; AR568-72 (HUD, *Market examples of SPCPs—SPCP Toolkit for Mortgage Lenders*); AR78-80 (ABA, *Special Purpose Credit Programs*); AR363 (Inside Mortg. Fin., *Special Purpose Credit Program Mortgages a Fraction of GSE Business* (Oct. 19, 2023)); AR434-35 (Orla McCaffrey, *JPMorgan Chase takes special-purpose credit program national* (Nov. 18, 2022), Am. Banker).

analysis is necessary when it determines that the rule will not have a significant economic impact on a substantial number of small entities that are subject to the requirements of the rule." *Mid-Tex Elec. Coop.*, 773 F.2d at 342. The Bureau was only required to consider the impact on small entities regulated by the Rule, meaning creditors.

In any event, the Bureau *did* address the Final Rule's costs to consumers, *see* 91 Fed. Reg. at 21660, 21661, 21662, 21665-66, and concluded that even considering impact on consumers would not alter the conclusion that no FRFA was required, *id.* at 21667. As to harm to credit service providers, Plaintiffs point to evidence of just three who are purportedly impacted — BLDS, SolasAI, and NFHA, Pls.' Mem. 13 — not a "substantial number," 5 U.S.C. § 605(b).

Finally, Plaintiffs err in arguing (Pls.' Mem. 14) that because the Bureau "lacked data, [it] also lacked the 'factual basis' necessary to certify that the Final Rule will not have a significant impact on a substantial number of small entities." Plaintiffs cite no authority requiring quantitative data, rather than a qualitative assessment where data is limited, as is the case here.

"So long as the procedural requirements of the certification are met, . . . this court's review is 'highly deferential' as to the substance of the analysis, particularly where an agency is predicting the likely economic effects of a rule." *Council for Urological Interests v. Burwell*, 790 F.3d 212, 227 (D.C. Cir. 2015) (quoting *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 438 (D.C. Cir. 2013)). Thus, a litigant's subjective belief that an agency "was incorrect" in certain of its judgments underlying the certification does not invalidate the certification. *Id.*

### B. Plaintiffs' Objections to the Rule's Comment Period Are Meritless

#### 1. The Bureau Gave Interested Parties Sufficient Time to Comment

While the APA requires that agencies "give interested persons an opportunity to participate in the rule making" by submitting comments, 5 U.S.C. § 553(b), (c), it does not impose a strict requirement on the duration of the comment period. And "[a]bsent constitutional constraints or

extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."'" *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543 (1978) (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)); *see also Wyoming v. USDA*, 661 F.3d 1209, 1239 (10th Cir. 2011) (court-ordered extension of a time period "would violate the well-settled principle articulated by the Supreme Court in *Vermont Yankee* 'that the formulation of procedure is to be basically left within the discretion of the agencies'" (quoting *Phillips Petroleum Co. v. EPA*, 803 F.2d 545, 559 (10th Cir. 1986)).

The Bureau complied with the APA by publishing an NPRM and giving interested parties 32 days to comment. The D.C. Circuit has described thirty days as "generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *Nat'l Lifeline Ass'n*, 921 F.3d at 1117; *see also Azar v. Allina Health Servs.*, 587 U.S. 566, 570 (2019) (noting the "APA minimum of 30 days" for comment periods); *see also Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 779 (5th Cir. 2023) ("[T]he APA generally requires only a minimum thirty-day comment period."). The D.C. Circuit has found a 30-day comment period reasonable even for regulations that were "technical[ly] complex[]." *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 534 (D.C. Cir. 1982) (finding the agency's "choice of a [30-day] comment period" not "unreasonable," notwithstanding "the technical complexity of the regulations," noting that "[n]either statute nor regulation mandates that the agency do more").[5]

