**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL FAIR HOUSING ALLIANCE; RISE ECONOMY; BLDS, LLC; and SOLASAI,

Plaintiffs,

v.

CONSUMER FINANCIAL PROTECTION BUREAU and MARK PAOLETTA, *in his official capacity as Acting Director of the Consumer Financial Protection Bureau*,

Defendants.

Civil Action No. 1:26-cv-01820 (BAH)

**BRIEF OF THE BANK POLICY INSTITUTE, AMERICAN BANKERS ASSOCIATION, AMERICAN FINANCIAL SERVICES ASSOCIATION, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, AND INDEPENDENT COMMUNITY BANKERS OF AMERICA AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS IN PART**

## CORPORATE DISCLOSURE STATEMENT

The Bank Policy Institute, American Bankers Association, American Financial Services Association, Chamber of Commerce of the United States of America, and Independent Community Bankers of America have no parent corporation, and no publicly held company owns 10% or more of their stock.

# TABLE OF CONTENTS

Page


INTEREST OF *AMICI CURIAE* .......... 1

INTRODUCTION .......... 3

ARGUMENT .......... 5

I. ECOA DOES NOT AUTHORIZE DISPARATE-IMPACT LIABILITY. .......... 5

A. The text of ECOA precludes disparate-impact liability. .......... 5

1. Under the Supreme Court's controlling test, disparate-impact liability is available only when the statute contains results-oriented language. .......... 5

2. ECOA lacks the required results-oriented language to authorize disparate-impact liability. .......... 8

3. No other statutory features overcome the absence of results-oriented language. .......... 10

B. Legislative history cannot change the meaning of the text adopted by Congress and signed by the President. .......... 11

1. The post-enactment legislative history relied upon by prior regulators is not a legitimate tool of statutory interpretation. .......... 12

2. To the extent the Court consults it, Plaintiffs' pre-enactment history simply confirms Congress's focus on disparate treatment. .......... 13

C. ECOA lacks congressional ratification of a circuit court consensus that the Supreme Court has found significant in recognizing disparate-impact liability. .......... 16

II. PLAINTIFFS CANNOT PREVAIL ON THEIR ARBITRARY-AND-CAPRICIOUS CLAIM. .......... 18

A. Disparate-impact liability is not needed to remedy discrimination in credit given other legal requirements and available remedies. .......... 19

B. Disparate-impact liability does not promote innovation as Plaintiffs contend. .......... 20

C. The Final Rule promotes certainty for consumers and lenders alike. .......... 21

III. IF THE COURT VACATES AS TO DISCOURAGEMENT OR SPCPs, IT SHOULD LEAVE THE DISPARATE-IMPACT PROVISION IN FORCE. .......... 22

CONCLUSION .......... 23

## TABLE OF AUTHORITIES


**Page**

**CASES**

*Akridge v. Alfa Ins. Cos.*,
93 F.4th 1181 (11th Cir. 2024) .......... 9

*Alexander v. Sandoval*,
532 U.S. 275 (2001) .......... 5

*Armstrong v. Flowers Hosp., Inc.*,
33 F.3d 1308 (11th Cir. 1994) .......... 19

*Bayard v. Behlmann Auto. Servs., Inc.*,
292 F. Supp. 2d 1181 (E.D. Mo. 2003) .......... 11

*Bd. of Trade of City of Chi. v. SEC*,
187 F.3d 713 (7th Cir. 1999) .......... 14

*Bhandari v. First Nat'l Bank of Com.*,
808 F.2d 1082 (5th Cir. 1987) .......... 16

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020) .......... 8

*BP P.L.C. v. Mayor & City Council of Baltimore*,
593 U.S. 230 (2021) .......... 17

*Bruesewitz v. Wyeth LLC*,
562 U.S. 223 (2011) .......... 12, 13

*Burrage v. United States*,
571 U.S. 204 (2014) .......... 9

*Carlson v. Postal Regul. Comm'n*,
938 F.3d 337 (D.C. Cir. 2019) .......... 22, 23

*Carroll v. Walden Univ., LLC*,
650 F. Supp. 3d 342 (D. Md. 2022) .......... 20

*Centro de Trabajadores Unidos v. Bessent*,
167 F.4th 1218 (D.C. Cir. 2026) .......... 18

*DaVita v. Marietta Mem'l Hosp. Emp. Health Benefit Plan*,
978 F.3d 326 (6th Cir. 2020) .......... 7

*Dennard v. Rollins*,
2026 WL 799547 (D.D.C. Mar. 23, 2026) .......... 20

*Doe v. BlueCross BlueShield of Tenn., Inc.*,
926 F.3d 235 (6th Cir. 2019) .......... 7

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
575 U.S. 768 (2015) .......... 8

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
545 U.S. 546 (2005) ..... 11

*Food Mktg. Inst. v. Argus Leader Media*,
588 U.S. 427 (2019) ..... 11

*Frith v. Whole Foods Mkt., Inc.*,
38 F.4th 263 (1st Cir. 2022) ..... 19

*Garcia v. Johanns*,
444 F.3d 625 (D.C. Cir. 2006) ..... 3, 8, 16

*Golden v. City of Columbus*,
404 F.3d 950 (6th Cir. 2005) ..... 16

*Griggs v. Duke Power Co.*,
401 U.S. 424 (1971) ..... 5

*Gross v. FBL Fin. Servs., Inc.*,
557 U.S. 167 (2009) ..... 5, 9

*Jewish War Veterans of the U.S. of Am., Inc. v. Mattis*,
266 F. Supp. 3d 248 (D.D.C. 2017) ..... 17

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) ..... 4, 17, 18

*Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*,
596 U.S. 880 (2022) ..... 7

*MD/DC/DE Broads. Ass'n v. FCC*,
236 F.3d 13 (D.C. Cir. 2001) ..... 23

*Mermelstein v. SEC*,
629 F. Supp. 672 (D.D.C. 1986) ..... 17

*Midkiff v. Adams Cnty. Reg'l Water Dist.*,
409 F.3d 758 (6th Cir. 2005) ..... 16