[5] Plaintiffs misconstrue two Executive Orders as requiring at least 60 days for comment. *See* Pls'. Mem. 14. Those Executive Orders did not create judicially enforceable obligations, *see* Exec. Order No. 12,866 § 10 (58 Fed. Reg. 51735) (Sep. 30, 1993); Exec. Order No. 13,563 § 7, 76 Fed. Reg. 3821 (Jan. 18, 2011), and in any case, they do not call for a comment period of at least 60 days in all cases, *see* Exec. Order No.12,866 § 6(a)(1) ("each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which *in most cases should* include a comment period of not less than 60 days" (emphasis added)); Exec. Order No. 13,563

Moreover, this 32-day comment period is not out of the ordinary for the Bureau. The Bureau has regularly published proposed rules with comment periods of 22 to 35 days, including in the Obama administration, the Biden administration, and both Trump administrations.[6]

The comments the Bureau received validate that the public had adequate time to comment. As the Bureau explained, it "received approximately 64,500 comment letters from a diverse range of stakeholders. Many of these comments were detailed and substantive. The number and depth of these comments demonstrate that interested parties had adequate time to review the proposal and formulate comprehensive views during the comment period." 91 Fed. Reg. at 21623. Each Plaintiff submitted lengthy comments, including a 78-page single-spaced comment from NFHA and Rise Economy, AR4540-4618, a four-page single-spaced comment from Rise Economy, AR19053-58, and a nine-page single-spaced comment from BLDS and SolasAI, AR30381-90. "Plaintiffs fail to show that the comment period was insufficient to allow them the opportunity to consider the rule and its supporting analysis and provide meaningful comment, especially in light

§ 2(b) ("To the extent feasible and permitted by law, each agency shall afford the public a meaningful opportunity to comment through the Internet on any proposed regulation, with a comment period that *should generally be* at least 60 days." (emphasis added)).

[6] *See* 2012 Truth in Lending Act (Regulation Z) Mortgage Servicing, 77 Fed. Reg. 57318 (Sep. 17, 2012) (22-day comment period); Ability To Repay Standards Under the Truth in Lending Act (Regulation Z), 78 Fed. Reg. 6622 (Jan. 30, 2013) (26-day comment period); Qualified Mortgage Definition Under the Truth in Lending Act (Regulation Z): Seasoned QM Loan Definition, 85 Fed. Reg. 53568 (Aug. 28, 2020) (31-day comment period); Protections for Borrowers Affected by the COVID-19 Emergency Under the Real Estate Settlement Procedures Act (RESPA), Regulation X, 86 Fed. Reg. 18840 (Apr. 9, 2021) (31-day comment period); Prohibition on Inclusion of Adverse Information in Consumer Reporting in Cases of Human Trafficking (Regulation V), 87 Fed. Reg. 20771 (Apr. 8, 2022) (31-day comment period); Truth in Lending (Regulation Z); Consumer Credit Offered to Borrowers in Advance of Expected Receipt of Compensation for Work, 89 Fed. Reg. 61358 (July 31, 2024) (30-day comment period); Remittance Transfers Under the Electronic Fund Transfer Act (Regulation E), 89 Fed. Reg. 79456 (Sep. 30, 2024) (35-day comment period); Legal Standard Applicable to Supervisory Designation Proceedings, 90 Fed. Reg. 41520 (Aug. 26, 2025) (30-day comment period).

of the comments that they and other interested parties submitted in response to this proposed rule." *Conf. of State Bank Supervisors v. Off. of Thrift Supervision*, 792 F. Supp. 837, 844 (D.D.C. 1992).

**2. Any Error Relating to the Comment Period Was Harmless**

Even if the Court concludes that CFPB's determination not to set a longer comment period was unreasonable, any error is harmless. In APA review, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. The "burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009); *PDK Lab'ys. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand."). To show that an unreasonably short comment period is not harmless, "the challenging party 'must indicate with reasonable specificity what portions of the [rule] it objects to and how it might have responded if given the opportunity.'" *Cath. Legal Immigr. Network, Inc. v. Exec. Off. for Immigr. Rev.*, Case No. 20-cv-03812 (APM), 2026 WL 861067, at *12 (D.D.C. Mar. 30, 2026) (quoting *Gerber v. Norton*, 294 F.3d 173, 182 (D.C. Cir. 2002)).