*Miller v. Am. Express Co.*,
688 F.2d 1235 (9th Cir. 1982) ..... 17

*Neal v. Honeywell Inc.*,
33 F.3d 860 (7th Cir. 1994) ..... 11

*NLRB v. SW Gen., Inc.*,
580 U.S. 288 (2017) ..... 14

*Pride v. U.S. Dep't of Agric.*,
2024 WL 3924579 (D.D.C. Aug. 23, 2024) ..... 20

*Raytheon Co. v. Hernandez*,
540 U.S. 44 (2003) ..... 7

*Ricci v. DeStefano*,
557 U.S. 557 (2009) ..... 19

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007) .......... 9

*Sanofi-Aventis v. FDA*,
725 F. Supp. 2d 92 (D.D.C. 2010) .......... 6

*Skidmore v. Swift & Co.*,
323 U.S. 134 (1944) .......... 18

*Smith v. City of Jackson*,
544 U.S. 228 (2005) .......... 6, 7, 16

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015) .......... *passim*

*United States v. Jones*,
2020 WL 2182569 (N.D. Ohio May 6, 2020) .......... 14

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) .......... 15

*Watson v. Ft. Wor. Bank & Tr.*,
487 U.S. 977 (1988) .......... 5, 21

*World Shipping Council v. Fed. Mar. Comm'n*,
152 F.4th 215 (D.C. Cir. 2025) .......... 23

**STATUTES**

5 U.S.C. § 551 .......... 22

12 U.S.C. § 2903 .......... 22

15 U.S.C. § 1691 .......... 3, 8, 9, 10

15 U.S.C. § 1691e .......... 10

29 U.S.C. § 623 .......... 6

42 U.S.C. § 2000e-2 .......... 6, 9

42 U.S.C. § 3604 .......... 7, 9

42 U.S.C. § 3607 .......... 10

42 U.S.C. § 12112 .......... 7

Equal Credit Opportunity Act, Pub. L. No. 93-495, § 502, 88 Stat. 1500,
1521 (1974) .......... 12

**REGULATIONS**

12 C.F.R. § 1002.6(a) (2023) .......... 12

41 Fed. Reg. 29870, 29874 (July 20, 1976) .......... 12

91 Fed. Reg. 21620, 21636 (Apr. 22, 2026) .......... 19, 21, 22, 23

**OTHER AUTHORITIES**

ABA, Comment Letter (Dec. 15, 2025) .......... 2

AFSA, Comment Letter (Dec. 15, 2025) .......... 2

BPI, Comment Letter (Dec. 15, 2025) .......... 2

Chamber, Comment Letter (Dec. 15, 2025) .......... 2

*Credit Discrimination: Hearings on H.R. 14856 and H.R. 14908 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency*, 93d Cong. 84 (1974) .......... 14, 15

H.R. Rep. No. 114-329 (2015) .......... 13

ICBA, Comment Letter (Dec. 15, 2025) .......... 2

Michael Selmi, *Was the Disparate Impact Theory a Mistake?*, 53 UCLA L. Rev. 701 (2006) .......... 19, 20

NFHA, Comment Letter (Dec. 15, 2025) .......... 17

Off. of the Comptroller of the Currency, *Comptroller's Handbook: Fair Lending* (2023) .......... 19, 20

Richard A. Primus, Bolling *Alone*, 104 Colum. L. Rev. 975 (2004) .......... 5

S. Rep. No. 94-589 (1976) .......... 12

*Summary: H.R. 14856*, Congress.gov .......... 14

## INTEREST OF *AMICI CURIAE*[1]

Bank Policy Institute (BPI) is a nonpartisan public policy, research, and advocacy group that represents universal banks, regional banks, and the major foreign banks doing business in the United States. BPI produces academic research and analysis on regulatory and monetary policy topics, analyzes and comments on proposed regulations, and represents the financial-services industry with respect to cybersecurity, fraud, and other information security issues.

Established in 1875, the American Bankers Association (ABA) is the united voice of America's $25 trillion banking industry, which is composed of small, regional, and large banks that together employ 2.1 million people, safeguard $19.7 trillion in deposits, and extend $13.1 trillion in loans.

Founded in 1916, the American Financial Services Association (AFSA) is the national trade association for the consumer-credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.

The Chamber of Commerce of the United States of America (Chamber) is the world's largest business organization. As the nation's leading advocate for business, the Chamber represents companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the

---

[1] Pursuant to Local Rule 7(o)(5), *Amici Curiae* state that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *Amici Curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The Independent Community Bankers of America (ICBA) has one mission: to create and promote an environment where community banks flourish. ICBA powers the potential of the nation's community banks through effective advocacy, education, and innovation. As local and trusted sources of credit, America's community banks leverage their relationship-based business model and innovative offerings to channel deposits into the neighborhoods they serve, creating jobs, fostering economic prosperity, and fueling their customers' financial goals and dreams.

*Amici* support fair lending principles and the goals of the Equal Credit Opportunity Act (ECOA). Every consumer should have equal access to the credit that drives the modern economy and Americans' prosperity. Indeed, *Amici*'s members are committed to this principle and have invested in robust compliance systems to ensure fairness in American credit markets, serve their communities, and expand access to credit.

*Amici* strongly believe that fair lending goals are best achieved through the articulation of clear rules that adhere to the statutory bounds imposed by Congress. To that end, *Amici* commented in support of the disparate-impact provision of the regulation by the Consumer Financial Protection Bureau now under review.[2] *Amici* believe that these

[2] *See* BPI, Comment Letter (Dec. 15, 2025), https://tinyurl.com/y7zhrcma; ABA, Comment Letter (Dec. 15, 2025), https://tinyurl.com/zkma88ce; AFSA, Comment Letter (Dec. 15, 2025), https://tinyurl.com/bdffnzfr; Chamber, Comment Letter (Dec. 15, 2025), https://tinyurl.com/5fa3kc4f; ICBA, Comment Letter (Dec. 15, 2025), https://tinyurl.com/3ufx4726.

provisions better align with ECOA's text, and thus that the Final Rule provides a more durable framework to advance the statute's purpose.

*Amici* urge this Court to grant summary judgment to Defendants on the disparate-impact provisions of the Final Rule. *Amici* take no position on Plaintiffs' challenge to the discouragement or Special Purpose Credit Programs (SPCP) provisions of the Final Rule, or on the other issues in the case.