Plaintiffs fail to meet their burden to demonstrate harm. Plaintiffs vaguely assert that they could have submitted more detailed analysis if given more time. *See* Decl. of Dr. Bernard Siskin ¶ 51, ECF No. 28-3; Decl. of Larry Bradley ¶ 28, ECF No. 28-4; Decl. of Lisa Rice ¶ 33, ECF No. 28-5 ("Rice Decl."); Decl. of Kevin Stein ¶ 10, ECF No. 28-6. But Plaintiffs concede that 60 days is reasonable, *see* Pls.' Mem. 14, and they offer no evidence to substantiate the notion that they could have provided more detailed analyses in four more weeks.

In addition, their claims of prejudice ring hollow in light of the fact that Plaintiffs submitted detailed comments in the time allotted. *See Omnipoint Corp. v. FCC*, 78 F.3d 620, 630 (D.C. Cir. 1996) (finding that litigants "were not harmed by the short comment period" in light of the comments they submitted on a proposed rule). NFHA and Rise Economy submitted a highly

detailed 78-page single-spaced comment, with 344 footnotes, covering every aspect of the proposed rule. AR 4541-4618. Plaintiffs cite this comment 32 times in their opening brief. NFHA avers that if given more time, it could have provided, for instance, "legal background surrounding the passage of ECOA," the "consequences of the elimination of disparate impact," and the "prevalence of credit applicant discouragement." Rice Decl. ¶ 33(b)-(d). But NFHA's comment letter already addressed those points. In its 78-page comment letter, NFHA addresses ECOA's history and passage, AR4546-49, the consequences of eliminating disparate impact, AR4554-61, 4563-66, and the prevalence of discouragement, AR4573-77. For their part, BLDS and SolasAI submitted a nine-page, single-spaced comment, with 20 footnotes, AR30382-30390, and Plaintiffs cite that comment nine times in their opening brief. Plaintiffs had an opportunity to comment, took advantage of that opportunity, and cannot show prejudicial error.

## VI. Russell Vought Validly Served as Acting Director

Plaintiffs' challenge to former Acting Director Vought's service is baseless. As Plaintiffs do not dispute, Vought met the FVRA's requirements for acting service, because he served (and still serves) in a Presidentially-appointed and Senate-confirmed office, the Director of Office of Management and Budget. 5 U.S.C. § 3345(a)(2); Pls.' Mem. 7. Nor do Plaintiffs contend that his service exceeded the FVRA's time limits. *See* Pls.' Mem. 7.

Plaintiffs' sole argument against Vought's service is that the FVRA does not apply because former Director Chopra did not die, resign, or become "unable to perform the functions and duties of the office" by virtue of his removal. 5 U.S.C. § 3345(a). But Plaintiffs' argument is difficult to square with the FVRA. The Government's position is simple: Removal is an event that would render an officer "unable to perform the functions and duties of the office." *Id.* If an officer is no longer holding an office, then the officer is unable to perform the duties and functions of that office. *See* Merriam-Webster's Collegiate Dictionary 1284 (10th ed. 1998) (defining "unable" as

"not able : INCAPABLE"). The statute includes no causal conditions on this catchall provision. Inability to perform thus means inability to perform, regardless of the cause.[7] Having been removed by President Trump, former Director Chopra was not able, or incapable, of performing the duties of Director, because he no longer possessed that office.