## INTRODUCTION

Like many other antidiscrimination statutes, ECOA prohibits "discriminat[ion] against any applicant" "on the basis of" protected characteristics. 15 U.S.C. § 1691(a)(1).

Plaintiffs' argument that Congress authorized disparate-impact liability under ECOA is remarkably thin. *See* ECF 28-1, at 26-29. They invite this Court to error by ignoring two critical (and dispositive) lodestars. *First*, the Supreme Court in *Inclusive Communities* provided the controlling test to decide whether a statute authorizes disparate-impact suits: courts must examine whether the statute contains effects-focused language akin to that in Title VII. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 533 (2015). If the statute lacks that effects-focused language, disparate-impact liability is unavailable. *Second*, Plaintiffs fail to note that the D.C. Circuit has already recognized under the Supreme Court's governing test that "ECOA contains no such [effects-focused] language." *Garcia v. Johanns*, 444 F.3d 625, 633 n.9 (D.C. Cir. 2006).

Together, those cases (*i.e.*, *Inclusive Communities* and *Garcia*) defeat Plaintiffs' challenge to the disparate-impact provisions in the CFPB's Final Rule. Plaintiffs cannot overcome this by resorting to legislative history or pointing to a smattering of (mainly) district court cases. Because the best reading of ECOA does not include disparate-impact

liability, this Court should uphold the Final Rule. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (explaining that statutes "do—in fact, must—have a single best meaning").

Seemingly aware their statutory analysis cannot carry the day, Plaintiffs devote a significant part of their case to an arbitrary-and-capricious claim against the Final Rule's position on disparate-impact liability. Under the arbitrary-and-capricious challenge rubric, they ask the Court to undo the Final Rule with policy-based arguments against the quality or quantity of the CFPB's reasoning. *See* ECF 28-1, at 30-34. But D.C. Circuit precedent prevents that gambit, and Plaintiffs' policy arguments fail on their own terms—the fair lending goals of antidiscrimination and equal opportunity for all are best achieved through the articulation of clear rules that adhere to the statutory bounds imposed by Congress. The intent-based liability under ECOA that Congress enacted properly balances interests, fosters innovation and a free market, and appropriately prohibits discrimination. Moreover, *Amici*'s members have invested in robust compliance systems to ensure fairness in American credit markets, serve their communities, and expand access to credit. Vacatur of the Final Rule as arbitrary and capricious would sow chaos for lenders and consumers, because they would be left in limbo about the statute's best meaning.

This Court should interpret ECOA as not authorizing disparate-impact liability in accord with its text and the guidance from the D.C. Circuit and Supreme Court. Because the Final Rule is severable and the Administrative Procedure Act (APA) enables courts to vacate a rule in part, the Court should reach this conclusion and leave this aspect of Regulation B intact, regardless of its determination as to the other aspects of the Final Rule that Plaintiffs challenge.

## ARGUMENT

### I. ECOA DOES NOT AUTHORIZE DISPARATE-IMPACT LIABILITY.

#### A. The text of ECOA precludes disparate-impact liability.

##### *1. Under the Supreme Court's controlling test, disparate-impact liability is available only when the statute contains results-oriented language.*

Many federal statutes prohibit discrimination in employment, housing, lending, and federal funding (among other things) "*on the basis of*" or "*because of*" certain characteristics. "[T]he ordinary meaning" of these prohibitions is that the protected characteristic may not be "the 'reason' that the [defendant] decided to act." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). The Supreme Court thus holds that such antidiscrimination language, without more, "reaches only instances of intentional discrimination." *Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) (cleaned up).

In 1971, the Supreme Court construed language in Title VII to forbid certain employment practices that it deemed "discriminatory in operation" even if "fair in form." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). Known as disparate-impact liability, this framework applies, when authorized by Congress, to practices "adopted without a deliberately discriminatory motive." *Watson v. Ft. Wor. Bank & Tr.*, 487 U.S. 977, 987 (1988). That can be a blunt tool—often requiring adjudication of "the myriad of innocent causes that may lead to statistical imbalances" and opening the door to "expensive litigation and potentially catastrophic liability." *Id.* at 992-93 (plurality op.).

Unsurprisingly then, "disparate impact is actionable under only a *subset* of federal antidiscrimination legislation." Richard A. Primus, Bolling *Alone*, 104 Colum. L. Rev. 975, 1027 n.187 (2004) (emphasis added). A handful of statutes expressly authorize disparate-impact suits; for instance, Title VII (as amended) sketches out the "[b]urden of proof in

disparate impact cases." 42 U.S.C. § 2000e-2(k). In the absence of such an explicit authorization, the Supreme Court has found disparate-impact liability authorized *only* where Congress has enacted statutory "text focus[ing] on the *effects* of the action." *Smith v. City of Jackson*, 544 U.S. 228, 236 (2005). That is, the Supreme Court requires that the text "refers to the consequences of actions and not just to the mindset of actors." *Inclusive Cmtys.*, 576 U.S. at 533. (Even if a statute had that effects-language, "the language and design of the statute as a whole" can still foreclose disparate-impact liability. *Sanofi-Aventis v. FDA*, 725 F. Supp. 2d 92, 98 (D.D.C. 2010).)

Surveying its disparate-impact case law back to *Griggs*, the Supreme Court has ruled that "Congress … chose words that serve the same purpose and bear the same basic meaning" in those federal statutes that the Court has held to contain disparate-impact liability. *Inclusive Cmtys.*, 576 U.S. at 535. In the portions of Title VII, the Age Discrimination in Employment Act (ADEA), and the Fair Housing Act (FHA) that the Supreme Court has held authorize disparate-impact claims, "the operative text looks to results." *Id.* at 534. The provisions each open with "lengthy sentences that begin with prohibitions on disparate treatment," before the word "'otherwise' … signal[s] a shift in emphasis from an actor's intent to the consequences of his actions." *Id.* at 534-35.