Plaintiffs' contrary arguments are unpersuasive. Citing a student law review note, Plaintiffs invoke the *ejusdem generis* canon, arguing that the catchall "otherwise unable" must be read similarly to "dies" or "resigns," which purportedly share the characteristic of being beyond the President's control. Pls.' Mem. 43-44 (5 U.S.C. § 3345(a)). To state the obvious, dying and resigning from a job are very different. It is difficult to say any essential characteristic they share, and they do not share the characteristic of being "uncontrollable . . . from the president's perspective." *Id.* at 44. The President can influence when officers resign by requesting an officer's resignation, which often prompts the officer to resign. For example, in *United States v. Valencia*, No. 5:17-cr-882, 2018 WL 6182755 (W.D. Tex. Nov. 27, 2018), *appeal dismissed*, 940 F.3d 181 (5th Cir. 2019), cited by Plaintiffs, an officer resigned at the President's request. To be sure, that court stated that had that officer "chosen to refuse to resign the President could have exercised his authority to fire him, which would make the [FVRA] inapplicable," *id.* at *4. Respectfully, the Court should reject that unreasoned dicta, which does not grapple with or acknowledge the statute's "otherwise unable to perform" language.

---

[7] This has been the government's position since the enactment of the FVRA. *See Designating an Acting Director of the Bureau of Consumer Financial Protection*, 41 Op. O.L.C. 99, 102 (2017) (explaining that "an officer is 'unable to perform the functions and duties of the office' during both short periods of unavailability, such as a period of sickness, and potentially longer ones, such as one resulting from the officer's removal"); *Guidance on Application of Federal Vacancies Reform Act of 1998*, 23 Op. O.L.C. 60, 61 (1999) ("In floor debate, Senators said, by way of example, that an officer would be 'otherwise unable to perform the functions and duties of the office' if he or she were fired, imprisoned, or sick." (citation omitted)).

Plaintiffs also argue that if the FVRA was meant to cover any vacancy regardless of cause, the statute would have just said "in the event of a vacancy." Pls.' Mem. 44. But "otherwise unable to perform" has broader effect than that language, because it applies not just when an office is vacant, but also where the officeholder is temporarily unable to perform, such as because of illness. *See id.* (acknowledging that FVRA applies when officeholder is "ill").

Plaintiffs also suggest that the President was circumventing the FVRA to allow Vought to serve indefinitely. *See* Pls.' Mem. 45. But as Plaintiffs acknowledge, Vought ultimately served for 540 days, less than a year and a half. That stacking 210-day periods might result in an acting officer serving for more than a year is not manipulation of the FVRA but part of the FVRA's design. *See* 5 U.S.C. § 3346. On August 1, 2026, the time for acting service under the FVRA expired, and at that point the Bureau's Deputy Director took over pursuant to the Bureau's succession statute. Thus, the FVRA has operated exactly as intended.

Even before that expiration, on June 6, 2026, the President nominated Brian Johnson as Director, who was favorably reported out of the Senate Banking Committee on September 17, 2026. Plaintiffs' cases (at Pls.' Mem. 45) about "circumvention of the Senate's appointment responsibility" are thus inapposite, as there is no such circumvention here. In any event, a hypothetical concern about Acting Directors serving for too long is no basis to disregard the language stating that the FVRA is triggered when an officeholder is "otherwise unable to perform." 5 U.S.C. § 3345(a).

## CONCLUSION

The Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

Dated: November 10, 2026

Respectfully submitted,

VICTORIA DORFMAN
General Counsel

JOSEPH FRISONE
Assistant General Counsel

ELIZABETH SPECK
Senior Counsel
Consumer Financial Protection Bureau
445 12th Street, SW
Washington, DC 20024

JONATHAN D. GUYNN
Acting Assistant Attorney General
Civil Division

TIMOTHY BORGERSON
Counsel to the Assistant Attorney General
Civil Division

DIANE KELLEHER
Director, Federal Programs Branch

*/s/ Jeremy S.B. Newman*
JEREMY S.B. NEWMAN
Chief Litigation Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 532-3114
Fax: (202) 616-8470
Email: jeremy.s.newman@usdoj.gov

*Attorneys for Defendants*