For example, provisions of Title VII and the ADEA prohibit employers not simply from intentionally "limit[ing], segregat[ing], or classify[ing]" employees but also from "*otherwise adversely affect[ing]*" their employees because of such employee's protected status. 42 U.S.C. § 2000e-2(a)(2) (emphasis added); 29 U.S.C. § 623(a)(2). Such language focuses "on the *effects* of the action on the employee rather than the motivation for the action of the employer." *Smith*, 544 U.S. at 236. An "adverse effect" is not just another

way of saying "disparate impact," according to the Supreme Court; it is "the very definition." *Id.* at 236 n.6.

Likewise, the FHA prohibits defendants *both* from intentionally "refus[ing] to sell or rent" *and* from "otherwise mak[ing] unavailable or deny[ing], a dwelling to any person because of" their protected status. 42 U.S.C. § 3604(a). "The word 'make' has many meanings, among them 'to cause to exist, appear, or occur.'" *Inclusive Cmtys.*, 576 U.S. at 534 (cleaned up). The Supreme Court has held that this is "results-oriented language," and this language "serve[s] the same purpose and bear[s] the same basic meaning" as the references to adverse effects in Title VII and the ADEA. *Id.* at 534-35. And the Americans with Disabilities Act expressly defines discrimination to include several neutral practices that "have the effect of" denying opportunities to individuals with disabilities. *See* 42 U.S.C. § 12112(b)(1), (2), (3)(A), (6); *Raytheon Co. v. Hernandez*, 540 U.S. 44, 53 (2003).

In sum, "when the [Supreme] Court has found that a statute prohibits disparate-impact discrimination, it has relied on language like 'otherwise adversely affect' or 'otherwise make unavailable,' which refers to the consequences of an action rather than the actor's intent." *Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 242 (6th Cir. 2019); *see also Marietta Mem'l Hosp. Emp. Health Benefit Plan v. DaVita Inc.*, 596 U.S. 880, 886 (2022) (Supreme Court rejecting disparate-impact liability where "[t]he text does not ask about 'the *effects* of non-differentiating plan terms that treat all individuals equally'" (quoting *DaVita v. Marietta Mem'l Hosp. Emp. Health Benefit Plan*, 978 F.3d 326, 363 (6th Cir. 2020) (Murphy, J., concurring in part))).

This methodology for interpreting the statute is binding on this Court for the additional reason that the D.C. Circuit has already charted this course. Interpreting the pre-*Inclusive Communities* Supreme Court decision in *Smith*, the D.C. Circuit has

explained that it is results-oriented language that "gives rise to a cause of action for disparate impact discrimination under Title VII and the ADEA." *Garcia*, 444 F.3d at 633.

### ***2. ECOA lacks the required results-oriented language to authorize disparate-impact liability.***

Here, as the D.C. Circuit previously recognized, ECOA does not contain the required results-oriented language to authorize disparate-impact liability. *Id.* ("ECOA contains no such language").[3] ECOA instead solely provides that it is "unlawful for any creditor to *discriminate against* any applicant, with respect to any aspect of a credit transaction—*on the basis of*" several protected characteristics. 15 U.S.C. § 1691(a) (emphases added). The words "'discriminate against' ... mean treating [an] individual worse than others who are similarly situated." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 657 (2020). And the statute ends there without shifting focus. It contains no language referencing effects or consequences, and it does not even contain a broad catchall phrase like "otherwise," suggesting that other, unintentional forms of liability are cognizable. By contrast, ECOA closely parallels "the 'disparate treatment' ... provision" of statutes like Title VII. *See EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 771 (2015).

A comparison between the relevant provisions of Title VII, the FHA, and ECOA, below, illustrates the point:

[3] *Garcia* contrasted the "otherwise adversely affect" language (discussed above), found in Title VII and the ADEA, with ECOA's text. 444 F.3d at 633 n.9. This Court should adhere to this reasoning by a unanimous panel of the D.C. Circuit. The reason *Garcia* did not express a definitive "opinion about whether a disparate impact claim can be pursued under ECOA" is that it did not matter to the court's rejection of class certification. *Id.*

| | | |
|---|---|---|
| | **TITLE VII**<br>*42 U.S.C. § 2000e-2(a)* | **ECOA**<br>*15 U.S.C. § 1691(a)* |
| ***Disparate Treatment*** | It shall be an unlawful employment practice for an employer—<br>(1) to fail or refuse to hire or to discharge any individual, or otherwise to ***discriminate against*** any individual with respect to his compensation, terms, conditions, or privileges of employment, ***because of*** such individual's race, color, religion, sex, or national origin; or | It shall be unlawful for any creditor to ***discriminate against*** any applicant, with respect to any aspect of a credit transaction—<br>(1) ***on the basis of*** race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);<br>(2) because all or part of the applicant's income derives from any public assistance program; or<br>(3) because the applicant has in good faith exercised any right under this chapter. |
| | **TITLE VII**<br>*42 U.S.C. § 2000e-2(a)* | **FHA**<br>*42 U.S.C. § 3604(a)* |
| ***Disparate Treatment &*** **Disparate Impact** | (2) to ***limit, segregate, or classify*** his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or **otherwise adversely affect** his status as an employee, ***because of*** such individual's race, color, religion, sex, or national origin. | [I]t shall be unlawful—<br>(a) ***To refuse to sell or rent*** after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or **otherwise make unavailable** or deny, a dwelling to any person ***because of*** race, color, religion, sex, familial status, or national origin. |

Plaintiffs' brief underscores the absence of any results-oriented language. The best Plaintiffs can do is suggest ECOA's use of "discriminate *on the basis of*" focuses on effects, as supposedly distinguished from the phrase "discriminate *because of*" employed by certain other statutes. ECF 28-1, at 26-27. But federal antidiscrimination statutes use those two phrases—"on the basis of" and "because of"—interchangeably, and the Supreme Court has consistently given them "the same meaning." *Gross*, 557 U.S. at 176 (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63-64 & n.14 (2007)); *Burrage v. United States*, 571 U.S. 204, 213 (2014). So have the courts of appeals. *See Akridge v. Alfa Ins.*

*Cos.*, 93 F.4th 1181, 1192 (11th Cir. 2024) (compiling cases). If "because of" does not authorize disparate-impact suits—and it does not—neither does "on the basis of."

#### ***3. No other statutory features overcome the absence of results-oriented language.***

In *Inclusive Communities* and *Smith*, the Supreme Court found "convincing confirmation" of its textual conclusion that the FHA and ADEA authorized disparate-impact liability in other provisions that would "be superfluous if Congress had assumed that disparate-impact liability did not exist." *Inclusive Cmtys.*, 576 U.S. at 537-38. For instance, the FHA exempts occupancy restrictions and adverse housing actions taken due to drug convictions. 42 U.S.C. § 3607(b)(1), (4). Neither constitutes a protected category, so "if the FHA encompassed only disparate-treatment claims," the provisions would "merely restate black-letter law." *Inclusive Cmtys.*, 576 U.S. at 538.

ECOA contains nothing similar. Quite the opposite: its safe harbors authorize lenders to consider protected characteristics in certain circumstances that would otherwise risk disparate-*treatment* liability. 15 U.S.C. § 1691(b)-(c) (authorizing, among other things, actions based on age, marital status and "special social needs" for SPCPs).

Nor does the punitive damages provision that Plaintiffs rely on—which instructs courts to consider "the extent to which the creditor's failure of compliance was intentional" in setting the amount of punitive damages, 15 U.S.C. § 1691e(b)—presume disparate-impact liability. ECF 28-1, at 27. This provision applies to violations of "*any requirement* imposed under this subchapter," not simply ECOA's antidiscrimination provision. 15 U.S.C. § 1691e(b) (emphasis added). Violations of *other* "requirement[s]"—for instance, that creditors provide a statement of reasons for any adverse action, *id.* § 1691(d)—need not be intentional, and courts have permitted punitive damages awards

for such violations. *See, e.g.*, *Bayard v. Behlmann Auto. Servs., Inc.*, 292 F. Supp. 2d 1181, 1188 (E.D. Mo. 2003).

**B. Legislative history cannot change the meaning of the text adopted by Congress and signed by the President.**

Though ECOA's text does not authorize disparate-impact liability, some courts and regulators have concluded—and Plaintiffs now argue—otherwise based on a cursory consultation of legislative history. Legislative history cannot establish disparate-impact liability. "[T]he authoritative statement is the statutory text, not the legislative history or any other extrinsic material." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005). Legislative history is irrelevant "[w]here, as here," a "careful examination of the ordinary meaning and structure of the law itself … yields a clear answer." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019). Resorting to legislative history improperly substitutes the views of committee members, or even congressional staffers, for the votes of the people's representatives for text "approved by the Constitution's [required] means, bicameral approval and presidential signature." *Neal v. Honeywell Inc.*, 33 F.3d 860, 862 (7th Cir. 1994) (Easterbrook, J.), *abrogated on other grounds by Graham Cnty. Soil & Water Conservation Dist. v. United States*, 545 U.S. 409 (2005).

And here, the legislative history is especially weak. Regulators and prior courts have relied upon legislative history that *post-dates* the relevant provisions of ECOA and thus is wholly irrelevant. Plaintiffs, meanwhile, try to dig up pre-enactment history discussing disparate impact—and instead inadvertently confirm that Congress was focused on disparate *treatment*.

### 1. *The post-enactment legislative history relied upon by prior regulators is not a legitimate tool of statutory interpretation.*

The now-rescinded version of Regulation B stated that "[t]he legislative history of the Act indicates that the Congress intended an 'effects test' concept … to be applicable to a creditor's determination of creditworthiness." 12 C.F.R. § 1002.6(a) (2023). This legislative history comes from a *later* Congress, apparently speculating as to the intentions of its predecessor. Specifically, in 1974, Congress adopted the first iteration of ECOA "to insure that the various financial institutions and other firms engaged in the extensions of credit exercise their responsibility to make credit available with fairness, impartiality, and without discrimination on the basis of sex or marital status." *See* Equal Credit Opportunity Act, Pub. L. No. 93-495, § 502, 88 Stat. 1500, 1521 (1974). Two years later, a subsequent Congress broadened ECOA to add race, color, religion, national origin, age, and public assistance income to the list of protected characteristics, but it did not amend the antidiscrimination framework the original statute set forth. *See* S. Rep. No. 94-589, at 16 (1976) ("Subsection (a) adds the following new categories of prohibited discrimination…. These are in addition to the existing prohibitions against discrimination on the grounds of sex or marital status."). It was this later Congress that regulators cited on the availability of disparate-impact liability. *See* Equal Credit Opportunity, 41 Fed. Reg. 29870, 29874 (proposed July 20, 1976) ("[T]he legislative history of the *amended* Act shows that Congress intended certain judicial decisions enunciating this 'effects test' from the employment area to be applied in the credit area." (emphasis added)).

This post-enactment history cannot illuminate the meaning of the text. As the Supreme Court has reiterated, a congressional statement or proposal made after the relevant text's adoption is "not a legitimate tool of statutory interpretation." *Bruesewitz*

*v. Wyeth LLC*, 562 U.S. 223, 242 (2011). "Real (pre-enactment) legislative history is persuasive to some because it is thought to shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." *Id.* By contrast, "[p]ost-enactment legislative history (a contradiction in terms)" can provide no insight into congressional understandings. *Id.* "Those who voted on the relevant statutory language"—here the prohibition on discrimination against any applicant—"were not necessarily the same persons who crafted the statements in the later Committee Report; or if they were did not necessarily have the same views at that earlier time; and no one voting at that earlier time could possibly have been informed by those later statements." *Id.* Illustrating how unreliable post-enactment legislative history is, a committee report from a more recent Congress says the opposite: "[T]he extension of disparate impact theory, which began in employment discrimination cases and was later applied to housing discrimination cases, is problematic in the context of ECOA and auto lending." H.R. Rep. No. 114-329, at 2 (2015).

#### 2. *To the extent the Court consults it, Plaintiffs' pre-enactment history simply confirms Congress's focus on disparate treatment.*

To their credit, Plaintiffs do not defend the post-enactment legislative history that formed the shaky edifice for the CFPB's prior view that ECOA recognizes disparate-impact liability. But the material Plaintiffs do seize on to support their challenge is even less probative—indeed, courts recognize it as not being legislative history at all. In particular, Plaintiffs base their argument on a shred of pre-enactment history: a letter the FTC submitted to a House subcommittee. ECF 28-1, at 28. For numerous reasons, though, the letter provides no evidence that Congress intended ECOA to provide for disparate-impact liability.

*First*, an agency's "letter is not 'legislative history' at all." *Bd. of Trade of City of Chi. v. SEC*, 187 F.3d 713, 720 (7th Cir. 1999) (Easterbrook, J.). "[S]tatements by individual *legislators* rank among the least illuminating forms of legislative history," but those at least reflect the views of someone who voted on the text at issue. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) (emphasis added). Statements by *regulators* to Congress, by contrast, reflect nothing more than "an agency's wishful thinking." *Bd. of Trade*, 187 F.3d at 720. Agency statements do "not speak for a single Member of Congress," and courts can only speculate whether they "accord with the views of some." *Id.* It is especially doubtful that the FTC's letter carried much weight here, where the agency admitted its "experience in matters related to discrimination of any type" was "*extremely limited*." *Credit Discrimination: Hearings on H.R. 14856 and H.R. 14908 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking and Currency*, 93d Cong. 84 (1974) (testimony of Charles A. Tobin, Sec'y, Fed. Trade Comm'n) (emphasis added) [hereinafter, *Hearings*].

*Second*, the letter did *not* critique "[a]n early draft of the 1974 Act," *contra* ECF 28-1, at 28, but rather an *entirely different* bill (H.R. 14856) that failed to get out of committee, *see Summary: H.R. 14856*, Congress.gov, https://tinyurl.com/4yr9dz6p. The "legislative history of unenacted legislation" cannot determine the meaning of the statute that was adopted. *United States v. Jones*, 2020 WL 2182569, at *1 (N.D. Ohio May 6, 2020).

*Third*, the FTC's concerns about the phrase "invidious discrimination" in H.R. 14856 had nothing to do with disparate-impact liability, as Plaintiffs intimate. *Contra* ECF 28-1, at 28. Quite the opposite: the FTC was worried that courts would assume, because "the term 'invidious' does not appear in" other antidiscrimination statutes, that

H.R. 14856 imposed a heightened level of "willfulness, malice, intent or *pattern of* discriminatory purpose" beyond the ordinary disparate-treatment case. *Hearings* at 86 (emphasis in original).

If anything, legislative debates about the term "invidious discrimination" confirm that Congress was concerned about *disparate treatment*, not disparate impact. Commenters including an *Amicus* here, understood that Congress was trying to prohibit "nothing more than the kind of discrimination that the 14th amendment addresses under the [E]qual [P]rotection [C]lause." *Id.* at 64-65 (testimony of Stanley Pottinger, Assistant Att'y Gen., C.R. Div.);[4] *see also Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause."). But commenters did not know how courts would construe "invidious discrimination" and fretted *either* that it might not capture all intentional discrimination,[5] *or* that it might sweep too broadly and capture unintentional discrimination too.[6] To the extent the discussion about "invidious discrimination" signifies anything, it is that the plain reading of ECOA is also the one

---

[4] *See also Hearings* at 121 (testimony of Robert B. Norris, Gen. Couns., Nat'l Consumer Fin. Ass'n) ("arbitrary action based on" a protected characteristic is "what is meant by the word 'discrimination'"); *id.* at 334 (testimony of Matthew Hale, Gen. Couns., ABA) ("[O]ur suggestion would be to omit the adjectives and to define 'discriminate' in the terms of what you really want to prohibit; which is action on the basis of factors not rationally related to the creditworthiness of the applicant or the soundness of the loan.").

[5] *See, e.g.*, *Hearings* at 65 (Pottinger) (courts might reason "invidious discrimination" means "something narrower than the kind of discrimination that historically under the 14th amendment has been illegal").

[6] *See, e.g.*, *id.* at 92 (testimony of Thomas A. Haeussler, CEO, Cap. Fin. Servs.) (expressing concern that "'invidious distinction' is merely any differentiation that could provoke resentment, dislike or discontent" and advocating for a rule focused on "the state of mind of the creditor").

Congress intended: ECOA targets disparate treatment on the basis of a protected characteristic, not disparate impact.

### C. ECOA lacks congressional ratification of a circuit court consensus that the Supreme Court has found significant in recognizing disparate-impact liability.

In *Inclusive Communities*, the Supreme Court judged as important to its holding that the FHA codified disparate-impact liability that "Congress accepted and ratified the unanimous holdings of [nine] Courts of Appeals finding disparate-impact liability." 576 U.S. at 536. It made a similar observation under the ADEA. *See Smith*, 544 U.S. at 236-37 (noting that "for over two decades after … *Griggs*, the Courts of Appeals uniformly interpreted the ADEA as authorizing recovery on a 'disparate-impact' theory in appropriate cases"). The Court reasoned that "if a word or phrase has been given a uniform interpretation by inferior courts, a later version of that act perpetuating the wording is presumed to carry forward that interpretation." *Inclusive Cmtys.*, 576 U.S. at 536 (cleaned up).

No circuit consensus exists with regard to ECOA. The Sixth and D.C. Circuits have simply assumed without deciding that disparate impact is cognizable—though, as noted, the D.C. Circuit pointedly observed that ECOA lacks the required results-oriented language under the Supreme Court's controlling methodology (a methodology this Court is bound to follow). *See Midkiff v. Adams Cnty. Reg'l Water Dist.*, 409 F.3d 758, 772 (6th Cir. 2005); *Golden v. City of Columbus*, 404 F.3d 950, 963 & n.11 (6th Cir. 2005); *Garcia*, 444 F.3d at 633 n.9. The Fifth Circuit assumed, after a cursory look at the post-enactment legislative history, that disparate-impact liability was available, but the opinion was later vacated and does not constitute binding precedent. *Bhandari v. First Nat'l Bank of Com.*, 808 F.2d 1082, 1101 (5th Cir. 1987), *reh'g granted*, 812 F.2d 936 (mem.). Only the Ninth

Circuit has squarely answered the question, and it did so based on a cursory analysis of the same flawed post-enactment history cited as support for the prior Regulation B—not the required textual analysis. *Miller v. Am. Express Co.*, 688 F.2d 1235, 1240 (9th Cir. 1982) ("Read in full, the Senate Report allows but does not limit proof of credit discrimination to the two traditional Title VII tests for employment discrimination."). Tellingly, as noted, Plaintiffs here do not even advance that argument. Accordingly, missing here is "judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 244 (2021) (quotation omitted).

With no *circuit* consensus, Plaintiffs identify 15 *district* court opinions over 50 years allowing a disparate-impact claim to proceed. ECF 28-1, at 28-29; NFHA, Comment Letter 10 n.49 (Dec. 15, 2025). If Congress cannot be presumed aware of a smattering of circuit court opinions, "it is presumptuous in the extreme to think that it is aware of, and consciously adverts to, isolated" district court opinions, which are not binding on any other case. *Mermelstein v. SEC*, 629 F. Supp. 672, 674 (D.D.C. 1986); *see also Jewish War Veterans of the U.S. of Am., Inc. v. Mattis*, 266 F. Supp. 3d 248, 253 (D.D.C. 2017) ("no harm" from leaving district court opinion on the books because "it is not binding on any court beyond its use in this case, and instead, is only valuable as persuasive authority").

Nor can the CFPB's prior interpretation of ECOA stand in for the absence of appellate-court consensus. *Contra* ECF 28-1, at 28-29. As the Supreme Court recently confirmed, "[c]ourts must exercise their independent judgment" in interpreting a statute and may not simply defer to an agency's interpretation. *Loper*, 603 U.S. at 412. To be sure, this Court may consult agency interpretations to the extent they are "useful in

determining the statute's meaning." *Id.* at 394. But Regulation B is not among those. Interpreting and applying an antidiscrimination statute "fall[s] more naturally into a judge's bailiwick than an agency's." *Id.* at 401 (quotation omitted). Thus, the prior Regulation B's probative value depended on "the thoroughness evident in its consideration, the validity of its reasoning," and "all those factors which give it power to persuade, if lacking power to control." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944). An interpretation based solely on legislative history—and post-enactment history, at that—has no "power to persuade." *Id.*

## II. PLAINTIFFS CANNOT PREVAIL ON THEIR ARBITRARY-AND-CAPRICIOUS CLAIM.

Given the weaknesses in Plaintiffs' interpretive arguments for disparate-impact liability, Plaintiffs instead focus on arguing that the CFPB failed to sufficiently consider policy arguments in favor of recognizing disparate-impact liability. ECF 28-1, at 30-34. Binding D.C. Circuit precedent recognizes that, where the validity of a regulation hinges on the right interpretation of the underlying statute, a remand for further explanation of policy justifications "would be a 'useless formality.'" *Centro de Trabajadores Unidos v. Bessent*, 167 F.4th 1218, 1237 (D.C. Cir. 2026). At any rate, Plaintiffs' policy arguments are wrong. Rejecting disparate-impact liability under ECOA not only reflects the best reading of the text but also harmonizes the Act with the purposes of federal antidiscrimination law. *See Inclusive Cmtys.*, 576 U.S. at 533 (confirming that its "interpretation is consistent with statutory purpose"). Vigorously enforcing ECOA's disparate-treatment provisions will do more to ensure borrowers can access credit on a nondiscriminatory basis than disparate-impact liability will.

### A. Disparate-impact liability is not needed to remedy discrimination in credit given other legal requirements and available remedies.

Plaintiffs insist that disparate-impact liability is needed to "remove[] unnecessary barriers to credit." ECF 28-1, at 30 (emphasis omitted). But existing law provides *other* tools that ensure access for underrepresented communities.

For example, disparate-impact liability arose as a tool to "'smoke out,' as it were, disparate treatment" behind facially neutral policies. *Ricci v. DeStefano*, 557 U.S. 557, 595 (2009) (Scalia, J., concurring). Indeed, *Griggs* itself began as a disparate-treatment case—the employer imposed testing requirements that "would have preserved the segregated job lines that Title VII was intended to eradicate" and exempted white employees—and could have been resolved under that theory. *See* Michael Selmi, *Was the Disparate Impact Theory a Mistake?*, 53 UCLA L. Rev. 701, 717-24 (2006). In fact, "[i]mmediately following the decision, … there was no indication that the case had spawned a new theory of liability." *Id.* at 723.

Unsurprisingly then, disparate-treatment provisions contain mechanisms to accomplish similar ends as disparate-impact liability. For example, the CFPB explained that "facially neutral policies may still violate the law if they are proxies or pretexts for discrimination on a prohibited basis." Final Rule, 91 Fed. Reg. 21620, 21636 (Apr. 22, 2026); *see also id.* at 21637 ("[C]hanges to the commentary that the Bureau is finalizing will make clear that practices that are intentionally designed or applied as proxies for prohibited characteristics will remain subject to disparate-treatment liability."); *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263, 271 (1st Cir. 2022); *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994).

Banks also cannot engage in redlining—a type of "disparate treatment in which a bank provides unequal access to credit, or unequal terms of credit, because of the race, color, national origin, or other protected characteristic(s) of the residents of the area where the credit seeker resides … or based on where the residential property to be mortgaged is located." Off. of the Comptroller of the Currency, *Comptroller's Handbook: Fair Lending* 8 (2023).

A survey of employment discrimination cases found that a "high percentage of *successful* disparate impact cases … also succeed on disparate treatment theories." Selmi, *supra*, at 740 (emphasis added). So too under ECOA. Courts in this District, for example, have permitted disparate-impact and disparate-treatment claims grounded in the same conduct to proceed. *See, e.g.*, *Pride v. U.S. Dep't of Agric.*, 2024 WL 3924579, at *7-9 (D.D.C. Aug. 23, 2024); *Dennard v. Rollins*, 2026 WL 799547, at *3 (D.D.C. Mar. 23, 2026). Similarly, reverse-redlining claims (*i.e.*, those alleging the improper provision of credit) have been pled as both disparate-treatment and disparate-impact claims. *See Carroll v. Walden Univ., LLC*, 650 F. Supp. 3d 342, 360 (D. Md. 2022).

Use of the tools Congress authorized, rather than the recognition of unauthorized disparate-impact claims, is the soundest way to prevent unlawful discrimination and to achieve Congress's aims of eliminating intentional discrimination.

### B. Disparate-impact liability does not promote innovation as Plaintiffs contend.

Notwithstanding these tools, Plaintiffs claim disparate-impact liability is uniquely suited to addressing biases "in the rapidly expanding world of automated models and targeted digital advertising." ECF 28-1, at 31. Not so. Disparate-treatment claims are more than adequate to address any legitimate concerns related to alleged bias in the use of AI.

Lenders, of course, may not program AI models to make decisions based on protected characteristics or design or deploy such tools in a manner that operates as a proxy for those characteristics.

By contrast, Plaintiffs would wield disparate-impact liability to hold lenders liable for *inadvertent* biases in tools. As the CFPB explained, the specter of disparate-impact liability based on unknown algorithmic biases may thwart lenders from using AI tools altogether. 91 Fed. Reg. at 21,636. In this way, disparate-impact liability can *harm*, rather than benefit, underrepresented customers. Given their nature, even non-meritorious disparate-impact claims can be difficult to assess at early stages of a case, and the cost and burden of defending against such claims through years of litigation is high—to say nothing of the reputational and other harms that flow from unfounded charges of discrimination. *Watson*, 487 U.S. at 992-93.

Thus, contrary to Plaintiffs' suggestion, the Final Rule's interpretation that ECOA does not authorize disparate-impact suits will allow lenders to "experiment more," "improving operational flexibility and spurring innovation in the credit application process." 91 Fed. Reg. at 21660.

### C. The Final Rule promotes certainty for consumers and lenders alike.

Finally, Plaintiffs claim that the Final Rule "creates substantial legal uncertainty" by placing ECOA in tension with other state and federal laws. ECF 28-1, at 32 (citing industry association comment letters). They overlook, however, that the CFPB's Final Rule clarified that banks may continue "targeting specific geographies or income levels for CRA [Community Reinvestment Act] or other purposes"—*e.g.*, lending to "majority-minority and low-to-moderate income census tract designations that numerous Federal

agencies use," consistent with applicable law. 91 Fed. Reg. at 21653. Although the CRA does not require an assessment of a bank's lending based on race or other prohibited bases, it does require an assessment of a bank's "record of meeting the credit needs of its entire community, including low- and moderate-income neighborhoods." 12 U.S.C. § 2903(a)(1). Similarly, the Bureau explained that targeted marketing to underserved groups does not violate the discouragement prohibition, stating that "affirmatively encouraging one group of consumers to apply for credit does not discourage others who were not the intended recipients of the message" and that "[t]argeted advertising and outreach to underserved populations can improve access to credit and advance the purpose of ECOA." 91 Fed. Reg. at 21647.

Plaintiffs also insist that the CFPB should have taken no position on the right reading of ECOA. ECF 28-1, at 33-34. But that would not be sound. "[B]ecause Regulation B contained a contrary interpretation" for many years, it was "necessary and appropriate" to "clarify" the statute's best reading. 91 Fed. Reg. at 21636. Openly aligning Regulation B with the correct reading could not be arbitrary and capricious.

## III. IF THE COURT VACATES AS TO DISCOURAGEMENT OR SPCPs, IT SHOULD LEAVE THE DISPARATE-IMPACT PROVISION IN FORCE.

If the Court concludes that either of the Final Rule's other provisions, addressing discouragement and SPCPs, is invalid, it should vacate only those portions, leaving the disparate-impact provision intact.

An "agency action" may be "the whole *or* a part of an agency rule." 5 U.S.C. § 551(13). Thus, when a court finds only part of an agency rule invalid, it may, under two conditions, "sever" and "set[] aside only the offending parts." *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019). "First, the court must find that the agency

would have adopted the same disposition regarding the unchallenged portion of the regulation if the challenged portion were subtracted." *Id.* (cleaned up). Second, the remaining parts "must be able to function sensibly without the stricken provision." *Id.* (quotation omitted).

Both conditions are met here. The CFPB "clearly intends that the regulation be treated as severable, to the extent possible, for it said so in adopting the regulation." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *see* 91 Fed. Reg. at 21,668 ("The Bureau intends that the provisions of the final rule are separate and severable from one another."). The disparate-impact provision also "function[s] entirely independently" of the others: It does not "reference[]" or "rel[y] on" the CFPB's conclusions as to discouragement or SPCPs "in any way," *World Shipping Council v. Fed. Mar. Comm'n*, 152 F.4th 215, 225 (D.C. Cir. 2025), and the CFPB "analyzed" all three issues "separate[ly]," *Carlson*, 938 F.3d at 352.

## CONCLUSION

The Court should uphold the Final Rule's interpretation that ECOA does not authorize disparate-impact liability.

Dated: November 17, 2026

Respectfully submitted,

*/s/ Brinton Lucas*

Alexander V. Maugeri (N.Y. Bar No. 5062666)*
JONES DAY
250 Vesey Street
New York, NY 10281-1047
(212) 326-3939
amaugeri@jonesday.com

Brinton Lucas (D.C. Bar No. 1015185)
Hannah Templin (D.C. Bar No. 90033674)*
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001-2113
(202) 879-3686
blucas@jonesday.com
htemplin@jonesday.com

*Seeking admission *pro hac vice*

*Counsel for* Amici Curiae

## CERTIFICATE OF COMPLIANCE

This *amicus* brief complies with the type-volume limit of Local Rule 7(o)(4) because it is 25 or fewer pages.

This *amicus* brief complies with the typeface and type-style requirements of Rule 5.1(d) because it has been prepared in a proportionally spaced typeface using Microsoft Word with Georgia in size 12 font.

Dated: November 17, 2026

Respectfully submitted,

*/s/ Brinton Lucas*

Alexander V. Maugeri (N.Y. Bar No. 5062666)*
JONES DAY
250 Vesey Street
New York, NY 10281-1047
(212) 326-3939
amaugeri@jonesday.com

Brinton Lucas (D.C. Bar No. 1015185)
Hannah Templin (D.C. Bar No. 90033674)*
JONES DAY
51 Louisiana Ave., N.W.
Washington, DC 20001-2113
(202) 879-3686
blucas@jonesday.com
htemplin@jonesday.com

*Seeking admission *pro hac vice*

*Counsel for* Amici Curiae